UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

JEAN ROBERT SAINT-JEAN and EDITH
SAINT-JEAN,

                  Plaintiffs,

            -v-

EMIGRANT MORTGAGE COMPANY,

                Defendants.

--------------------------------------------------------X

Index No. 11-CV-2122

The Honorable Sterling Johnson, Jr.

# MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS COMPLAINT

David A. Scheffel, Esq.
Eric B. Epstein, Esq.
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019-6119
(212) 735-0799

*Attorneys for Defendant*
*Emigrant Mortgage Company*

**TABLE OF CONTENTS**

Table of Authorities ................................................................................................. iii

I.    INTRODUCTION ........................................................................................ 1

II.   PLAINTIFFS' ALLEGATIONS ............................................................... 4

      A.   The Parties ..................................................................................... 4

      B.   The NINA Loan Program .............................................................. 4

           1.   The NINA Loan Program Allowed Homeowners With Non-Traditional Financial Histories to Qualify for Refinancing Loans ....................................................................................... 4

           2.   The NINA Loan Program Did Not Include Any Terms or Conditions That Discriminated on the Basis of Race .................... 5

           3.   Federal Regulators Commended the NINA Loan Program and Determined that Emigrant Bank's Loan Programs Complied With All Antidiscrimination Laws .................................................. 5

           4.   EMC Typically Retained Ownership of NINA Loans Rather than Securitizing Those Loans ........................................................ 7

           5.   Plaintiffs Allege, and Object to, a High Degree of Minority Participation in the Federally-Approved NINA Loan Program ...... 7

      C.   Plaintiffs' NINA Loan ................................................................. 8

III.  THE FORECLOSURE PROCEEDING AGAINST PLAINTIFFS AND THE COMMENCEMENT OF THIS ACTION ........................................... 10

IV.   ARGUMENT ............................................................................................ 11

      A.   A Complaint That Fails to State a "Plausible Claim for Relief" Must Be Dismissed ........................................................................... 11

      B.   Plaintiffs' Claims are Barred under the Applicable Statutes of Limitations ....................................................................................... 11

           1.   Plaintiffs Have Brought Their Claims Outside of the Applicable Statute of Limitations Periods .................................... 11

           2.   Plaintiffs' Attempt to Invoke the Discovery Rule is Unavailing .. 12

      C.   The Complaint Fails to State a Plausible Claim That EMC Committed Lending Discrimination or Violated TILA .............................. 15

1.    The Complaint Does Not State a Plausible Claim That EMC Committed Lending Discrimination ............................................. 15

a)    The Complaint Fails to Allege Facts Satisfying the Third Element of a Reverse Redlining Claim ................... 17

b)    The Complaint Fails to Allege Facts Satisfying the Fourth Element of a Reverse Redlining Claim ................ 19

2.    The Complaint Does Not State a Plausible Claim That EMC Violated TILA ............................................................................. 22

V.    CONCLUSION ................................................................................. 23

## **TABLE OF AUTHORITIES**

### **Cases**

*Archer v. Nissan Motor Acceptance Corp.*, 550 F.3d 508 (5th Cir. 2008) .......................13

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .........................................................................11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................11, 16

*Brown v. Coach Stores, Inc.*, 163 F.3d 706 (2d Cir. 1998)..........................................20, 21

*In re Divittorio*, No. 09-1089, 2009 WL 2246138 (Bankr. D.Mass. Jul. 23, 2009) ....18, 22

*EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292 (7th Cir. 1991) ................20, 21

*Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922 (2d Cir. 1998)............................4 n. 1

*Guilbert v. Gardner*, 480 F.3d 140 (2d Cir. 2007) ..........................................................14

*Hack v. President & Fellows of Yale College*, 237 F.3d 81 (2d Cir. 2000),
    *cert. denied* 534 U.S. 888 (2001).........................................................................20, 21

*Hales v. HSBC Bank U.S.A., N.A.*, 347 Fed. Appx. 698 (2d Cir. 2009) ............................14

*Holloway v. King*, 161 Fed. Appx. 122 (2d Cir. 2005)................................................6 n. 2

*Kennedy v. Related Mgm't*, No. 08 Civ. 3969, 2009 WL 2222530
    (S.D.N.Y. Jul. 23, 2009) ...........................................................................................16

*Kronish v. U.S.*, 150 F.3d 112 (2d Cir. 1998) ...................................................................14

*McAllister v. Queens Borough Public Library*,
    309 Fed. Appx. 457 (2d Cir. 2009)........................................................................ 14-15

*Morris v. Broadridge Fin. Servs., Inc.*, No. 10-CV-1707,
    2010 WL 5187669 (E.D.N.Y. Dec. 14, 2010) ..........................................................15

*Morse v. Univ. of Vermont*, 973 F.2d 122 (2d Cir. 1992)................................................15

*Lee v. Bd. of Governors of the Federal Reserve System*,
    118 F.3d 905 (2d Cir. 1997).................................................................................17, 19

*Ng v. HSBC Mortg. Corp.*, No. 07-CV-5434, 2010 WL 889256
    (E.D.N.Y. Mar. 10, 2010) .........................................................................................16

*Powell v. Am. Gen. Fin., Inc.*, 310 F. Supp.2d 481 (N.D.N.Y. 2004) .......................17, 19

*Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293 (2d Cir. 1998)................19

