

July 6, 2012

Hon. James Orenstein
United States Magistrate Judge
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

>           **Re:**    ***Saint-Jean v. Emigrant Mortgage Company***, **11-cv-2122 (SJ)(JO)**

Dear Judge Orenstein:

  The Center for Responsible Lending and South Brooklyn Legal Services represent the Plaintiffs in the above-referenced action. Plaintiffs allege that from 2005 through 2009, Emigrant Mortgage Company (hereinafter Emigrant) aggressively originated highly-abusive, high cost home loans to minority homeowners with low credit scores and significant equity in violation of the Fair Housing Act (FHA), the Equal Credit Opportunity Act (ECOA), the Truth in Lending Act (TILA), and various state and local civil rights laws.

  Consistent with this Court's orders of June 5 and 13, 2012, the parties filed simultaneous discovery motions on June 22, 2012: Plaintiffs' Letter Motion to Compel (Dkt No. 60) (hereinafter Plaintiffs' Motion), and Defendant's Motion for a Protective Order and to Compel Documents and Memorandum in Support (Dkt Nos. 55 & 56) (hereinafter Emigrant's Motion or Defendant's Motion). Because Plaintiffs' Motion comprehensively addresses many of the same matters also raised by Defendant's Motion, Plaintiffs hereby incorporate by reference their June 22 Motion to Compel into this response. In the remainder of this letter, Plaintiffs address those issues specifically raised by Defendant's Motion.

## I.  EMIGRANT'S MOTION FOR PROTECTIVE ORDER

  A.  Plaintiffs' Request for Loan Level Account Data – Document Request Number 23

  Emigrant argues that production of Loan Level Account Data should be limited solely to borrowers' race and ethnicity. Rather than addressing the applicable discovery standard, however, Emigrant supports its assertions by offering yet another attack on the sufficiency of Plaintiffs' discrimination and Truth in Lending claims, circuitously claiming that any additional discovery sought by Plaintiffs is irrelevant. As explained in Plaintiffs' Motion, the Loan Level Account Data that Plaintiffs requested is both highly relevant and not remotely burdensome to produce. Plaintiffs therefore respectfully request that this Court grant Plaintiffs' Motion as provided in the accompanying draft order.

  "Courts place a strict burden on a party resisting discovery . . . . [A]n objection to a document request must clearly set forth the specifics of the objection and how that objection relates to the documents being demanded. The burden is on the party resisting discovery to

clarify and explain precisely why its objections are proper given the broad and liberal construction of the discovery rules found in the Federal Rules of Civil Procedure." *Member Services, Inc. v. Security Mut. Life Ins.*, Civ. No. 06-1164, 2007 WL 2907520, at *4 (N.D.N.Y. Oct 3, 2007). To successfully resist production of information sought in discovery, Emigrant must show that any "specific discovery request is so far outside of the liberal standard of relevance as to warrant relief." *Chevron Corp. v. Aguinda Salazar*, Civ. No. 11-3718, 2011 WL 2207555, at *3 (S.D.N.Y. June 2, 2011).

Emigrant's belief that Plaintiffs' claims lack merit is not a valid basis for refusing to produce otherwise relevant discovery. *See Spencer v. Int'l Shoppes, Inc.*, 06-cv-2637, 2011 WL 3625582, at * 2 (E.D.N.Y. Aug. 16, 2011) (contentions about a party's likely success on the merits, or lack thereof, is not a proper consideration in determining the proper scope of discovery). Arguments regarding the nature of Plaintiffs' claims and sufficiency of the Complaint have been briefed extensively in connection with Emigrant's Motion to Dismiss and Plaintiffs' Motion for Leave to File a First Amended Answer, as well as in the several unsuccessful attempts already made by Emigrant to limit or stay discovery. Emigrant's insistence on rearguing, yet again, its motion to dismiss Plaintiffs' claims, rather than cooperating with Plaintiffs on discovery, is improper.[1]

1. Emigrant's Loan Level Account Data is Relevant to Plaintiffs' Fair Lending and TILA Claims

As comprehensively laid out in Plaintiffs' Motion, the Loan Level Account Data sought by Plaintiffs is highly relevant to Plaintiffs' claims that Emigrant's lending policies had a disparate impact on minority borrowers in violation of the FHA, ECOA, and state and local civil rights statutes. This data is necessary to perform a thorough statistical analysis of Emigrant's pattern of no-income refinance lending, which will ultimately show whether the products used to conduct this lending were more expensive and/or more likely to result in foreclosure, and whether minority borrowers were more likely to receive these products. (*See* Affidavit of Ian Ayres ¶¶ 10-20, annexed as Exhibit 17 to Pls.' Mot., hereinafter Ayres Aff.) This kind of statistical analysis is required in disparate impact cases, and in order to conduct a comparative study, Plaintiffs must have access to the requested data across Emigrant's loan programs. *Id.* For a recitation of the case law setting forth the statistical analysis requirement in disparate