*Thompson v. Mountain Peak Assocs., LLC*, No. 2:05-CV-145,
    2006 WL 1582126 (D.Nev. Jun. 5, 2006)....................................................13

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001).......................................................13

*Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003) .................19, 20, 21

*Williams v. 2000 Homes Inc.*, No. 09-CV-16, 2009 WL 2252528
    (E.D.N.Y. Jul. 29, 2009) ............................................................................16

*Woodworth v. Bank of Am., Nat'l Ass'n*, No. 09-3058, 2011 WL 1540358
    (Dr. Or.  Mar. 23, 2011) ............................................................................16

## **Statutes and Regulations**

3 N.Y.C.R.R. § 41.1.....................................................................................18

Community Reinvestment Act .....................................................................5, 6

Equal Credit Opportunity Act .............................................................. *passim*

Fair Housing Act................................................................................. *passim*

Rule 12 of the Federal Rules of Civil Procedure ............................................1

New York Civil Practice Law and Rules § 214(2)  ........................................12

New York State Executive Law...............................................................2, 12, 16

New York City Administrative Code ....................................................2, 12, 16

Truth in Lending Act ......................................................................... *passim*

Defendant Emigrant Mortgage Company ("EMC") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint under Rule 12 of the Federal Rules of Civil Procedure ("FRCP").  As set forth in detail below, the Court should dismiss the Complaint for two independent reasons.  First, Plaintiffs' claims are barred by the applicable statutes of limitations.  Second, the Complaint fails to allege facts sufficient to state a plausible claim that EMC violated the laws at issue in this case.

I.  <u>INTRODUCTION</u>

Over three years ago, Plaintiffs had an overdue water bill of over $20,000 and an overdue gas bill of $16,000.  Plaintiffs also had an extraordinarily poor credit history, with credit scores in the 500s, and owed approximately $255,000 on their mortgage.

Wishing to refinance their mortgage in order to obtain cash and pay off their debts, Plaintiffs contacted a mortgage broker with whom they were previously acquainted.  Through that mortgage broker, Plaintiffs obtained a $370,000 refinancing loan from EMC on January 10, 2008.

Plaintiffs obtained their refinancing loan under EMC's no-income-no-asset ("NINA") loan program.  Under that program, an individual could qualify for a loan without providing documentation of her income or assets.  Federal regulators have consistently praised the NINA loan program in connection with Federal policy encouraging the extension of credit opportunities on flexible terms and conditions to individuals with poor credit histories.  Unfortunately, in order to obtain a larger loan, Plaintiffs grossly inflated their income, specifically by misstating their income to be over $102,000 when it was actually $66,000.

Through their refinancing loan from EMC, Plaintiffs extinguished many of their personal debts and obtained $66,494.30 in cash.  However, over the following six

months, Plaintiffs depleted that cash and then defaulted on their loan.  Since then – for the past two years – Plaintiffs have made no payments whatsoever under their loan.

As a result of Plaintiffs' default on their loan, EMC brought a foreclosure action against Plaintiffs.  Plaintiffs are represented in that foreclosure action by South Brooklyn Legal Services, the same law office that represents Plaintiffs in this case, and have advanced multiple defenses to foreclosure, as well as counterclaims against EMC, in that foreclosure action.  That foreclosure action remains pending today.

Now, over three years after Plaintiffs' loan transaction with EMC and one year after the commencement of the foreclosure action stemming from Plaintiffs' loan default, Plaintiffs have commenced the instant action.  This action advances claims against EMC that Plaintiffs could have alleged long ago among their counterclaims in the foreclosure action.  The Complaint does not offer any explanation as to why Plaintiffs have chosen to bring these claims at this late stage.

Plaintiffs advance two categories of claims in this action.  Plaintiffs first contend that the Federally-approved NINA loan program under which they obtained their loan from EMC somehow had the effect of discriminating against minorities in the City of New York.  Plaintiffs advance this claim under the Fair Housing Act ("FHA"), Equal Credit Opportunity Act ("ECOA"), New York State Executive Law, and New York City Administrative Code.  Second, Plaintiffs contend that the disclosures provided by EMC in connection with the loan transaction violated the Federal Truth in Lending Act ("TILA"), principally in that these disclosures purportedly did not make clear the consequences that Plaintiffs would face if they failed to make payments under the loan.

The Court should dismiss these claims for two independent reasons.  First, these claims are time barred.  Plaintiffs' FHA and ECOA claims are subject to a two-year statute of limitations; Plaintiffs' state-law claims are subject to a three-year statute of limitations; and Plaintiffs' TILA claim is subject to a statute of limitations of one year with respect to Plaintiff's claim for damages, and three years with respect to Plaintiffs' claim for rescission on the ground of improper disclosures.  Plaintiffs have brought all of these claims well over three years after their refinancing transaction with EMC and, therefore, well outside the applicable statute of limitations periods.  *See infra* Point IV.B.

Second, the Complaint fails to allege facts stating a plausible claim that EMC violated the lending laws at issue in this case.  With respect to Plaintiffs' discrimination claims, the Complaint does not allege facts stating a plausible claim that the Federally-approved NINA loan program had an illegal, discriminatory impact on minorities.  To the contrary, it is undisputed that the NINA loan program offered loans on the same terms and conditions to all similarly situated applicants, regardless of their race.  With respect to Plaintiffs' TILA claim, the Complaint is legally insufficient because (1) TILA applies only to transactions concerning a person's principal dwelling, and it does not appear that the residence in question here was the principal dwelling of Mr. Saint-Jean, and (2) the facts alleged in the Complaint do not indicate that EMC violated any of the requirements of TILA.  *See infra* Point IV.C.