---

[1] For example, Emigrant argues, once again, that Plaintiffs' claims are legally meritless in the Second Circuit. In support of this contention, Emigrant cites *Watson v. N.Y. Pressman's Union,* 444 Fed. Appx. 500, 2011 WL 6157476 (2d Cir. 2011), an unpublished summary order the Second Circuit itself directs should have no precedential value, *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 656 (2d Cir. 2003), a post-trial decision involving the requirements for establishing a *prima facie* case, rather than the pleading standard for disparate impact claims, and *Brown v. Coach Stores, Inc.*, 163 F.3d 706 (2d Cir. 1998), which describes a heightened pleading standard later rejected by the Supreme Court. *See Swierkiewicz v. Sorema*, 534 U.S. 506, 510-511 (2003); *James v. Countrywide Financial Corp.,* -- F. Supp. 2d --, 2012 WL 359922 (E.D.N.Y. Feb. 2, 2012) ("Swierkiewicz . . . remains the proper pleading standard in the Second Circuit for Title VII claims, even after the Supreme Court's decision in *Twombly* and *Iqbal.*")

impact cases, Plaintiffs respectfully direct the Court's attention to pages 8-9 of their Motion.

In support of its contention that all Loan Level Account Data except the race and ethnicity of borrowers is irrelevant to Plaintiffs' discrimination claims, Emigrant cites a series of distinguishable, if not entirely inapplicable, cases.  Emigrant places special emphasis on *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982), a Title VII employment discrimination case primarily concerned with Rule 23 of the Federal Rules of Civil Procedure and the requirements for certifying a class action and approving a class representative.  *Falcon* does not address the pleading or discovery standard for disparate impact claims.  Instead, the Court considered only questions related to whether a class was properly maintained where the class representative's individual claims were more limited than the class claims.  *See Falcon*, 457 U.S. at 157-61.  *Falcon's* narrow holding does not apply here, where Plaintiffs are not seeking to certify a class and where Plaintiffs' claims regarding the impact of Emigrant's specific lending practices are sufficiently pled.

Emigrant cites to several other distinguishable cases in arguing that Plaintiffs' Loan Level Account Data requests are irrelevant.  (Def.'s Mot. at 3.)  None of these cases discusses whether the type of discovery sought by Plaintiffs is proper.  *Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005), concerns the cognizability of disparate impact claims under the Age Discrimination in Employment Act (ADEA), which treats such claims in a significantly narrower fashion than Title VII.  The language quoted by Emigrant comes from the Court's earlier decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989), issued before the Civil Rights Act of 1991 expanded employers' potential liability under a Title VII disparate impact theory but did not make any similar changes to the ADEA.  The *Smith* holding thus applies only to the narrow context of age discrimination cases brought under disparate impact theories.  *Smith* does not control in the instant matter, although it bears noting that Plaintiffs have not simply alleged disparate impact or "a generalized policy" but have alleged particularized discriminatory lending practices by Emigrant.  (*See* Def.'s Mot. at 3.)  *Byrnie v. Town of Cromwell*, 243 F.3d 93 (2d Cir. 2001), involves a similarly narrow disparate impact age discrimination claim, as well as a gender discrimination claim that failed to identify any specific employment practices.  The holding of *Catanzaro v. Weiden*, 188 F.3d 56 (2d Cir. 1999), is misrepresented by Emigrant. The *Catanzaro* court ruled that plaintiffs were "*not* challenging the overall housing policy of the city," but found plaintiffs' discrimination claims insufficient given plaintiffs' narrow facts and lack of evidence.  *Id.* at 65 (emphasis added).  Lastly, *Sidari v. Orleans County*, 180 F.R.D. 226 (W.D.N.Y. 1997), concerns the scope of pattern and practice discovery in a disparate treatment case brought under Title VII, and does not involve the kind of statistical analysis necessary to prove a disparate impact claim.

Emigrant's Motion also addresses Plaintiffs' contentions, set forth during oral argument before Judge Johnson on May 24 and in Plaintiffs' letter to this Court on June 7 (Dkt. No. 53), that Emigrant's presentation of "aggregate data" regarding the race/ethnicity of participants in Emigrant's no-income loan programs is misleading.  Specifically, Plaintiffs object to Emigrant's attempts to categorize White Hispanics as non-minority borrowers.  Plaintiffs do not dispute Emigrant's statement that race and ethnicity are distinct categories, but argue in response that the Fair Housing Act prohibits discrimination on the bases of race *and* national origin, and that Plaintiffs' complaint alleges Emigrant's no-income refinance program had a disproportionate

3

impact on both Black and Hispanic borrowers and neighborhoods.  (Compl. ¶¶ 40-42.)  In any event, Plaintiffs maintain that this sort of factual dispute is an inappropriate basis upon which to consider the relevance of Plaintiffs' discovery requests, much as it is an inappropriate consideration for the pending Motion to Dismiss.