For these reasons, and for the reasons stated below, the Court should dismiss the Complaint in its entirety.

II.  PLAINTIFFS' ALLEGATIONS

    A.  The Parties

Plaintiffs, black and Haitian-American individuals, allege that they are married and reside together at 1145 East 80th Street, Brooklyn, New York 11236, in the Canarsie neighborhood.  Compl. ¶¶ 6-7.  They describe this address as their "principal dwelling." *Id*. ¶ 120.  In fact, however, Mr. Saint-Jean has indicated on his Federal income tax returns that he resides at a different address: 1376 East 37th Street, Brooklyn, New York 11210.  *See* Scheffel Dec. Ex. A.[1]

EMC is a mortgage lender incorporated in the State of New York, with its principal place of business in Elmsford, New York.  Compl. ¶ 7.  EMC administered the NINA loan program referred to in the Complaint.  *Id*. ¶ 1.

EMC's parent company is Emigrant Bank.  Compl. ¶ 15.  Founded in 1850, Emigrant Bank is the oldest savings bank in the City of New York and the largest privately owned bank in the United States.  *Id*. ¶ 15.

    B.  The NINA Loan Program

        1.  The NINA Loan Program Allowed Homeowners With Non-Traditional Financial Histories to Qualify for Refinancing Loans

The NINA loan program made home mortgage refinancing loans available to individuals without requiring them to "demonstrate or state their income."  Compl. ¶ 16. EMC determined an applicant's eligibility for a NINA loan on the basis of, among other things, "careful, accurate appraisals" of the "borrower's home equity."  *Id*. ¶ 26.

---

[1]    In deciding a motion to dismiss, a Court may consider evidence outside the pleadings when it is relevant to a party's standing.  *See Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998).  Here, as discussed below, Mr. Saint-Jean's residence is relevant to standing because the Federal Truth in Lending Act applies only to certain transactions concerning a person's "principal dwelling."  *See* 15 U.S.C. § 1635(e).  The Court therefore may consider Mr. Saint-Jean's Federal income tax returns in that regard.  *See Filetech*, 157 F.3d at 932.

NINA loans were available to certain "borrowers with extremely low credit scores," provided they had "sufficient equity in the home." Compl. ¶ 22. When an applicant for a NINA loan had an unusually low credit score, EMC often charged the applicant "a higher interest rate." *Id.*

At the time in question in the Complaint, NINA loans also often included, in addition to an initial interest rate, an 18 percent "default" rate. Compl. ¶¶ 3, 25. This "default" rate would activate only in the event that a borrower failed to make one or more payments; it otherwise had no effect on the interest charged under a NINA loan. *Id.*

      2.  The NINA Loan Program Did Not Include Any Terms or Conditions That Discriminated on the Basis of Race

It is undisputed that the NINA loan program did not include any terms or conditions that discriminated against applicants or borrowers on the basis of race. Compl. ¶ 35. As Plaintiffs concede, the NINA loan program was "facially neutral." *Id.*

      3.  Federal Regulators Commended the NINA Loan Program and Determined that Emigrant Bank's Loan Programs Complied With All Antidiscrimination Laws

Federal law encourages large lending institutions such as Emigrant Bank to make efforts to extend credit on flexible terms to individuals who otherwise may be ineligible for conventional credit due to poor credit histories. *See* Federal Community Reinvestment Act ("CRA"), 12 U.S.C. § 2901 *et seq.*; Federal Deposit Insurance Corporation ("FDIC") CRA regulations, 12 C.F.R. § 345.11 *et seq.* The FDIC regularly evaluates lenders' compliance with this Federal policy, and the FDIC must "take this record into account in the agency's evaluation of an application for a deposit facility by the institution." *See* 12 C.F.R. § 345.11(b).

As the Complaint indicates, the FDIC regularly conducted such evaluations of Emigrant Bank's compliance with the CRA. *See* Compl. page 6, footnote 1. Such evaluations, entitled "Community Reinvestment Act Performance Evaluations," are attached to the Scheffel Dec. as Exs. B-F.[2] In those evaluations, the FDIC consistently found that Emigrant Bank had complied fully with the CRA, and praised the NINA loan program in that regard. *See*, *e.g.*, 2006 CRA Performance Evaluation (Scheffel Dec. Ex. F) at 14-16.

Specifically, the FDIC praised Emigrant Bank's reduced-documentation and no-documentation loan programs, such as the NINA loan program, as "innovative and flexible" products that allowed individuals with "non-traditional financial histories" to qualify for mortgage loans. *See*, *e.g.*, 2006 CRA Performance Evaluation (Scheffel Dec. Ex. F), at 14-16. The FDIC commended these loan programs for placing "the underwriting emphasis on a low loan-to-value ratio rather than credit history, income verification, etc. As a result, applicants with poor or no credit history may be approved for this mortgage based upon the amount of equity they invest in the property." *Id*. at 16. The FDIC characterized these loan programs as meeting "the specific credit needs of [Emigrant Bank's] community," specifically by increasing "home ownership opportunities for prospective borrowers of low- and moderate-income who would not qualify for conventional financing." *Id*. at 14.