As discussed on pages 9-11 of Plaintiffs' Motion and in the Affidavit of Ian Ayres, Plaintiffs' Request for Loan Level Account Data is also highly relevant to Plaintiffs' TILA claims.  The cases Emigrant cites are distinguishable and not to the contrary.  Emigrant relies on *In re DiVittorio,* 670 F. 3d 273 (2012), *affirming In re DiVittorio,* No. 09-1089, 2009 WL 2246138 (Bankr. D. Mass. July 23, 2009), a bankruptcy case where the borrower claimed that the annual percentage rate (APR) was under-disclosed because the lender included in its APR calculation a lower, performance-based interest rate that would take effect after twenty-two months of on-time payments.  The facts of *DiVittorio* are distinguishable from the facts and allegations set forth in Plaintiffs' Complaint.  Specifically, Plaintiffs contend that Emigrant's no-income refinance program was designed to trigger default interest rates as a matter of course, making them finance charges includable in calculating the APR, and the Complaint provides specific support for this claim.  No such detailed allegations were made in *DiVittorio,* nor did Mr. DiVittorio support his general allegations that subprime lenders should anticipate their borrowers would default with evidence such as the dramatic foreclosure rates included in Plaintiffs' Complaint.  Plaintiffs allege that, unlike the lender in *DiVittorio*, Emigrant anticipated or should have anticipated that borrowers within its no-income refinance program would default within one year, and that the true interest rate was therefore intended by Emigrant to be the 18% "default" level.  Plaintiffs also assert that their TILA claims are sufficiently pled in the Complaint, and that the *DiVittorio* ruling has no applicability over a discovery dispute at this stage of the proceedings.

2.   Production of Loan Level Account Data is Not Burdensome

Emigrant's contention that production of certain Loan Level Account Data would be burdensome rings hollow in light of Emigrant's refusal to provide basic information about what data it tracks in various databases, information that would be easily identified by the production of database schemas.  (Tr. of Deposition of Kevin Matthie 49:9-16, June 7, 2012 (Matthie Tr.), annexed as Exhibit 15 to Pls.' Mot.)  Plaintiffs therefore request that the Court order Emigrant to provide this information, in order to provide Plaintiffs' with the location of relevant and discoverable information and to test Emigrant's assertions regarding burden.

As discussed extensively in Plaintiffs' Motion, the burden argument outlined in Emigrant's Motion and the accompanying Affidavit of Kevin Matthie is also inconsistent with testimony provided by Mr. Matthie at his deposition on June 7.  A full transcript of Mr. Mattie's deposition testimony is annexed to Plaintiffs' Motion as Exhibit 15, and pages 11-13 of Plaintiffs' Motion provide a detailed accounting of where Loan Level Account Data is stored by Emigrant.  Based upon Mr. Mattie's deposition testimony, Plaintiffs offer the following responses to Emigrant's assertion that certain information listed in Plaintiffs' Document Request 23 is not tracked "in a manner that permits automatic retrieval across multiple loans by means of a single search query." (Def.'s Mot. at 8.)







Finally, there is no dispute that Emigrant does track the following data named in Plaintiffs' Document Request 23: a-e, g, l, n, o, s, u, v, w, x, y, z, aa, cc, dd, ee, ff, hh, ii, oo, qq, ss, and tt.  (Matthie Aff. ¶ 2, annexed to Emigrant's Motion; Def.'s Mot. at 8)  These types of information are clearly relevant to Plaintiffs' claims as outlined above, and this Court should compel production.

      B.  Scope of Loan Programs

Despite previous guidance from this Court that Plaintiffs are entitled to discovery relevant to their claims as alleged in the Complaint, Defendant's Motion again asks this Court to limit the scope of discovery to the narrow issue of Emigrant's StarFlex OnTime Advantage program, one of several products that Emigrant used to conduct its no-income refinance lending business.  (Def.'s Mot. at 8-9.)  As noted in Plaintiffs' Motion and as explained below, Emigrant's refusal to produce documents relating to any loan program other than StarFlex OnTime Advantage is improper and should be rejected.  (Pls.' Mot. at 7-8.)

Plaintiffs are entitled to discovery of any non-privileged matter that is "relevant to any party's claim or defense" or "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  The scope of discovery is broad and "encompass[es] any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Schoolcraft v. City of New York*, 10-cv-6005, 2012 WL 2161596, at *12 (S.D.N.Y. June 14, 2012) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).).  The Complaint says nothing about the StarFlex OnTime Advantage Program.  Rather, the Complaint alleges that Emigrant engaged in a pattern of high cost, no-income refinance lending that discriminated against minority borrowers.  The discovery produced to date indicates that the StarFlex OnTime Advantage Program was just one of several loan products (including other products in the StarFlex family and HiQ+ products) that Emigrant used to conduct its high cost, no-income refinance lending business.  Plaintiffs are entitled to discovery of the methods that Emigrant used to conduct this pattern of lending, including all applicable loan products or programs.