The FDIC also found that Emigrant Bank's loan programs complied with all anti-discrimination laws. *See*, *e.g.*, 2006 CRA Performance Evaluation (Scheffel Dec. Ex. F),

---

[2]    In deciding a motion to dismiss, a Court may consider documents relied upon in a complaint. *Holloway v. King*, 161 Fed. Appx. 122, 124 (2d Cir. 2005). In this case, the Complaint relies upon the Community Reinvestment Act Evaluations (*see* Compl. page 6, footnote 1), and the Court therefore may consider those documents.

at 24 (noting that "Emigrant's policies, procedures, and training, designed to prevent discriminatory or other illegal credit practices, were reviewed.  No substantive violations of the antidiscrimination laws and regulations were identified during this evaluation.").

### 4. EMC Typically Retained Ownership of NINA Loans Rather than Securitizing Those Loans

EMC retains ownership of the "vast majority" of the loans that it originates, rather than selling its loans on the secondary mortgage market.  Compl. ¶ 24.  In particular, EMC retained ownership of the "vast majority" of the loans it extended under the NINA loan program at issue in this case, including the specific NINA loan that EMC extended to the Saint-Jeans.  *Id.*  Therefore, EMC had significant financial exposure if borrowers defaulted on NINA loans and had a financial interest in seeing its borrowers successfully repay their loans rather than go into default.

### 5. Plaintiffs Allege, and Object to, a High Degree of Minority Participation in the Federally-Approved NINA Loan Program

Plaintiffs contend in broad terms that the loan program at issue in this case had a "discriminatory impact" on minorities.  Compl. ¶ 35.  However, Plaintiffs do not describe any specific, discriminatory policies or practices associated with that loan program.  Plaintiffs do not allege that the loan program either barred or targeted minorities, or that it treated minority applicants or borrowers differently than it treated similarly-situated, non-minority applicants or borrowers.  *See id.*

Instead, the Complaint alleges that a "discriminatory impact" occurred in the sense that minorities were represented in high numbers in the population of individuals who participated in the NINA loan program.  Compl. ¶ 40.  The Complaint alleges that this high degree of minority participation in the NINA loan program occurred because, in the general population of the City of New York, a disproportionate number of minorities

had low credit scores and, consequently, were represented in the population of applicants for and borrowers of NINA loans.  Compl. ¶¶ 1, 2, 37-38.

Plaintiffs also object to two aspects of the NINA loan program:  (1) that some NINA loans were "high cost," a term which Plaintiffs define as loans in which the interest rate was "a difference of at least five basis points above the going 'Prime' interest rate,'" and (2) that some NINA loans contained an 18 percent "default" rate that went into effect only if a borrower missed one or more payments.  *See* Compl. ¶¶ 20 and 25.

C.  Plaintiffs' NINA Loan

Plaintiffs obtained the home mortgage refinancing loan at issue in this case (the "Loan") by contacting a mortgage broker who was located in Queens and who was an "acquaintance" of theirs.  Compl. ¶ 47.  Plaintiffs wanted to obtain a loan in order to "pay off their debts."  *Id*.

At that time, Plaintiffs "both had credit scores in the 500s."  Compl. ¶ 49.  Plaintiffs also had an overdue water bill of over $20,000, and an overdue gas bill of $16,000.  *Id*. ¶¶ 66, 67 and 73.  In addition, Plaintiffs "had a gross monthly income of approximately $5,500 and owed approximately $255,000 on their existing mortgage."  *Id*. ¶ 53.  Plaintiffs previously had refinanced their mortgage loan on one occasion; that transaction was not with EMC.  *Id*. ¶¶ 44-45.

Plaintiffs applied for and received a loan offer from EMC under the NINA loan program.  Compl. ¶¶ 52-55.  Plaintiffs accepted this offer, and the Loan transaction closed on January 10, 2008.  *Id*. ¶ 56.

Notably, as part of the Loan transaction at issue between EMC and Plaintiffs, Plaintiffs signed a document, entitled a "Resource Letter," setting forth in detail the monthly payments that Plaintiffs would be required to make under the loan, as well as the

8

income and other financial resources Plaintiffs would need to have in order to make those payments. *See* Compl. ¶ 69 (describing the Resource Letter); Scheffel Dec. Ex. G (attaching copy of Resource Letter). This Resource Letter advised Plaintiffs to seek a smaller loan if they did not have such income and financial resources. *See* Scheffel Dec. Ex. G. By signing this Resource Letter, Plaintiffs misrepresented to EMC that they had regular, dependable annual income of over $102,000 and that they therefore were capable of making the payments required under the loan, when, in fact, Plaintiffs' income at that time was $66,000. *See* Compl. ¶¶ 53 and 69, and Scheffel Dec. Ex. G.

The Loan was a $370,000 refinance loan with an initial interest rate of 11.75%. Compl. ¶ 63. The Loan allowed Plaintiffs to reduce this interest rate substantially by making regular, on-time payments. *Id*. ¶ 70.

The initial monthly payments under the Loan were $4,174, "including taxes and insurance." Compl. ¶ 66. Like many other EMC loans, the Loan had an 18 percent "default" interest rate. *Id*. ¶ 63. Plaintiffs reviewed their "closing papers" at the Loan closing, and in particular reviewed the Loan's interest rate; Plaintiffs then proceeded to sign all of the Loan documents. *Id*. ¶¶ 59, 63.