In *Schoolcraft v. City of New York*, the court denied a motion to quash and rejected reasoning analogous to the reasoning that Emigrant employs here.  In *Schoolcraft*, Councilman Peter Vallone sought to quash a subpoena that sought documents relating to alleged manipulation of crime statistics by the NYPD.  *Schoolcraft*, 2012 WL 2161596, at *12.  Councilman Vallone argued that the requested discovery was irrelevant because the Plaintiff was stationed in the 81st

Precinct, whereas Councilman Vallone represents an area "within the confines of the 114th Precinct." *Id.* at 13.   In rejecting this reasoning and denying the motion to quash, the court explained that "the allegations in the complaint [were] not limited to the 81st Precinct[,]" but instead extended to "the entire NYPD." *Id.*

Similarly, Plaintiffs' allegations encompass a much broader pattern of lending activity than the single loan product that Emigrant ultimately extended to Plaintiffs.  Indeed, it appears that Emigrant only ever originated a total of 255 loans in New York City under the StarFlex OnTime Advantage program.  (*See* Pls.' Mot., Ex. 33.)  The Complaint, by contrast, alleges that Emigrant made approximately 675 *high cost* refinance loans in New York City between 2005 and 2009 alone.[2]   (Compl. ¶ 40 & Exhibit A.)  Emigrant concentrated the bulk of its costliest and most destructive refinance loans in minority census tracts, with the foreseeable result that foreclosures are similarly highly concentrated in minority neighborhoods.  (Compl. ¶¶ 41-42.)

In short, Plaintiffs' allegations concern Emigrant's entire pattern of no-income refinance lending.  And as Emigrant's own documents make quite plain, HiQ+ and StarFlex are the product families used by Emigrant to conduct its no-income refinance lending program.

> Emigrant's residential lending business consists of two segments:
> (1) Full Documentation Loans for which lending decisions are
> based on review of income, assets, credit and collateral; and (2) No
> Doc Loans (currently denoted as 'HiQ', 'HiQ+' or 'STAR') which
> are subject to premium pricing.

(BrokerDirect SourceBook at EMC 00237, attached as Exhibit 16 to Pls.' Mot.)[3]  Plaintiffs therefore very reasonably offered to limit certain discovery requests to the HiQ+ and StarFlex product families.  (Pls.' Mot., Exhibit 23 at 2.)  Moreover, certain requests are not appropriately limited even to the HiQ+ and StarFlex product families.  In particular, Plaintiffs need to evaluate certain Loan Level Account Data regarding all loans originated by Emigrant in the relevant time period in order to conduct a sound statistical analysis related to their disparate impact claim. (*See* Ayres Aff. ¶¶ 14, 16-20.)

Finally, Emigrant's insistence that it does not offer any "high cost" loan products or maintain information regarding high cost loans (Def.'s Mot. at 10), is inconsistent with mandatory reporting requirements under the Home Mortgage Disclosure Act (HMDA) and Emigrant's own deposition testimony.  Federal law requires Emigrant to report the spread between the APR and the applicable Treasury yield for any first-lien loan where the rate spread equals or exceeds three percentage points and any subordinate-lien loan equal to or exceeding five percentage points.  *See* Regulation C, Home Mortgage Disclosure, 12 C.F.R. Part 203, Appendix A, I.G.1 (Rate Spread).  The Federal Reserve began requiring financial institutions to report price data for these "higher-priced loans" in response to concerns that wide price ranges in

---

[2] High cost in this instance is defined as an interest rate spread that is at least five points above comparable maturity treasury securities.

[3] The HiQ program is used for purchases only, whereas HiQ+ is available for refinance loans. (Pls.' Mot., Exhibit 16, BrokerDirect SourceBook at EMC 00116 & 00120.)

the subprime market "may reflect unlawful discrimination rather than legitimate risk- and cost-related factors."  Federal Reserve, *Frequently Asked Questions About the New HMDA Data*, Question Number 11, April 3, 2006, available at http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20060403a1.pdf; *see also* Regulation C, Final Rule, 67 Fed. Reg. 7222, 7228-29 (Feb. 15, 2002).

Accordingly, Plaintiffs sought documents relating to "high cost" loans and defined "high cost" as a loan with either (1) an APR that is three or more percentage points above the yield of comparable Treasury securities, or (2) a default interest rate of 16% or greater.  Mr. Matthie confirmed at his deposition ██████████████████████████████████████ ██████████████████████████████████ (Matthie Tr. 19:14-15, 26:6-8, 99:24-100:3, 100:24-101:6.)  Furthermore, publicly available HMDA data confirms that Emigrant routinely originates loans meeting Plaintiffs' definition of "high cost."  (Compl. ¶¶ 40-42.)