Plaintiffs received $66,494.30 in cash as a result of the Loan transaction. Compl. ¶ 73. They used $16,000 of this money to pay their overdue gas bill – their $20,000 water bill already had been paid by EMC as part of the Loan transaction – thus leaving Plaintiffs with over $50,000 in cash. *Id*.

Of the cash they received at closing, Plaintiffs spent approximately $27,500 "to make substantial repairs to their home." Compl. ¶ 73. By July, 2008, Plaintiffs already "had used most of the funds set aside from the loan closing." *Id*. ¶ 84. At this point –

9

approximately six months after the Loan transaction – Plaintiffs stopped making their Loan payments. *Id*. ¶ 84. As a result, the Loan's 18 percent default rate went into effect. *Id*. ¶ 85. Plaintiffs made no further payments under the Loan. *Id*. ¶¶ 85-86. Thus, Plaintiffs now have gone approximately two years without making any mortgage payments under the Loan.

III. THE FORECLOSURE PROCEEDING AGAINST PLAINTIFFS AND THE
     COMMENCEMENT OF THE INSTANT ACTION

Due to Plaintiffs' default under the Loan, EMC filed a foreclosure proceeding against Plaintiffs in Kings County Supreme Court (the "Foreclosure Proceeding"). Compl. ¶ 87. EMC commenced the Foreclosure Proceeding, by the filing of a Summons and Complaint, on March 23, 2009. *See* Scheffel Dec. Ex. H. Plaintiffs were personally served with the Summons and Complaint in the Foreclosure Proceeding on March 31, 2009. *See* Scheffel Dec. Ex. I.

On May 21, 2009, Plaintiffs answered the Complaint in the Foreclosure Proceeding and asserted counterclaims against EMC in that action. *See* Scheffel Dec. Ex. J. However, Plaintiffs claim that they "did not discover the discrimination underlying their loan until they consulted with an attorney in July of 2009." Compl. ¶ 88.

EMC and Plaintiffs have litigated the Foreclosure Proceeding through the present time; the case remains unresolved. On August 13, 2010, Plaintiffs, through their attorneys South Brooklyn Legal Services, the same law office that represents Plaintiffs in the instant action, amended their answer and counterclaims against EMC in the Foreclosure Proceeding. *See* Scheffel Dec. Ex. K. However, those amended counterclaims did not include the discrimination or TILA claims at issue in the instant action. *Id*. Plaintiffs subsequently commenced the instant action on April 29, 2011.

IV. <u>ARGUMENT</u>

    A. A Complaint That Fails to State a "Plausible Claim for Relief" Must Be
<u>Dismissed</u>

To withstand a motion to dismiss, "a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"
*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 555 (2007)). This standard requires "more than an unadorned, the-defendant-
unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949. A pleading that "tenders
naked assertions devoid of further factual enhancement" or offers only "labels and
conclusions" or a "formulaic recitation of the elements of a cause of action" fails to meet
this standard and must be dismissed. *Id.* Therefore, a complaint states a "plausible claim
for relief" only if the complaint contains "factual content that allows the court to draw the
reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949-
50. As described below, the Complaint does not contain factual content stating a
sufficient basis for relief under these pleading standards.

    B. <u>Plaintiffs' Claims are Barred under the Applicable Statutes of Limitations</u>

The Court should dismiss Plaintiffs' claims as time-barred. Plaintiffs have
brought these claims well beyond the applicable statute of limitation periods. Plaintiffs'
apparent attempt to avoid this statute of limitations bar by raising tolling arguments in the
Complaint is untenable.

    1. Plaintiffs Have Brought Their Claims Outside of the Applicable
<u>Statute of Limitations Periods</u>

Plaintiffs commenced this action long after the statutes of limitations periods
applicable to Plaintiffs' claims expired. Specifically:

- Plaintiffs' FHA claim is subject to a two-year statute of limitations. *See* 42 U.S.C. § 3613.

- Plaintiffs' EEOC claim also is subject to a two-year statute of limitations. *See* 15 U.S.C. § 1691e(f).

- Plaintiffs' TILA claim is subject to a one-year statute of limitations to the extent that Plaintiffs seek damages (15 U.S.C. § 1640(e)), and a three-year statute of limitations to the extent that Plaintiffs seek rescission of the Loan on the basis of allegedly insufficient or incomplete disclosures in connection with the Loan transaction (15 U.S.C. § 1635(f)).

- Under the New York Civil Practice Law and Rules ("CPLR") § 214(2), Plaintiffs' state-law, statutory claims – specifically, Plaintiffs claims under the New York State Executive Law § 296-a and Title 8 of the New York City Administrative Code – are subject to a three-year statute of limitations.

Each of Plaintiffs' claims is time-barred because the Loan transaction at issue in this case took place on January 10, 2008: over three years ago and thus outside of these statute of limitations periods. Compl. ¶ 56.

Notably, if the Court dismisses this case based on this statute of limitations bar, Plaintiffs still will have the opportunity to litigate the defenses to foreclosure and the counterclaims against EMC that Plaintiffs have advanced in the Foreclosure Proceeding.

2. Plaintiffs' Attempt to Invoke the Discovery Rule is Unavailing

As discussed, Plaintiffs plead that they did not "discover" the "discrimination underlying their loan until they consulted with an attorney in July of 2009." Compl. ¶ 88. This allegation is an apparent attempt by Plaintiffs to argue that their discrimination

claims were tolled for statute of limitations purposes until July of 2009.  This argument cannot salvage Plaintiffs' time-barred TILA claim because that claim is not based on alleged discrimination.