Mr. Matthie's deposition testimony and publicly available data directly refute Emigrant's preposterous assertion that it neither offers loans meeting Plaintiffs' definition of high cost, nor "maintain[s] information regarding which loans, if any, are consistent with Plaintiffs' definition." (Def. Mot. at 10.)  Information regarding the pricing associated with Emigrant's pattern of no-income refinance lending is highly relevant to Plaintiffs' allegations that Emigrant concentrated its costliest loans in minority neighborhoods and amongst minority borrowers.  Plaintiffs therefore respectfully request that the Court deny Emigrant's request to limit the scope of discovery and grant Plaintiffs' Motion to Compel, as provided in the draft order accompanying Plaintiffs' Motion.

C.  Process issues

Plaintiffs have gone to great lengths to first draft, then discuss and explain, and finally move to compel responses to Plaintiffs' document requests and interrogatories.  Those requests are specific and distinct.  In response, Emigrant has lumped together sixteen of Plaintiffs' document requests with six interrogatories—many relating to different claims and seeking distinct types of information—into the umbrella of "issues relating to the processes of Emigrant's mortgage lending business."  (Def. Mot. at 10.)  Emigrant makes two brief and generalized arguments: 1) "[a]n exploration of the processes of Emigrant's banking business is not germane" to Plaintiffs' fair lending claims; and 2) "[d]iscovery as to the methods by which Emigrant originates and services loans would not serve the purposes of" a fair lending analysis. (Def. Mot. at 10-11.)  Not only are Emigrant's objections as to relevance grossly insufficient, they are misplaced.

Request 9 seeks documents "concerning any evaluation" by Emigrant of its high cost loan programs, including for performance, profitability, etc.  Evaluations by Emigrant of its high cost loan programs—the facially neutral policies at issue in this case—are clearly relevant to Plaintiffs' civil rights disparate impact claims and to testing the sufficiency of Emigrant's showing after Plaintiffs have established a *prima facie* case under the FHA.  At that point, the burden shifts to Emigrant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide interest and that no alternative would serve that interest with less

discriminatory effect." *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 302 (2d Cir. 1998) (quotations and citations omitted). Accordingly, information related to Emigrant's evaluation and decision-making regarding its high cost loan programs is clearly relevant to Plaintiffs' fair lending claims. There is no basis for Emigrant's objection.

Further, contrary to Emigrant's assertions and as argued in Section I.A. above, Plaintiffs are not obligated to establish their *prima facie* case to qualify for discovery either generally or specifically for their civil rights claims. The "governing rules set forth no such requirement, and for good reason. [V]ery often a party who in good faith . . . asserted a claim against another party, may nonetheless be able to establish liability, or even a *prima facie* case absent access to potentially highly relevant information which is uniquely within the possession or control of an opponent." *Member Servs. Inc.*, 2007 WL 2907520 at *5.

Finally, Emigrant's evaluations of its high cost loan programs are relevant to Plaintiffs' TILA claim, which alleges that Emigrant designed its loan to be at the default interest rate of 18% for the majority of the loan term.

Requests 11 and 12 seek information related to TILA calculations and compliance; Emigrant's relevance objections, citing Plaintiffs' fair lending claims, do not apply. Both requests are clearly relevant to Plaintiffs' TILA claims.

Request 13 seeks documents related to Emigrant's policies, practices or procedures for determining compliance with the laws underlying Plaintiffs' civil rights claims. Emigrant offers no specific basis for objection to this request. The request is relevant to Emigrant's claim that it has not violated these laws, to assessing the impact of and response to any violations discovered through internal reviews, and to the business interest analysis in the civil rights claims.

Request 14 seeks broker communications, which Plaintiffs' agreed to limit to communications concerning HiQ+ and StarFlex products. Emigrant's characterization of these loan products to brokers, including responses to questions from brokers and vice versa, are relevant to both Plaintiffs' TILA and fair lending claims. For TILA, the communications may include information such as how and whether Emigrant expected borrowers to make on-time payments for the life of the loan, whether Emigrant instructed brokers to characterize the loan terms or structure loans in particular ways that would ensure triggering the default rate. For fair lending claims, such communications are relevant to the question of whether Emigrant's high cost, no-income refinance programs are supported by a legitimate business rationale, a fundamental element of any disparate impact case. For example, such communications may include Emigrant's characterizations about the market to which the high cost loan products cater and how the loan process and products operate in theory and in practice and what the expected outcomes might be for various loan products.

Emigrant objects specifically to Request 14, arguing it is unduly burdensome because it would require a manual search of loan files. This is not true. ████████████████████ ████████████████████████ These email files could be electronically searched in a targeted way if Emigrant cooperatively informed that process. ███████████████████████

████████████████████████████████████████████████ (Matthie
Tr. 56:20-57:18.)  Thus, Emigrant can likely pull correspondence with brokers using electronic
searches.  Finally, Plaintiffs' remain open to alternative resolutions.  Emigrant has been
unwilling, both generally and specific to this request, to propose or negotiate search protocols for
requested information.