As to Plaintiffs' other claims, this argument is meritless for two independent reasons.  First, the legal principle under which certain claims may be tolled until the discovery of the underlying injury (hereinafter referred to as the "discovery rule") is inapplicable as a matter of law to the claims at issue in this case.  Second, even if the discovery rule were applicable to those claims, it did not delay the accrual of those claims until Plaintiffs' alleged discovery of discrimination in July of 2009.

With respect to the first point, the discovery rule does not apply to the FHA or the ECOA because the U.S. Supreme Court has held that Federal courts may not apply the discovery rule to a Federal statute when the language of the statute does not expressly contemplate the application of the discovery rule.  *TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001) (determining that the discovery rule is inapplicable to the statute of limitations in the Fair Credit Reporting Act because the statutory text does not call for the application of the discovery rule).  Under *TRW*, the discovery rule is inapplicable to the FHA and the ECOA because the text of those statutes does not expressly contemplate the tolling of a claim under those statutes on discovery grounds.  *See Archer v. Nissan Motor Acceptance Corp.*, 550 F.3d 508, 509 (5th Cir. 2008) (holding that, pursuant to *TRW*, the discovery rule does not apply to the ECOA); *Thompson v. Mountain Peak Assocs., LLC*, No. 2:05-CV-145, 2006 WL 1582126, at *3 (D.Nev. Jun. 5, 2006) (holding that, pursuant to *TRW*, the discovery rule does not apply to the FHA).

The discovery rule also is inapplicable to Plaintiffs' state law claims because the discovery rule does not exist under New York law. *See Hales v. HSBC Bank U.S.A., N.A.*, 347 Fed. Appx. 698, 699 (2d Cir. 2009) (rejecting an argument that, under New York law, the timing of a plaintiff's discovery of facts regarding a claim is relevant to determining when the claim accrued); *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) (noting that, under New York law, "[t]he plaintiff need not be aware of the breach or wrong to start the statute [of limitations] running.").

With respect to the second point, even if the discovery rule applied to the claims at issue in this case – which, as noted, it does not – the discovery rule still would be unavailing to Plaintiffs because it does not delay the accrual of a claim until a plaintiff fully appreciates the legal nature and factual underpinnings of the claim. *Kronish v. U.S.*, 150 F.3d 112, 121-22 (2d Cir. 1998). Rather, the discovery rule at most can delay the accrual of a claim until the plaintiff discovers or reasonably could discover his or her "injury" and who may have caused that injury. *Id.* Thus, under the discovery rule, "a plaintiff need not know each and every relevant fact of her injury or even that the injury implicates a cognizable legal claim. Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect herself by seeking legal advice." *Kronish*, 150 F.3d at 121.

Pursuant to these principles, discrimination claims, even under the discovery rule, generally accrue when the injury at issue takes place, even if the plaintiff does not learn until a later date that the injury may have resulted from discriminatory conduct. *McAllister v. Queens Borough Public Library*, 309 Fed. Appx. 457, 459 (2d Cir. 2009) (rejecting plaintiff's argument that he was "entitled to wait to file" a wrongful

termination claim "until he learned his termination was discriminatory").  *See also*

*Morse v. Univ. of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992) (holding that plaintiff's

claim that she was terminated as a master's degree candidate for discriminatory reasons

accrued at "the time of the discriminatory act," *i.e.*, at the time of her termination);

*Morris v. Broadridge Fin. Servs., Inc.*, No. 10-CV-1707, 2010 WL 5187669, at *3

(E.D.N.Y. Dec. 14, 2010) (Seybert, J.) (rejecting the argument that a discrimination claim

does not accrue until a plaintiff "realizes both the injury and the discriminatory animus

that caused it," and holding instead that such a claim accrues "at the time of Plaintiff's

injury, regardless of whether Plaintiff was aware of Defendants' allegedly discriminatory

motives.").

Accordingly, even if the Court applies the discovery rule here, Plaintiffs' claims

accrued upon the closing of the Loan transaction on January 10, 2008, because that is the

date on which Plaintiffs experienced the alleged injury at issue, namely the alleged

imposition on them of a loan with injurious terms and conditions.  The Court therefore

should dismiss the Complaint as time-barred.

C.  The Complaint Fails to State a Plausible Claim That EMC Committed
<u>Lending Discrimination or Violated TILA</u>

In addition to dismissing Plaintiffs' claims as time barred, the Court should

dismiss Plaintiffs' claims because the Complaint does not allege facts plausibly stating a

violation of discrimination laws or TILA.

1.  The Complaint Does Not State a Plausible Claim That EMC
<u>Committed Lending Discrimination</u>

Courts typically analyze all lending discrimination claims according to the same

substantive standard regardless of whether the claim is brought under the FHA, the

ECOA or comparable state and local statutes such as, in this case, the New York State

Executive Law and the New York City Administrative Code. *See Ng v. HSBC Mortg. Corp.*, No. 07-CV-5434, 2010 WL 889256, at **11-12 (E.D.N.Y. Mar. 10, 2010) (Mauskoph, J.); *Kennedy v. Related Mgm't*, No. 08 Civ. 3969, 2009 WL 2222530, at *8 (S.D.N.Y. Jul. 23, 2009).