After negotiation, Request 15 seeks marketing materials for Emigrant's very high cost
loan products.  Similarly, after negotiation, Interrogatory 12 seeks identification of individuals
with supervisory authority over the marketing of very high cost loan products.  Marketing
materials may show how and whether Emigrant expected borrowers to treat these loans, and
whether they expected borrowers to make on-time payments for the life of the loan or whether
they expected them to default as related to Plaintiffs' TILA claims.  For the fair lending claims,
the marketing materials will include Emigrant's characterizations of the borrowers to which it
intended to sell the high cost loan products and what benefits the products offer to borrowers, all
of which can inform disparate impact analysis.  Moreover, a comparison of the characterizations
in the marketing materials with a) Emigrant's internal business justifications, b) what Emigrant
communicated to borrowers or brokers, and c) what Emigrant argues in this case, will prove
relevant to Emigrant's business justification arguments.

Requests 16 and 18 seek materials Emigrant uses for employee and broker training and
operations relating to compliance with consumer protection and fair lending laws and with
Emigrant's internal rules and regulations for its loan products.  Emigrant's general objection that
this relates to process and, thus, is not relevant to fair lending claims is insufficient.  The nature,
extent and application of the facially neutral policies at issue in this case, namely, Emigrant's
high cost, no-income lending programs, are clearly relevant to Plaintiffs' civil rights disparate
impact claims. Documents responsive to these requests will likely also be relevant to Emigrant's
business justifications for its policies.  Finally, Plaintiffs remain open to alternative resolutions or
limitations to these requests.  Emigrant has been unwilling, both generally and specific to this
request, to propose or negotiate search protocols for requested information.

As limited by Plaintiffs after discussion with Emigrant, Request 17 seeks policy,
procedure and practice documents related to collection and/or use of race, ethnicity and
geographic location of applicants or potential borrowers.  Plaintiffs allege that Emigrant's
abusive high cost loan programs disparately impacted minority borrowers in geographic
locations where the population was majority-minority.  Emigrant's policies, procedures and
practices relating to the use of demographic characteristics on which Plaintiffs' discrimination
claims are premised are relevant.

Requests 19,[4] 20 and 21 relate to broker agreements and compensation and Emigrant's
policies related to compensation both internally and with third parties, which Plaintiffs have

---

[4] Based on conversations with Emigrant, Plaintiffs agreed that Interrogatory 11, seeking
identification of brokers originating very high cost loans, would likely be subsumed in Request
19.  Interrogatory 11 is relevant for the same reasons as Request 19.  Plaintiffs reserve the right
to continue to seek this information if a response to Request 19 is inadequate.  (Letter from
Plaintiffs to Emigrant at 8 (April 17, 2012), annexed as Exhibit 23 to Pls.' Mot.)

limited to the HiQ+ and StarFlex family of products.  Similarly, Interrogatories 14 and 15 seek information related to Emigrant's relationship with brokers, especially those who originate very high cost loans.  Plaintiffs allege that brokers marketed and originated Emigrant's discriminatory loans.  Again, the nature and extent of the facially neutral policies responsible for disparately impacting minorities, namely, Emigrant's high cost loan programs, including any financial incentives for brokers to originate particular loan products, are clearly relevant to Plaintiffs' civil rights disparate impact claims.  The requests will also lead to discovery of documents related to Emigrant's business justification for the programs.

Request 22 seeks documents related to Emigrant's policies and procedures applicable to delinquent mortgages.  Plaintiffs' allege that Emigrant designed their loan to be at the default interest rate of 18% for the majority of the loan term.  The requested documents are directly relevant to proof of this claim.  These policies and procedures are also relevant to Plaintiffs' fair lending claims because they will reveal Emigrant's business justifications for fashioning the relevant high cost loan programs in a particular way and provide points of comparison for treatment of delinquent mortgages among Emigrant's loan programs.

Request 26 seeks Emigrant's audited financial statements and Interrogatories 16 and 17 have been rephrased in negotiations to seek the treatment of no-income and/or very high cost loans in Emigrant's financials.  The financial treatment and profitability of Emigrant's very high cost loans over the course of the life of such loans are directly relevant to Plaintiffs' TILA claims, as they reflect Emigrant's expectations about these loans' income streams.  Moreover, the documents are relevant to Plaintiffs' civil rights claims because profitability is undoubtedly an element of Emigrant's business justification for its high cost loan programs.

As limited by Plaintiffs, Requests 27 and 28 seeks documents relating to investigation, audits, reviews, and general oversight of Emigrant or its agents generally and as relevant to origination of mortgage loans.  The requested documents impact how the facially neutral policies that Plaintiffs allege are responsible for disparately impacting minorities are implemented in practice.  The documents are also relevant to Emigrant's business justification because they will reveal the process by which mortgages are originated and Emigrant's evaluation of that process.