In this case, Plaintiffs appear to frame their discrimination claim in terms of reverse redlining. Reverse redlining refers to discrimination in terms of "lending to a group of persons on less favorable terms than those borrowers would have received if they were outside that particular class of persons." *Ng*, 2010 WL 889256, at **11-12 (dismissing a reverse redlining claim as "overly general and too conclusory to comply with *Twombly* and *Iqbal*").

A reverse redlining claim must allege four necessary elements: "(1) plaintiff is a member of a protected class; (2) plaintiff applied for and was qualified for loans; (3) the loans were made on grossly unfavorable terms; and (4) the transaction was discriminatory.... The fourth element may be satisfied by allegations of discriminatory intent, i.e., that 'the lender intentionally targeted [plaintiff] for unfair loans on the basis of' protected status; of disparate treatment, i.e., 'that the lender continues to provide loans to other applicants with similar qualifications, but on significantly more favorable terms'; or of disparate impact on the protected class." *Williams v. 2000 Homes Inc.*, No. 09-CV-16, 2009 WL 2252528, at *5 (E.D.N.Y. Jul. 29, 2009) (Gleeson, J.) (dismissing reverse redlining claim). *Accord Woodworth v. Bank of Am., Nat'l Ass'n*, No. 09-3058, 2011 WL 1540358, at *19 (Dr. Or. Mar. 23, 2011) (dismissing a reverse redlining claim that failed to allege facts plausibly suggesting "that discriminatory animus motivated the

16

defendants' conduct.").  Here, the Complaint is legally insufficient with respect to the third and fourth elements of a reverse redlining claim.

a)  The Complaint Fails to Allege Facts Satisfying the Third<br>Element of a Reverse Redlining Claim

With respect to the third necessary element of a reverse redlining claim, the Complaint contains no factual content plausibly suggesting that the loan program at issue involved grossly unfavorably terms.  Plaintiffs' conclusory allegation that the loan program at issue was "abusive" (Compl. ¶ 1) – a term that Plaintiffs do not define or elaborate upon in the Complaint – is insufficient.  Moreover, Plaintiffs' critique of the terms of the loan program is legally groundless for three specific, independent reasons.

First, in a lending discrimination case, an allegation that a lending policy imposes terms that contradict Federal law lacks plausibility where, as here, the policy in fact has been approved under Federal law.  *See Lee v. Bd. of Governors of the Federal Reserve System*, 118 F.3d 905, 916 (2d Cir. 1997) (finding a disparate impact claim in the lending context to be groundless where the policy at issue was "expressly permitted" by regulators); *Powell v. Am. Gen. Fin., Inc.*, 310 F. Supp.2d 481, 488 (N.D.N.Y. 2004) (dismissing disparate impact claim where "ECOA regulations explicitly permit lenders to use race-blind factors such as credit histories and income levels when determining whether to extend credit.").  Therefore, Plaintiffs' broad allegation that the NINA loan program involved "abusive" terms inconsistent with Federal law (*see* Compl. ¶ 1) is untenable given that, as reflected in the documents cited in the Complaint, Federal regulators consistently praised the program after giving it careful scrutiny under Federal law.  *See* Compl. page 6, footnote 1.  *See also* Scheffel Dec. Exs. B-F.

17

Second, Plaintiffs' argument that the Loan at issue in this case was "high cost" (Compl. ¶ 20) is incorrect. Plaintiffs define "high cost" as "a difference of at least five basis points above the going 'Prime' interest rate." *Id.* Under New York law, however, a "high cost" loan is a loan that, among other things, has both (1) a principal amount of less than $300,000 and (2) an APR that "will exceed by more than eight percentage points the yield on United States Treasury securities having comparable periods of maturity...." *See* 3 N.Y.C.R.R. § 41.1. The Loan fails both of those tests: the Loan involved a principal amount of more than $300,000, and did not entail an APR more than eight percentage points above the U.S. Treasury rate at the time of the loan transaction. The Loan therefore was not "high cost" under New York law. *See also* 1635 U.S.C. § 1601(a)(a) (setting forth the similar, Federal definition of a "high cost" loan, which the Loan at issue in this case also does not satisfy).

Third, under applicable case law, Plaintiffs' objection to the inclusion in the Loan of a "default" rate of interest (*see* Compl. ¶ 4) – which would take effect only in the event that Plaintiffs failed to make their required payments under the Loan – is groundless. Thus, in *In re Divittorio*, No. 09-1089, 2009 WL 2246138, at *10 (Bankr. D.Mass. Jul. 23, 2009), the Court rejected an argument that a lender violated applicable law when the lender, in calculating the APR of a loan in connection with the loan closing, gave no weight to the possibility of borrower default and the potential effect that such default would have on the borrower's rate of interest. As the Court held in reaching that conclusion: "The Debtor spills much ink arguing the statistical unreasonableness of assuming that a sub-prime borrower such as the Debtor would make twenty-two timely payments and as such, his argument largely collapses into a tirade against the sub-prime

18

mortgage loans and the availability of loan products with exotic features such as the Reduction Feature.... [However], it is not unreasonable for a lender to assume that a borrower will make timely payments.  That is no more than what the borrower agrees to do when he signs a note and mortgage."  *Id*. at *10.

> b)  The Complaint Fails to Allege Facts Satisfying the Fourth Element of a Reverse Redlining Claim

With respect to the fourth necessary element of a reverse redlining claim, Plaintiffs' allegation that the loan program at issue had a disparate impact on minorities is not legally viable, for two independent reasons.