> D.  Fair Lending Policies, Procedures, Compliance, Reports and Other Related Documents

Emigrant continues to refuse to produce documents relating to fair lending evaluations, claiming that such materials are not relevant to Plaintiffs' claims.  (Def.'s Mot. at 11-12.)  Emigrant also raises, for the first time, issues of privilege in connection with Plaintiffs' request for documents relating to Emigrant's policies, practices and procedures for determining compliance with fair lending laws, evaluations of the fair lending impact of its no-income refinance lending practices and other documents relating to fair lending issues.  (*See id.* at 11; *see also* Chart Summarizing Status of Plaintiffs' Discovery Requests, Request Numbers 9, 13, 16, 17, attached as Exhibit 1 to Pls.' Mot. to Compel; Def.'s Response to Plaintiffs' Request Numbers 9, 13, 16, 17, attached as Exhibit 4 to Pls." Mot. to Compel.)

To the extent Emigrant is withholding materials on the basis of privilege, it was required

to identify those documents in a privilege log.  *See* Local Civil Rule 26.2.   Furthermore, Mr. Matthie's testimony ███████████████████████████████████████████████████ about the existence of non-privileged documents in Emigrant's possession, including minutes, reports, materials and audits from Emigrant's Fair Lending Committee, or internal emails or other non-privileged documents responsive to Plaintiffs' request.  Nor does Emigrant appear to be claiming that such documents do not exist.  Indeed, Mr. Matthie's testimony is particularly suspect on this topic given his admission ███████████████████████████████████████ ████████████████████████████████████

Plaintiffs therefore respectfully request that the Court deny Emigrant's Motion for a Protective Order and grant Plaintiffs' Motion to Compel, as provided in the draft order accompanying Plaintiffs' Motion.

### E.   Time frame

As described in Plaintiffs' Motion to Compel, the temporal scope of Plaintiff's discovery requests—narrowed to 2004 through 2010—is reasonable and Plaintiffs will not repeat those arguments here.  (*See* Pls.' Mot. at 6-7.)

Emigrant's newest argument, that the statement "2005 through 2009" is ambiguous, is absurd.  (Def.'s Mot. at 12.)  Any reasonable person would understand the phrase to include the entirety of the year 2009, making December 31, 2009 the end date.

Lastly, Emigrant assertion that a correction to a typographical error in Plaintiffs' Complaint somehow alters the "central factual allegation underlying [Plaintiff's] disparate impact claim" is equally absurd. (Def.'s Mot. at 12.)  The footnote states in relevant part: "HMDA data reveals that between the years 2005 and 2008—and not between the years 2007 and 2009, as stated in the Complaint—Emigrant originated 62.5% of its highest-cost loans in majority-minority census tracts."  (Pls.' Opp'n to Emigrant's Mot. to Dismiss at 15 n. 8.)   The footnote simply corrects a previous typographical error and, in any event, is one of many citations to publicly available data supporting Plaintiffs' central allegation that Emigrant engaged in a pattern of discriminatory and predatory lending from *at least* 2005 through 2009.

### F.   Loan defaults

Emigrant asks this Court to bar discovery requests regarding protocols for responding to delinquent mortgages on relevance grounds.  As described in Plaintiffs' Motion, Emigrant's policies, practices, and procedures regarding delinquent mortgages are relevant and Plaintiffs will not repeat those arguments here.  (*See* Pls.' Mot. at 8 ("Emigrant engaged in unlawful discrimination . . . by . . . targeting borrowers with . . . loans that were designed to default.").)  Emigrant once again improperly attempts to re-argue its Motion to Dismiss by claiming that the issue of loan default can be severed from loan origination.  (Def.'s Mot. at 13.)  It cannot.  The relevance of policies, practices, and procedures regarding loans that are in default has already been extensively briefed and Plaintiffs refer the Court to these earlier arguments.  (*See* Pls.' Mot. at 9-11; Plaintiff's Opp'n to Mot. to Dismiss at 20-23.)

Plaintiffs therefore respectfully request that the Court deny Emigrant's request to limit the scope of discovery and grant Plaintiffs' Motion to Compel, as provided in the draft order accompanying Plaintiffs' Motion.

### G.   Rule 30(b)(6) Deposition of Emigrant and Related Document Requests

More than four months ago, and in response to Emigrant's persistent refusal to provide information about the sources and location of potentially relevant discovery, Plaintiffs requested documents relating to various computer systems and databases in use by Emigrant and other e-discovery topics.  (Pls.' 2d Set of Requests for Production, annexed as Ex. 6 to Pls.' Mot.)   The relevance of these requests is detailed extensively in Plaintiffs' Motion, and need not be repeated here.  (Pls.' Mot. at 2-5, 11-13.)   *See also* Fed. R. Civ. P. 26(b)(1) (relevant discovery includes information regarding the "existence, . . . custody, condition, and location of any documents … and the identity and location of persons who know of any discoverable matter").  Plaintiffs respectfully request that the Court deny Defendant's request for a protective order and compel Emigrant to produce documents as provided in the draft order accompanying Plaintiffs' motion.