First, as discussed above (*see supra* Point IV(C)(1)(a)), Second Circuit case law indicates that a disparate impact claim in the lending context is not viable where, as in this case, the loan program at issue has been approved under Federal law.  *See Lee*, 118 F.3d at 916, *supra*.  *See also Powell*, 310 F. Supp.2d at 488, *supra*.

Second, Plaintiffs' disparate impact theory is based on the degree of minority participation in the loan program.  As explained below, this argument is insufficient to show illegal discrimination.

"Under disparate impact analysis, 'a prima facie case is established by showing that the challenged practice of the defendant actually or predictably results in . . . discrimination.'"  *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 302 (2d Cir. 1998) (affirming dismissal of disparate impact claim).  In particular, the plaintiff must demonstrate: "'(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'"  *Tsombanidis v. West Haven Fire*

*Dep't*, 352 F.3d 565, 575 (2d Cir. 2003) (finding that plaintiffs failed to plausibly allege a *prima face* case of disparate impact).

In a disparate impact case, it is "insufficient" merely to allege a "bottom line racial imbalance" in a particular population of individuals, such as the members of a workforce or the participants in a loan program. *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998) (affirming the dismissal of a disparate impact claim where plaintiff's claim was based solely on the degree of minority participation in the workforce). *Accord EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292, 305 (7th Cir. 1991) (a "plaintiff does not make out a case of disparate impact simply by showing that, 'at the bottom line', there is a racial imbalance.").

Instead, a disparate impact claim must proceed by identifying "appropriate comparison groups" that demonstrate an unlawful, discriminatory result. *Tsombanidis*, 352 F.3d at 576-7. Plaintiffs "must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy." *Id*. This comparison "must reveal that although neutral, the policy in question imposes a 'significantly adverse or disproportionate impact' on a protected group of individuals." *Id*. at 575.

Plaintiffs must show the alleged disparate impact with "statistical evidence" or a comparable "analytical method." *Tsombanidis*, 352 F.3d at 575-7. "Although there may be cases where statistics are not necessary, there must be some analytical mechanism to determine disproportionate impact." *Id*. at 576.

A disparate impact claim that fails to satisfy this standard by alleging "facts sufficient to constitute disparate impact discrimination" must be dismissed. *Hack v.*

*President & Fellows of Yale College*, 237 F.3d 81, 90-91 (2d Cir. 2000), *cert. denied* 534 U.S. 888 (2001) (affirming dismissal of an FHA disparate impact claim under FRCP 12(b)(6)).  A court "cannot read into [a plaintiff's] complaint the missing allegations crucial to a disparate impact claim because a Rule 12(b)(6) motion tests the adequacy of the complaint... not the briefs."  *Id*.

    In this case, the Complaint does not include facts stating a plausible claim that the alleged loan program had an unlawful disparate impact on minorities.  For example, the Complaint does not set forth statistics comparing the impact that the EMC loan program at issue had on minorities to the impact the program had on similarly situated non-minorities.  *See Tsombanidis*, 352 F.3d at 575 ("The basis for a successful disparate impact claim involves a comparison between two groups - those affected and those unaffected by the facially neutral policy.").  This is a fatal flaw.

    Instead, the Complaint quotes various data in order to allege a high degree of minority participation in the loan program.  *See* Compl. ¶ 40.  However, as discussed, such an alleged "bottom line racial imbalance" is insufficient to state a disparate impact claim.  *Brown*, 163 F.3d at 712; *Chicago Miniature Lamp Works*, 947 F.2d at 305.  Moreover, based on the facts pled in the Complaint, this alleged imbalance is not a function of any discriminatory policy or practice by EMC but rather is due to the percentage of minorities among the population of the City of New York with low credit scores.  *See* Compl. ¶ 37.

    Accordingly, the discrimination claims set forth in the Complaint are insufficient and must be dismissed.

2. **The Complaint Does Not State a Plausible Claim That EMC Violated** TILA

For two independent reasons, the Complaint fails to state a claim that EMC violated TILA. First, TILA applies only to certain transactions relating to a person's "principal dwelling." *See* 15 U.S.C. § 1635(e). As discussed, Mr. Saint-Jean has claimed on Federal tax returns to reside at an address other than that secured by the Loan transaction at issue in this case. This casts doubt on Plaintiffs' standing to asset a TILA claim regarding that transaction.

Second, the essence of Plaintiffs' TILA claim is Plaintiffs' allegation that EMC's TILA disclosures were faulty in that they did not give weight to the possibility that Plaintiffs would default on the Loan and that Plaintiffs thereby would trigger the Loan's 18 percent default rate. *See* Compl. ¶ 123. As discussed, however, relevant case law indicates that such an argument lacks any basis. *In re Divittorio*, 2009 WL 2246138, at *10 (finding that a lender need not consider the possibility of borrower default when calculating an APR because "it is not unreasonable for a lender to assume that a borrower will make timely payments.").

22

V.  <u>CONCLUSION</u>

For the reasons above, EMC respectfully requests that the Court dismiss the

Complaint in its entirety.

Dated: June 8, 2011                          Respectfully submitted,

                                             DORSEY & WHITNEY LLP


                                             <u>/s/ David A. Scheffel</u>
                                             David A. Scheffel
                                             Eric B. Epstein
                                             51 West 52nd Street
                                             New York, NY 10019-6119

                                             *Attorneys for Defendant*
                                             *Emigrant Mortgage Company*