With respect to Emigrant's preposterous assertion that "Plaintiffs only noticed this deposition on May 31, and only informed Emigrant on June 1 that Plaintiffs would insist on Emigrant furnishing testimony on all . . . deposition topics" (Def.'s Mot. at 14), Plaintiffs direct the Court's attention to the first two deposition notices and the parties' correspondence on this topic.[5]  In short, Plaintiffs initially noticed the deposition in question on February 24, 2012, over four months ago.  The May 31 deposition notice to which Defendant's refer is actually the third such notice, issued only after the Plaintiffs suspended the deposition twice at Emigrant's request and re-noticed the deposition for a date offered by Emigrant and agreed upon by the parties.  In fact, the deposition ultimately went forward only after the court denied Defendant's request to stay discovery.

The Court should deny Emigrant's request for a protective order prohibiting Plaintiffs from continuing to depose Emigrant on topics on which Mr. Matthie was insufficiently knowledgeable.  In particular, Mr. Matthie had absolutely no knowledge of Topics 5 & 6 of the

---

[5] The notices and relevant correspondence are annexed to Plaintiffs' Motion and this Response as follows:  (1) Notice of 30(b)(6) Deposition Regarding Technology (Feb. 24, 2012), attached hereto as Exhibit 37; (2) 2d Notice of 30(b)(6) Deposition Regarding Technology (April 16, 2012), attached hereto as Exhibit 38; (3) Letter from Emigrant to Plaintiffs (April 11, 2012), attached as Exhibit 34 to Pls.' Mot. (promising to provide alternate dates for deposition of designated 30(b)(6) witness Kevin Matthie "as soon as possible"); (4) Letter from Plaintiffs to Emigrant (April 16, 2012), attached hereto as Exhibit 39; (5) Email from Joanne Werdel to Eric Epstein and David Scheffel (May 2, 2012), attached as Exhibit 27 to Pls.' Mot.; (6) Email from Joanne Werdel to Eric Epstein and David Scheffel (May 10, 2012), attached hereto as Exhibit 40; (7) Letter from Emigrant to Plaintiffs (June 4, 2012), attached hereto as Exhibit 41; (8) Letter from Plaintiffs to Emigrant (June 4, 2012), attached hereto as Exhibit 41; (9) Def.'s Motion for a Protective Order (Dkt. No. 50); (10) Opp'n to Def.'s Mot. for Protective Order (June 5, 2012) (Dkt No. 51); (11) Letter from Plaintiffs to Emigrant (June 12, 2012), attached as Exhibit 29 to Pls.' Motion.

30(b)(6) notice:  "The identity, description, contents and general functions of computer databases, programs, models and regression analyses developed or utilized" to "analyze racial disparities."  (*See* Letter from Plaintiffs to Emigrant, attached as Exhibit 29 to Pls.' Mot.)  Mr. Matthie testified only ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (Matthie Tr. 113:4-7.)

## II.    EMIGRANT'S MOTION TO COMPEL

Plaintiffs have already provided Emigrant with documents regarding their "respective and joint financial histories," (Def.'s Mot. at 16), including W-2s, documents relating to the initial purchase of their home, a car loan note and bank statements through November of 2008.  (*See* Email from Rachel Geballe to Eric Epstein and David Scheffel, April 22, 2012, attached hereto as Exhibit 43.)   Plaintiffs have, however, objected to producing such personal financial information for the time period following the date of Plaintiffs' default.  (*Id.*; *see also* Letter from Plaintiffs to Emigrant at 3 (Feb. 13, 2012), attached hereto as Exhibit 44.)

Emigrant raised this issue with the Court at the May 3 status conference.  (Def.'s Mot. at 16.)   The Court agreed with Plaintiffs that their financial information during the time period after their default is not relevant and need not be produced, a point which Emigrant concedes. (*Id.*)  Emigrant now seeks this same information on the grounds that it is relevant to the issue of damages in this case.  Emigrant is mistaken.  Plaintiffs seek damages arising from the "foreclosure and the loss of nearly all of the equity in their long-time family home," (Compl. ¶ 4), which can be determined using information up to and including default, but which does not require examination of Plaintiffs' "joint financial histories" following the date of default.

## III.    CONCLUSION

For the reasons explained above and in Plaintiffs' Motion, Plaintiffs respectfully request that the Court deny Emigrant's Motion and grant Plaintiffs' Motion to Compel, as provided in the draft order accompanying Plaintiffs' Motion.

Respectfully submitted,

/s/

Joanne Werdel

Cc:    All counsel via ECF