UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JEAN ROBERT SAINT-JEAN, et al.,

               Plaintiff,

                                11 CV 2122 (SJ)

      -against-                  **MEMORANDUM AND
ORDER**

EMIGRANT MORTGAGE
COMPANY, et al.,

               Defendants.
-------------------------------------------------------X
A P P E A R A N C E S

SOUTH BROOKLYN LEGAL SERVICES
Foreclosure Prevention Project
105 Court Street
Brooklyn, NY 11201
By:    Sara Linda Manaugh
        Jennifer Sinton
        Meghan Faux
        Rachel Geballe
*Attorneys for Plaintiffs*

RELMAN & DANE, PLLC
1225 19th, St., NW, Suite 600
Washington, DC 20036
By:    John P. Relman
        Glenn Schlactus
        Tara Ramchandani
        Timothy Smyth
*Attorneys for Plaintiffs*

CENTER FOR RESPONSIBLE LENDING
910 17th St NW, Suite 500
Washington, DC 20006
By:    Michael D. Calhoun
*Attorney for Plaintiffs*

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
By:     Bettina B. Plevan
        Evandro Cristiano Gigante
        Keisha-Ann G. Gray
*Attorneys for Defendant*

DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019-6119
By:     David A. Scheffel
        Eric B. Epstein
        Gina Susan Spiegelman
*Attorneys for Defendant*

JOHNSON, Senior District Judge:

This case comes before the Court on a motion to amend the complaint and on the defendant's motion to dismiss. Jean-Robert and Edith Saint-Jean, Felix and Yantil Saintil, Linda Commodore, Felipe Howell, and Jean and Beverly Small, (the "Plaintiffs"), homeowners and former homeowners who refinanced mortgages, received financing, or had related financial dealings with Emigrant Mortgage Company, Inc., Emigrant Savings-Bank Manhattan, Emigrant Bancorp, Inc., or Emigrant Bank (collectively "Defendant" or "Emigrant"), claim Emigrant engaged in a predatory practice of originating discriminatory and abusive mortgage refinance instruments through an equity-stripping "No Income, No Assets" ("NINA") loan program until 2009. In short, the plaintiffs allege that Emigrant originated loans to individuals with significant home equity and very low credit scores, disregarding their ability to make payments and ensuring a stake in homeowner equity with very

2

high interest rates triggered upon the inevitable default on these loans. Plaintiffs claim this program, even where facially neutral, disproportionately saddled minority homeowners in New York City with exorbitant, unaffordable mortgages that were expected and intended to fail at origination.

In 2011, Plaintiffs brought the present action, filing a complaint ("Complaint") alleging violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604, 3605; the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, et seq.; New York State Human Rights Law, N.Y. Exec. Law § 296-a; New York City Administrative Code § 8-502; and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1691, et seq. (See Original Complaint ¶¶ 227-78.) On January 31, 2014, Plaintiffs moved to amend their complaint, attaching the proposed Second Amended Complaint ("SAC"). On March 31, 2014, Magistrate Judge James Orenstein, at this Court's request, issued a Report and Recommendations ("the Report") with respect to Emigrant's pending motion to dismiss and Plaintiffs' pending motion to amend. This Court reviews those recommendations, and the objections thereto, herein.

## BACKGROUND

### A. The Report and Recommendation

This Court referred Defendant's motion to dismiss to the assigned magistrate judge in this case, Magistrate Judge James Orenstein, for a Report and Recommendation on July 29, 2013. A district court judge may designate a magistrate judge to hear and determine certain motions pending before the Court and to submit to the Court proposed findings of fact and a recommendation as to the

3

disposition of the motion. See 28 U.S.C. § 636(b)(1). Within fourteen days of service of the recommendation, any party may file written objections to the magistrate's report. See id. Upon de novo review of those portions of the record to which objections were made, the district court judge may affirm or reject the recommendations. See id. The Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the report and recommendation to which no objections are addressed. See Thomas v. Arn, 474 U.S. 140, 150 (1985).

Presently before the Court is the Report and Recommendation ("Report") prepared by Magistrate Judge James Orenstein. Judge Orenstein issued the Report on March 31, 2014, recommending that this Court grant Emigrant's motion to dismiss Plaintiffs' claims under state and municipal law, deny Emigrant's motion to dismiss under federal law, deny Plaintiffs' leave to add new claims under state and municipal law, and grant Plaintiffs leave to add new plaintiffs, defendants, and federal claims. See March 31, 2014 Report and Recommendation of Magistrate Judge James Orenstein, Docket No. 206 at 1 (the "Report"). All parties filed limited objections to the Report and Recommendation on April 17, 2014 and Plaintiffs responded to Defendant's objections to the Report on May 1, 2014. Upon review of the recommendations, objections, and responses thereto, and for the reasons stated herein, the conclusions in the Report are adopted in part and set aside in part, and the Court adopts and affirms the recommendations that Plaintiffs' motion to amend the complaint should be granted and Defendant's motion to dismiss is denied.

4

## B. Brief Historical Overview

Separate from this Court's analysis of the specific issues raised here, the Plaintiffs have situated their claims in an arena of historical significance. Although this Court's analysis is limited to the sufficiency of the complaint, as is proper on a motion to dismiss, Plaintiffs claim discrimination in lending and cite decades of precedent in housing and lending discrimination in assuring this Court that their present claims in their original and amended complaints are not merely "speculative" or "bald assertions." While a general historical overview is entirely separate from this Court's substantive and procedural analysis of the specific claims in this case in the sections that follow, the Court sees merit in discussing the milieu in which these claims exist. Therefore, a brief review of the historical context appears warranted.

Historically, racial discrimination in lending barred Blacks and Latinos from home mortgages and financial products, a process known as "redlining." Redlining involved the widespread practice of delineating Black and Latino neighborhoods in red to indicate undesirable investment locations (another narrative locates this term in the drawing of red lines through certain zip codes),[1] in addition to other actions

---

[1] See e.g., Anthony D. Taibi, Banking, Finance, and Community Economic Empowerment: Structural Economic Theory, Procedural Civil Rights, and Substantive Racial Justice, 107 HARV. L. REV. 1463, 1486 (1994) ("Redlining originally referred to the practice of literally drawing a red line around certain neighborhoods on a city map and refusing to make loans for property or businesses located within the demarcated zones."); Ta-Nehisi Coates, The Case for Reparations, THE ATLANTIC, May 2014 (available at http://www.theatlantic.com/features/archive/2014/05/the-case-for-reparations/361631/) ("The FHA had adopted a system of maps that rated neighborhoods according to their perceived stability.... Neighborhoods where black people lived were rated "D" and were usually considered ineligible for FHA backing [and]...were colored in red....[Redlining] spread to

P-049

excluding minority neighborhoods from territories where banks would invest or offer financial products.[2] Even where these putative minority homeowners were well-qualified for the home loans or housing they sought, their applications were not considered.

The concept of redlining involved ongoing and detailed schemes whereby Black and Latino putative borrowers in minority neighborhoods would be denied opportunities for credit and home ownership.[3] Additional factors at play sometimes clouded or complicated recognition of the racialized aspects of redlining practices.

> Redlining is a broader concept than discrimination and encompasses issues of class, region, and sector

---

the entire mortgage industry... excluding black people from most legitimate means of obtaining a mortgage.")
[2] See Taibi, supra, at 1486.

> The practice [of redlining] also derives from outright racial discrimination or from the related prejudice that property values in racially changing neighborhoods must decline. Furthermore, herd behavior may result if others follow one major lender's decision not to invest....[t]o the extent that Black people live in distinct communities, racially disparate rejection rates indicate that Black communities suffer from systematic under-investment -- redlining.

Id. (citations omitted).
[3] See e.g., Charles L. Nier, III, Perpetuation of Segregation: Toward A New Historical and Legal Interpretation of Redlining Under the Fair Housing Act, 32 J. MARSHALL L. REV. 617 (1999).

> "[The] continued existence [of redlining] was related to the marketing practices espoused by lenders in delineating "effective lending territory...." [E]ffective lending territories of major lenders do not arise spontaneously. Rather, they are actively shaped by the marketing strategies of lending institutions. Most major lenders do not wait passively for customers to walk into their offices and request loan application forms. Instead, they actively initiate specific marketing strategies that target certain types of customers, often upscale persons, and particular geographic areas. The lending patterns that emerge are thus the end result of a series of choices by mortgage lenders, such as where to locate retail offices; who to hire as agents to solicit mortgage loan applications; which real estate brokers and mortgage brokers to cultivate for business relationships; and what advertising tactics to adopt.

Id. at 637.

P-049

> disinvestment ... in addition to the problems of the inner city. To the extent, however, that there is a significant racial pattern of differential credit grants and high geographical concentration of African-Americans, there is tremendous overlap between redlining and lending discrimination.

See Taibi, supra, at 1486. After the Supreme Court struck down racially restrictive covenants in Shelley v. Kraemer, 334 U.S. 1 (1948), racial discrimination continued in housing and lending through increasingly hidden and insidious redlining practices. The pervasiveness of redlining practices fueled the development of a civil rights litigation and associated social reforms.

A modern iteration of this discriminatory practice, often termed "reverse redlining," discriminates by erecting barriers to favorable credit treatment, even where qualified, in extending credit to minority neighborhoods on unfair terms.[4] See e.g., Linda E. Fisher, Target Marketing Of Subprime Loans: Racialized Consumer Fraud & Reverse Redlining, 18 J.L. & POL'Y 121, 125–27 (2009) (the strong correlation between race and subprime lending suggests "African-Americans and Latinos were either intentionally singled out for the worst loans or have suffered disproportionately from the effects of facially neutral lending policies"). The practice involved targeting neighborhoods, overwhelmingly Black and Latino, with inflated credit, subprime loans, and other predatory lending practices although consumers might be eligible for preferable credit or loans. The same communities

---

[4] See Taibi, supra, at 1487 ("the term [redlining] refers to any set of practices that systematically denies credit to applicants from low- and moderate income, and minority neighborhoods.") (citations omitted).

7

P-049

which faced redlining previously now received credit on grossly unfair terms in reverse redlining schemes. [5]  Reverse redlining has become a target of civil rights litigation and has been found cognizable as a claim in the federal courts.  See e.g., Justin Steil, Innovative Responses To Foreclosures: Paths To Neighborhood Stability And Housing Opportunity,1 COLUM. J. RACE & L. 63 (2011) (citing Hargraves v. Capital City Mortg. Corp., 140 F. Supp. 2d 7 (D.D.C. 2000); Matthews v. New Century Mortg. Corp., 185 F. Supp. 2d 874 (S.D. Ohio 2002); Barkley v. Olympia Mortg. Co., No. 04-cv-875, 2010 WL 3709278 (E.D.N.Y. Sep. 13, 2010)).

### Factual Background[6]

Plaintiffs in this case allege that Defendant Emigrant Mortgage Company aggressively marketed and originated high-cost mortgage refinance products to Black and Latino homeowners in majority-minority census tracts in New York City from 2004 through 2009.[7]  (SAC ¶¶ 1–2.)  Marketed to people with low credit

---

[5] See e.g., Fisher, supra, at 140-41 (mortgage brokers and "lenders tailored their advertising and sales pitches to [African-American and Hispanic] populations.... while targeting is not per se discriminatory, it easily becomes so when the loans offered contain terms significantly worse than those offered to similarly situated white borrowers") (citations omitted); Charles L. Nier, III and Maureen R. St. Cyr, A Racial Financial Crisis: Rethinking The Theory of Reverse Redlining To Combat Predatory Lending Under The Fair Housing Act, 83 TEMP. L. REV. 941 (2011); Charles Falck, Equitable Access: Examining Information Asymmetry in Reverse Redlining Claims Through Critical Race Theory, 18 TEX. J. ON C.L. & C.R. 101 (2012).

[6] As this Court conducts its review de novo, a thorough recitation of the facts appears warranted, given that additional facts to those cited in the Report may appear throughout this opinion.  In addition, as discussed herein, the Court will consider the allegations set forth in the original complaint, which is the subject of the instant motion to dismiss, in conjunction with the allegations in the proposed amended complaint as Plaintiffs' motion to amend is granted herein.  Since the motion to amend will succeed, and for convenience of litigation going forward, citations herein are primarily to Plaintiffs' Second Amended Complaint.

[7] For purposes for deciding a motion to dismiss, all allegations of the plaintiff are accepted as true. Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007))

8

P-049

scores and high likelihood of default, Plaintiffs allege that the default 18% interest rate imposed was predatory, targeted toward minority homeowners, and functioned, effectively, as an equity-stripping scheme against Black and Latino homeowners. Id. In addition, Emigrant did not encounter Black and Latino borrowers innocuously in their NINA lending program. Instead, racially explicit analyses of Emigrant's own lending histories allowed Emigrant to discover and exploit neighborhoods where, historically, NINA loans were most profitable. (SAC ¶ 3.) Emigrant's equity-stripping scheme was facilitated through the use of inaccurate consumer disclosures that concealed the true annual percentage rates ("APR") and through affirmative misstatements by Emigrant's agents, among other things. (SAC at ¶¶ 4, 31–43.)

Plaintiffs situate Emigrant's conduct within widespread practices of predatory lending, subprime lending, mortgage fraud and abuse, and other misconduct underlying the foreclosure crisis in progress at the time Plaintiffs commenced their case. (SAC ¶¶ 21–26.[8]) Plaintiffs note that minority neighborhoods are the "epicenter" of the foreclosure crisis.

Even controlling for income, credit history, and other factors, minority borrowers were more likely to receive costly subprime loans than their white counterparts. (SAC ¶ 25 (citing Unequal Burden: Income and Racial Disparities in Subprime Lending, Department of Housing and Urban Development (2000)) (Black

---

[8] Citing *Foreclosures by Race and Ethnicity: The Demographics of a Crisis*, Center for Responsible Lending (2010) (available at http://www.responsiblelending.org/mortgage-lending/research-analysis/foreclosures-by-race-and-ethnicity.pdf).

P-049

neighborhoods four times more likely to use subprime products; upper-income Black areas over twice as likely as in middle-income white neighborhoods to refinance in subprime market) (available at http://www.huduser.org/Publications/pdf/newyork.pdf).) In addition, the practice had the effect of draining wealth tied up in people's homes, and critically compromising entire communities.[9]

### The Equity Stripping Scheme

Plaintiffs allege that Emigrant engaged in a wholesale shift of its lending policies in the mid-1990s. (SAC ¶¶ 26–31.) Whereas Emigrant had traditionally been a conservative lender that experienced few defaults, it began offering NINA loans, traditionally reserved for borrowers with good credit, in 1995. (SAC ¶ 26.) Emigrant made loans overwhelmingly in white, upper-income census tracts in 1994 and prior, with only 4% of its total loans in minority census tracts and 66% in white

---

[9] See e.g., New Property, 113 COLUM. L. REV. 1773 at 1840–41:

> The home is both vital in its own right and generative of other defining relationships. Someone who loses her or his home will almost certainly lose her or his neighbors. With greater distance, friendships and numerous informal supports--exchanges of babysitting, help with repairs, and much more--will break down. Worse, losing a home can endanger a family…. The lack of stable housing also makes difficult or impossible the retention of other important property, including the clothes that define one's status in society, the mementos that honor one's ancestors, the computers that allow connection with online communities and opportunities to obtain income, and even the basic documents required to establish one's identity.

> Property relationships involving the home--whether with grantors, mortgagees, or landlords--thus are typically the most important interaction a low-income person has with strangers. And it is an extremely perilous one, for not only are the stakes extremely high for the home's resident, but the home will also be worth a great deal, albeit much less, to strangers…. The centrality of the home and its crucial role as a point of access to other forms of wealth is not new. Neither, unfortunately, are the efforts of powerful strangers to dispossess vulnerable people.

P-049

census tracts. (SAC ¶ 29.) Conversely, by 2004, 83% of Emigrants loans were NINA loans and 57% of those were originated in majority-minority census tracts. (SAC ¶ 31.)

By 2005, Plaintiffs allege that Emigrant had fully developed a predatory lending program delivering high-cost loans to vulnerable minority borrowers who already had substantial equity in their homes. (SAC ¶¶ 32–33.) Unlike other NINA programs, Emigrant would lend to consumers with low credit (applying even higher interest rates and virtually ensuring default), unusual even among Emigrant's competitors. (SAC ¶¶ 34–35.) Whereas many mortgage lenders were selling their loans in the secondary market during this period, and therefore were required to accommodate investor and rating agency loan and credit quality assessments, Emigrant held the loans it issued or transferred them within its family of banking institutions. (SAC ¶¶ 36, 38.)

By identifying individuals with significant equity in their homes, Emigrant was able to profit as borrowers defaulted. (SAC ¶ 37-44.) Through the use of onerous mortgage terms, like the 18% default APR (used in 83% of Emigrant's 2007 mortgages and 91% of its 2008 mortgages), which could be imposed after a single late payment, Emigrant quickly "stripped" homeowners of their equity. (SAC ¶ 37.) By offering incentives, including payment premiums for brokers closing high-cost loans, Emigrant's brokers had a financial incentive to ignore borrowers' qualifications for preferable loans, in favor of higher cost loans that would generate this premium. (SAC ¶ 39.) In addition, delayed foreclosures

11

allowed Emigrant to maximize accrued default interest on these loans. (SAC ¶ 42.) Despite careful and accurate appraisals of home equity and borrower eligibility, and despite clear evidence these were nonperforming loans as the overwhelming majority of Emigrants' foreclosures in 2007 and 2008 were on loans originating in the last two years, Emigrant's conduct continued. (SAC ¶¶ 38, 42.)

Plaintiffs' loans bear the hallmarks of this scheme, including but not limited to high interest rates and payment premiums rewarding mortgage brokers for locking in higher-cost loans. (SAC ¶ 37-39.) Plaintiffs claim that by focusing on borrowers with low credit scores at high interest rates, Emigrant ensured high default rates; by focusing on borrowers with high pre-existing home equity, Emigrant ensured the profitability of this scheme. (SAC ¶¶ 35, 38, 43.) By 2008, while NINA loans represented only 3% of refinance loans for all other lenders, they comprised 85% of Emigrant's one-to-four family refinance loans. (SAC ¶ 41.) In that same year, in New York City, Emigrant accounted for 30% of citywide NINA refinance losses, despite originating less than 1.5% of refinance loans citywide. (SAC ¶ 44.)

In addition, Emigrant is charged with misleading consumers as to the nature of the alleged equity-stripping scheme. (SAC ¶¶ 45–47.) Plaintiffs' claim Emigrant used legal disclosure requirements, like those stipulated by the Truth in Lending Act, to obscure rather than clarify the actual financial consequences attendant to this misconduct. (SAC ¶ 46.) Among other things, Emigrant's disclosures omitted foreseeable and fully expected outcomes, including the inevitable 18% APR.

12

(SAC ¶¶ 46–47.) Whereas other lenders limited NINA refinancing to people with high credit scores, given the absence of other key underwriting elements like income, Emigrant failed to even attempt to meet the industry standards in this regard. (SAC ¶ 26, 34.)

Majority-minority census tracts in New York City also contained the majority of residents with poor credit. (SAC ¶¶ 48–53.) Concentrated in minority neighborhoods, Emigrant's NINA product foreseeably impacted minorities disproportionately, including in the context of default and foreclosures. (SAC ¶¶ 54–56.)

Plaintiffs also allege intentional targeting of Black and Latino borrowers by Emigrant. Emigrant selected advertising outlets that would reach Black and Latino neighborhoods and even grouped these outlets on the racial make-up of their audience. Emigrant's marketing, including advertising placement and purchases, was targeted to locations with significant or predominantly Black and Latino populations by design. Plaintiffs allege this targeting continued as the marketing of this loan package to Black and Latino borrowers enhanced profits for Emigrant, as Emigrant's own internal analyses demonstrated.[10] (SAC ¶¶ 57–61.)

---

[10] If Plaintiffs' allegations are proven, the effect of such a scheme is, quite literally, to drain the wealth from a community. See e.g., David Super, A New New Property, 113 COLUM. L. REV. 1773, 1790 (2013) ("Between 2007 and 2010, white families lost 11% of their net worth, while African Americans lost almost one-third and Latinos and Latinas saw their assets decline 44%. This reflects many Latino/Latina and African American households' lack of asset cushions as well as the large fraction of their wealth tied up in their homes, which left them vulnerable to the collapse of the housing market.").

P-049

The Plaintiffs

Plaintiffs in this case are five families alleged to be severely impacted by Emigrant's equity-stripping scheme and subject to subsequent foreclosure proceedings. For these Plaintiffs, Emigrant disclosed interest rates which did not reflect the foreseeable and expected 18% default APR; instead Emigrant disclosed the rate for uninterrupted on-time payments – in some cases, assuming five or more years of timely payments plus a subsequent rate reduction. None of the Plaintiffs had high credit scores and all had modest incomes, often lower than the payments imposed. Ignorant of sophisticated credit transactions and terminology, the adjustable-rate mortgages and instruments driving Emigrant's alleged discriminatory conduct misled even those borrowers with pre-existing fixed-rate mortgages and experience meeting lender obligations. Many indicia, including prepayment penalties, premiums to brokers who secured higher cost loans, and attorneys representing Emigrant but characterized as a resource to the borrower, obscured the cost and risks of the loan to Plaintiffs. In the end, Emigrant often recovered outstanding balances, default fees, and other costs as the homes at issue were sold or repurchased by Emigrant at auction after foreclosure. None of the Plaintiffs realized they were part of an alleged discriminatory lending scheme until they met with counsel with expertise in this area in 2011 and after. (See generally SAC ¶¶ 62–226)

Jean-Robert and Edith Saint-Jean head a Haitian-American family residing in Brooklyn, homeowners since 1995. (SAC ¶¶ 62–63.) In 2007, they sought a

home equity loan but were steered toward a mortgage refinance. (SAC ¶¶ 65–69.) They had modest incomes and low credit scores. (SAC ¶¶ 68, 72.) Among other things, their mortgage broker dissuaded them from hiring counsel, claiming he would provide them an attorney at closing; represented that their interest rates and their monthly payments would decrease after six months of timely payments; and received a payment premium from Emigrant for closing a higher cost loan. (SAC ¶¶ 73–74, 80, 83.) At or before closing, the mortgage broker failed to disclose the fact the mortgage rate was adjustable, the 18% default interest rate, or the prepayment penalties attendant to the loan. (SAC ¶ 82.)

The Saint-Jeans closed on their mortgage on January 10, 2008. (SAC ¶ 75.) Counsel for Emigrant never denied assertions that he would represent the Saint-Jeans' interests. (SAC ¶ 77.) The interest rates and payments were higher than promised (nearly all of their net income) but the broker dissuaded them from walking away from the deal by again assuring the Saint-Jeans the rate would be lowered after six months. (SAC ¶¶ 78–80.) Despite having provided the mortgage broker with pay stubs and tax returns, the Saint-Jeans were qualified for a loan whose payments represented almost all of the Saint-Jeans' monthly net income and nearly 80% of their gross monthly income. (SAC ¶ 85.) It was suggested that the Saint-Jeans use the loan itself to make monthly payments until the interest rate was lowered, as promised, after six months. (SAC ¶ 80.)

Prior to closing, the Saint-Jeans received no documentation relating to the loan. (SAC ¶ 75.) Emigrant disclosed only an 10.119% APR (lower than the pre-

15

default rate as it factored in a rate decrease after five years of uninterrupted on-time payments), failed to factor in a predicted and foreseeable default rate of interest, failed to provide each of the Saint-Jeans with adequate disclosure information pursuant to the Truth in Lending Act, and buried a set of documents in the closing papers that neither the attorneys nor the mortgage brokers explained to the Saint-Jeans. (SAC ¶¶ 80, 82-92, 94, 96-100.) These included a "Resource Letter" indicating an effective income exceeding $100,000 would be required to make payments on the loan. (SAC ¶ 89.) In addition, the closing proceeded amidst a host of fees that cut into proceeds of the loan. (SAC ¶¶ 86–87.)

After six on-time payments, the Saint-Jeans sought the promised lower interest rate to no avail. (SAC ¶ 101.) The mortgage broker stopped accepting their calls and their attempts to contact Emigrant were fruitless. (SAC ¶¶ 103–05.) When they could not continue making full payments, the 18% default interest rate was imposed. (SAC ¶ 105.) The Saint-Jeans' monthly payments increased to over $6,000, exceeding their entire net and gross monthly incomes. (SAC ¶¶ 72, 105-07.) Once contacted, Emigrant declined to accept partial payments the Saint-Jeans offered at the prior rate. (SAC ¶ 106.) Emigrant filed for foreclosure in mid-2009, after allowing over $30,000 in default fees to accrue over eight months. (SAC ¶ 107.) Two months after that, the Saint-Jeans first consulted counsel, learned their loan was discriminatory in nature, and rescinded their loan via letter on July 12, 2010. (SAC ¶¶ 109–10.)

16

P-049

Felex and Yantil Saintil owned a home in Brooklyn with fixed rate first and second mortgages. (SAC ¶¶ 111–13.) They had modest incomes and low credit scores. (SAC ¶¶ 116–18.) Informed their payments would remain nearly the same, the Saintils refinanced both mortgages with Emigrant. (SAC ¶ 119.) They were never informed that this mortgage, unlike their other mortgages, was an adjustable rate mortgage. (Id.) Like the Saint-Jeans, the Saintils were not notified of prepayment penalties or the 18% default interest rate; they were told an attorney who represented their interests would be provided at closing; a host of redundant and unexplained fees ate away the proceeds of the loan; and the mortgage broker received a $3,250 premium and additional fees. (SAC ¶¶ 124–28.)

The Saintils were approved for a loan far in excess of their ability to pay, despite presenting tax returns and paystubs for the mortgage broker's consideration prior to the loan. (SAC ¶¶ 116–17.) They received no documents prior to closing and, at the closing, they relied on representations from the mortgage broker and the attorney (whom the Saintils were told represented them and whose fee was deducted from the proceeds of their loan) in executing the loan documents. (SAC ¶¶ 121, 131.) The Saintils were unaware of the "resource letter" in the closing documents that indicated they would need an income in excess of $94,000 to adhere to the payment schedule. (SAC ¶ 132.) The mortgage documents did not include riders setting forth the prepayment penalty or the 18% default interest rate, both of which later applied to the Saintils. (SAC ¶ 125.) The initial monthly payments

17

represented more than 100% of the Saintil's gross monthly income and they soon were unable to timely make payments. (SAC ¶¶ 130, 140–42.) They learned about both the 18% default APR and the prepayment penalties as they were imposed by Emigrant. (SAC ¶¶ 141–42.) Although they negotiated with Emigrant and entered a series of unworkable modifications, in August 2011, Emigrant filed a foreclosure action. (SAC ¶¶ 144–48.)

Like the Saint-Jeans, the Saintils were not made aware of the true cost of the loan through TILA disclosures or discussions with the mortgage broker or the attorney purportedly representing them. (SAC ¶¶ 129, 131, 137–39.) Also similar, the Saintils had disclosed adequate information for Emigrant to be aware of their income and its inadequacy to meet the terms of the loan. (SAC ¶¶ 135–36.) Plaintiffs allege these loans were 'designed to fail' at origination and that it was entirely foreseeable that the 18% default rate would be triggered early on in the life of the loan. (SAC ¶¶ 136.) Like the Saint-Jeans, the foreclosure occurred years after Emigrant had been collecting high-cost interest and fees under the 18% default rate. (SAC ¶¶ 144–48.) Like the Saint-Jeans, the Saintils discovered a discriminatory scheme only after conferring with counsel. (SAC ¶ 150.)

Linda Commodore, who owned an apartment in Manhattan, sought refinancing after she lost her information technology job in the general economic slump in the financial institutions in lower Manhattan after 9/11. (SAC ¶¶ 151–53.) At the time of her refinance in 2004, she was working only part time and had a low

credit score. (SAC ¶¶ 156–57.) She was unaware her new loan was an adjustable rate mortgage, or that it contained a default 18% interest rate, and she immediately struggled with payments as she couldn't find steady work. (SAC ¶¶ 158–62, 169–70.) As Commodore continued to struggle to find work, Emigrant declined to accept partial payments, refused to modify the loans. (SAC ¶¶ 171–72.) In 2006, Emigrant commenced a foreclosure action and Emigrant sold her home to a third party in 2007. (SAC ¶¶ 174–75.)

Like the other plaintiffs, Ms. Commodore's loan was accompanied by a host of undisclosed fees, including attorneys' fees for an attorney who represented Emigrant during the closing. (SAC ¶¶ 160, 163.) Ms. Commodore was unaware of the "Resource Letter" indicating her income was clearly insufficient to make ongoing and timely payments on the loan. (SAC ¶ 165.) Ms. Commodore was not made aware of the true cost of the loan through TILA disclosures or discussions with the mortgage broker or the attorney purportedly representing her. (SAC ¶¶ 162, 166.) She learned of the 18% default rate only at imposition, when her payments doubled. (SAC ¶¶ 162, 170.) After foreclosure and sale of her home, like the other plaintiffs, most proceeds were absorbed by accrued default fees and other fees imposed by Emigrant over the three-year life of the loan. (SAC ¶¶ 175.) Plaintiffs claim Ms. Commodore's loan was 'designed to fail' at origination because Emigrant knew or had reason to know that the monthly payments on the loan were unsustainable for Ms. Commodore. (SAC ¶¶ 167–68.) Like the others, Ms.

19

Commodore discovered a discriminatory scheme only after conferring with counsel. (SAC ¶ 176.)

Mother and daughter, Jean and Beverley Small, bought a home in Brooklyn in 1996. (SAC ¶ 178.) Ten years later, they spoke with a mortgage broker about refinancing because of their difficulty making payments on their original mortgage. (SAC ¶ 179.) Despite modest incomes and low credit scores, both of which were disclosed, the Smalls were approved for a mortgage refinance. (SAC ¶¶ 179, 183.) They were also told that, after two monthly payments of $2,800, their payments would decrease permanently to $1,100, a 60% decrease. (SAC ¶ 184.) They were dissuaded from bringing a lawyer, and told that a lawyer present at the closing would represent their interests. (SAC ¶ 186.)

As with the other Plaintiffs, the mortgage broker received a sizeable premium payment at closing, and redundant and unexplained fees ate away proceedings from the loan, including attorneys' fees. (SAC ¶ 190–92.) The promised decrease in monthly payments never came to fruition and the Smalls struggled immediately with the payments. (SAC ¶ 193, 198.)

The Smalls were unaware of the adjustable rate mortgage, the prepayment penalties and other fees, and the 18% default rate of interest until imposition. (SAC ¶¶ 188–89.) The resource letter in the loan stated dependable income exceeding $82,000 would be required for this loan but this was not disclosed to the Smalls, flagged by the attorney purportedly representing them at closing, nor considered by Emigrant despite the income disclosures the Smalls made. (SAC ¶ 194.) Nor would

20

Emigrant agree to a loan modification when approached by the Smalls once they realized their incipient financial crisis. (SAC ¶ 200.) Instead, Emigrant continued with foreclosure proceedings. (SAC ¶ 200.) Once aware of their financial predicament, the Smalls sold their house in 2008; most proceeds of the sale went to Emigrant's outstanding balance, including thousands of dollars in "default fees." (SAC ¶¶ 202–03.)

After a decade of being homeowners, the Smalls now rent an apartment. (SAC ¶ 177.) Like other plaintiffs, they learned of the 18% default APR at the time of imposition. (SAC ¶ 188.) Like the other plaintiffs, the Smalls were not made aware of the true cost of the loan through disclosures or discussions with the mortgage broker or the attorney purportedly representing them. (SAC ¶¶ 195–97.) Also similar, the Smalls had disclosed adequate information for Emigrant to be aware of their income and its inadequacy to meet the terms of the loan. (SAC ¶ 196.) Plaintiffs allege these loans were 'designed to fail' at origination and that it was entirely foreseeable that the 18% default rate would be triggered early on in the life of the loan. (SAC ¶¶ 197.) Like the other plaintiffs, the Smalls discovered a discriminatory scheme only after conferring with counsel. (SAC ¶ 204.)

In 2007, Felipe Howell had lived in his Jamaica, New York home for nearly thirty years and owned his home outright, having paid off his mortgage in full. (SAC ¶¶ 205–06.) Despite having no income beyond prospective rental income for the construction of a new residential building (for which he sought the loan), Mr.

Howell was referred to a mortgage broker by a contractor working in his neighborhood and qualified for a cash-out refinance from Emigrant. (SAC ¶ 209.) He had no income and a low credit score. (SAC ¶¶ 209–10.) Despite voicing concerns at the fact he had no income, Mr. Howell was persuaded by the mortgage broker to proceed with the loan. (SAC ¶ 201.) Like the other plaintiffs, the mortgage broker received a premium at the time of the closing, additional redundant and unexplained fees were deducted from the proceeds of the loan, and Mr. Howell was unaware that an income of $51,527 would have been required for this loan (he had no income). (SAC ¶¶ 214–15, 217.)

By March 2009, Howell had lost his home to Emigrant's foreclosure proceeding. (SAC ¶ 205.) Like other plaintiffs, Mr. Howell learned of the 18% default APR at the time of imposition. (SAC ¶ 214.) Like the other plaintiffs, Mr. Howell not made aware of the true cost of the loan through disclosures or discussions with the mortgage broker (who received a premium) or the attorney purportedly representing him (and whose fees he paid). (SAC ¶¶ 214, 218.) Also similar, Mr. Howell had disclosed adequate information for Emigrant to be aware of his total absence of income and its inadequacy to meet the terms of the loan; he was unable to make even a single payment. (SAC ¶¶ 219, 221.)

Plaintiffs allege these loans were 'designed to fail' at origination and that it was entirely foreseeable that the 18% default rate would be triggered early on in the life of the loan. (SAC ¶ 220.) Like the other plaintiffs, Mr. Howell discovered a discriminatory scheme only after conferring with counsel familiar with

22

discrimination law. (SAC ¶ 225.) At the time of the foreclosure, Emigrant purchased Mr. Howell's home at auction for $1,000 despite its earlier appraisal at $430,000. (SAC ¶ 224.)

## DISCUSSION

The foreclosure crisis has been characterized by revelations of predatory lending in various forms, including exorbitant fees, prepayment penalties, inflated interest rates, steering and targeting of loans toward vulnerable groups, "exploding" adjustable interest rates, and deceptive sales tactics, including false representations that apparent problems or concerns would be healed later, during the life of the loan. Although this conduct was widespread for years, it falls to this Court to determine whether and how Plaintiffs' grievances are actionable under federal law, in the context of the instant motion to dismiss.

## I.      Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, the Complaint "does not need detailed factual allegations" but must set forth the grounds for entitlement to relief with "more than labels and conclusions." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted). "[A] formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). The grounds for relief must be plausible. See 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal v. Ashcroft, 556 U.S. 662, 678 (2009) (quoting Twombly); see also Twombly, 550 U.S. 555

23

("Factual allegations must be enough to raise a right to relief above the speculative level.") (citation omitted).  Bald assertions are insufficient to state a claim under this standard.  <u>See</u> 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," including those "couched as factual allegation[s].").

On a motion to dismiss, the court has the discretion to consider the allegations in a proposed amended complaint in conjunction with the original complaint upon which the 12(b)(6) motion was filed.  <u>Dougherty v. Town of North Hempstead Bd. of Zoning Appeals</u>, 282 F.3d 83, 87-88, 89 (2d Cir. 2002) (review in light of allegations in original and proposed complaints). <u>Palm Beach Strategic Income, LP v. Salzman</u>, 457 Fed. App'x. 40 (2d Cir. 2012) (same); <u>Hamzik v. Office for People with Developmental Disabilities</u>, 859 F.Supp.2d 265 (N.D.N.Y. 2012) ("Where a plaintiff seeks to amend his complaint while a motion to dismiss is pending, a court [may consider]… the merits of the motion in light of the amended complaint"); <u>Roller Bearing Co. of Am., Inc. v. Am. Software, Inc.</u>, 570 F.Supp.2d 376, 384 (D.Conn.2008) (same); <u>Allstate Ins. Co. v. Passaro-Henry</u>, 660 F.Supp.2d 317, 324 (D. Conn. 2009) (evaluation of motion to dismiss "directed to final product").

1.     **Plaintiffs' Civil Rights Claims**

In this motion to dismiss, Emigrant has challenged both the timeliness and the substance of Plaintiffs' claims, as set forth herein.

24

### a. Plaintiffs' Civil Rights Claims Are Timely

Reviewing the timeliness of Plaintiffs' civil rights claims, this Court finds the Report's analysis well-reasoned and sound. In the Report, the magistrate judge found that the discovery rule and the doctrine of equitable tolling applied, and that Plaintiffs' federal civil rights claims were timely. (Report at 20–22.) Emigrant objects to this recommendation, distinguishing Plaintiffs' injury from Plaintiffs' legal theory and claiming that the accrual of Plaintiffs' claims must be determined by the date of the injury, rather than the date Plaintiffs understood Emigrant's alleged discriminatory motives. Emigrant also claims the discovery rule does not apply to ECOA and FHA claims, and that Plaintiffs have not pled adequate facts, or advanced sufficient arguments, to appropriately conclude the doctrine of equitable tolling applies. (Def. Obj. 7–11.)

Plaintiffs respond to Emigrant's objections, claiming the doctrine of equitable tolling and the discovery rule provide independent and sufficient grounds to find Plaintiffs' discrimination claims timely. (Pl. Resp. at 6.) Plaintiffs claim the inherently self-concealing nature of discriminatory mortgage lending schemes and Second Circuit precedent supports the applicability of the discovery rule and equitable tolling to Plaintiffs' claims. (Pl. Resp. at 6–13.) Plaintiffs also object to the recommendation, insofar as it fails to include their state and municipal claims among those equitably tolled, i.e., Plaintiffs object to the recommendation that their state and municipal claims are untimely. (Pl. Obj. at 14–15.)

P-049

### i. The Discovery Rule Tolls the Applicable Statute of Limitations

The discovery rule is "a doctrine that delays accrual of a cause of action until the plaintiff has 'discovered' it. The rule arose in fraud cases as an exception to the general limitations rule that a cause of action accrues once a plaintiff has a 'complete and present cause of action.'" Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 644 (2010). The discovery rule tolls the statute of limitations only "where a plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted.'" A.Q.C. ex rel. Castillo v. United States, 656 F.3d 135, 139-40 (2d Cir. 2011) (quoting Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998)). In the case of discrimination or fraud, "where a defendant's deceptive conduct may prevent a plaintiff from even knowing that he or she has been defrauded…., the law which was designed to prevent fraud could become the means by which it is made successful and secure." Merck, 559 U.S. at 644 (citations omitted). The discovery rule is both a commitment to fundamental fairness and a safeguard against sophisticated schemes that use parameters of the law to facilitate injustices.

In its objections to the Magistrate Judge's Report, Emigrant opposes application of the discovery rule. Emigrant would draw a distinction between Plaintiffs' discovery of their injury and Plaintiffs' discovery of the alleged discriminatory animus, i.e., Emigrant's alleged equity-stripping scheme involving widespread use and targeting of predatory mortgages to predominantly minority neighborhoods. Using the same premise, Emigrant also argues that the date of

26

accrual occurs around six months of closing, at the time of the Saint-Jeans' default, and that Plaintiffs' claims are time-barred even with application of the discovery rule. (Def. Obj. at 7–8.)

Emigrant's attempts to distinguish injury from legal theory, for purposes of 'discovery' of Plaintiffs' claims, ignores relevant authority in this circuit that speaks to the contrary. The Second Circuit recognizes prevailing case law defining Plaintiffs' injuries through the lens of their ability to plead a complete cause of action. "The fact that <u>Merck</u> specifically referenced pleading requirements when discussing the limitations trigger indicates to us that the <u>Merck</u> Court thought about the requirements for 'discovering' a fact in terms of what was required to adequately plead that fact and survive a motion to dismiss." <u>City of Pontiac Gen. Employees' Retirement Sys. v. MBIA, Inc.</u>, 637 F.3d 169, 174–75 (2d Cir.2011). Thus, for purposes of the discovery rule, it is the law in this circuit that "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." <u>Id.</u> at 175.

In objecting, Emigrant fails to acknowledge that the discrimination alleged was unknown to Plaintiffs at the time of their individual defaults. <u>Compare</u> <u>Merck</u>, 579 at 644-45 ("where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered"). Emigrant would characterize Plaintiffs' injury as defaulting on the mortgage when the 'complete and present cause of action,' <u>i.e.</u>, the actual injury, requires understanding Emigrant's

27

broader conduct in enacting a predatory, equity-stripping lending scheme that targeted minority homeowners and neighborhoods. Plaintiffs' injury involves a discriminatory, fraudulent scheme, a "complete and present cause of action" Plaintiffs could not appreciate absent context unavailable to them as individual borrowers at the time of default.

Moreover, Emigrant's claim that FHA and ECOA claims are not properly subject to the discovery rule is unavailing. Both statutes are silent as to the discovery rule, i.e., application of a general discovery rule is excluded under neither statute, and courts in this circuit have applied the discovery rule to FHA and ECOA claims in similar cases. See e.g., Adkins v. Morgan Stanley, No. 12-CV-7667, 2013 WL 3835198 (S.D.N.Y. July 25, 2013) (discovery rule applies to FHA claims); Clement v. United Homes, LLC, 914 F. Supp. 2d 362, 372 (E.D.N.Y. 2012) (discovery rule applies to FHA); Jones v. Ford Motor Credit Co., 2002 WL 88431, at *5 (S.D.N.Y. Jan. 22, 2002) (discovery rule applies to ECOA discriminatory lending claims); and Phillips v. Better Homes Depot, Inc., No. 02-CV-1168, 2003 WL 25867736, at *25 (E.D.N.Y. Nov. 12, 2003) (discovery rule applies to ECOA claims; "a victim may not know he or she has been the target of discrimination until meeting other victims or learning more about lending practices in minority communities").

In this case, the Court cannot credit Emigrant's claim that Plaintiffs understood the nature of their injury at the time of their default. Plaintiffs' specific allegations that the injury was not apparent until meeting with counsel in 2009

28

credibly suggest these claims—which, if proven, appear to demonstrate discriminatory and predatory lending practices—could not have been raised without application of the discovery rule. The patterns and practices defining Plaintiffs' allegations of discriminatory lending to particular neighborhoods and persons on the basis of race, and despite the availability of better or cheaper mortgage products, bespeaks a widespread scheme. Such a scheme, if proven, would be invisible to individual borrowers and sufficiently sophisticated to require the development of a critical mass of cases involving defaults under these circumstances, as well as the understanding of counsel experienced in discrimination litigation, to appreciate and explain the discriminatory conduct.

Plaintiffs' claim that the accrual date commences when Plaintiffs met with counsel and understood they were victims of a discriminatory lending scheme is credible and consistent with authority in this circuit. Accepting and adopting the recommendation contained in the Report, upon <u>de novo</u> analysis and given the additional reasoning set forth <u>infra</u>, the Court finds that the discovery rule applies to Plaintiffs' ECOA and FHA claims, that Plaintiffs' did not discover their claims prior to conferring with counsel in July, 2009, and that Plaintiffs' civil rights claims are timely.

### ii. Plaintiffs' Claims are Equitably Tolled

Even if the discovery rule did not apply, the doctrine of equitable tolling applies to Plaintiffs' federal and state claims. Under federal law, where Plaintiff can demonstrate fraudulent concealment, Emigrant is equitably estopped from asserting

29

a statute of limitations defense with respect to these claims.  See New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988) (equitable tolling appropriate in enduring fraudulent enterprise involving multiple contracts and participation incentives); Cerbone v. International Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2d Cir. 1985) (equitable tolling appropriate in age discrimination claim).   The doctrine of equitable tolling requires a demonstration that (1) the defendant concealed the existence of the cause of action; (2) the action commenced within the applicable limitations period once plaintiff was aware of the cause of action; and (3) a lack of due diligence was not the basis for plaintiffs' ignorance of the claim.  Hendrickson, 840 F.2d at 1083.  See also, M & T Mortg. Corp. v. White, 736 F. Supp. 2d 538, 555-56 (E.D.N.Y. 2010) (FHA, ECOA claims timely given fraudulent concealment).

Emigrant's objection to the Report relies on its claim that there is no evidence of intentional concealment and their rejection of the idea that the alleged misconduct was self-concealing in nature.  (Def. Obj. at 10–11; Def. Reply at 5–6.) However, Emigrant ignores a significant body of case law, including in this district, finding that FHA, ECOA, and other claims similar to those advanced by Plaintiffs in the context of discriminatory mortgage lending, are inherently self-concealing.  See e.g., White, 736 F. Supp. 2d 538, 555–56 (ECOA and FHA claims equitably tolled given establishment of intentional and self-concealing nature of claim); Council v. Better Homes Depot, Inc., No. 04-CV-5620, 2006 WL 2376381, at *9 (E.D.N.Y. Aug. 16, 2006) (FHA, ECOA, and TILA mortgage fraud claims subject to equitable

30

tolling); <u>Phillips v. Better Homes Depot, Inc.</u>, No. 02-CV-1168, 2003 WL
25867736, at *25 (E.D.N.Y. Nov. 12, 2003) (equitable tolling appropriate for
reverse redlining claims under ECOA).

Courts have also found that Plaintiffs have little basis to understand their
claims exist until they have met with counsel, satisfying the second prong of the
fraudulent concealment. [11]  <u>White</u>, 736 F. Supp. 2d 538, 555–56 (accrual of
limitations period  only after plaintiffs meet with counsel and understand nature of
claims); <u>Council</u>, 2006 WL 2376381, at *10–11 (same); <u>Phillips</u>, 2003 WL
25867736, at *25 (ECOA limitations period accrual only after plaintiffs met with
counsel who understood and conveyed scope of defendant's misconduct; "[t]here is
a difference between being aware that you got a bad deal and being aware that you
were discriminated against in a systematic fashion.").

As in the referenced cases, Plaintiffs in this case had little or no basis to fully
understand their claims and the nature of a systemic, discriminatory equity-stripping
scheme due to fraudulent concealment by Emigrant.   Although the scheme as
alleged was  inherently  self-concealing,  Plaintiffs  have  supplemented  the
'concealment' analysis with allegations of intentional acts attendant to Emigrant's
concealing of the fraud.  These overt and intentional acts include: steering Plaintiffs
to mortgage brokers who directed them toward the more costly loans associated
with this scheme; assuring Plaintiffs, despite specific questioning, that their interests

---

[11] One analyst suggests the federal courts bear some responsibility to ensure "information
asymmetry" such as this does not disadvantage plaintiffs unfairly.  <u>See</u> Charles Falck, <u>Equitable
Access: Examining Information Asymmetry in Reverse Redlining Claims Through Critical Race
Theory</u>, 18 TEX. J. ON C.L. & C.R. 101 (2012).

P-049

were represented by attorneys who actually represented Emigrant;[12] and explicit and repeated representations made by Emigrant about terms and conditions of Plaintiffs' loan that were untrue or unavailing during the life of the loan.

With respect to the federal claims, this Court finds that the concealment prong is adequately demonstrated, both in the inherent self-concealing nature of this type of discrimination, and through the overt and intentional conduct alleged by the Plaintiffs. The very questions and assurances referenced above demonstrate that Plaintiffs' ignorance of their claim was not for lack of due diligence. Nor did Plaintiffs have any other basis to understand the nature of this cause of action prior to speaking to counsel representing them in this action. For these reasons, equitable tolling of Plaintiffs claims is appropriate and the Court adopts the recommendation of the magistrate judge in this regard.

Plaintiffs' state and municipal claims also benefit from equitable estoppel in this analysis. The standard for equitable tolling under New York State law is substantially similar to the federal standard and applies to Plaintiffs' claims under New York State and New York City antidiscrimination laws. See e.g., Council, 2006 WL 2376381, at *11 (state equitable tolling standard substantially similar to federal standard). Plaintiffs have advanced credible allegations of an ongoing and widespread equity-stripping scheme in Black and Latino neighborhoods involving

---

[12] As an aside, the Court views the allegations of misconduct by attorneys and mortgage brokers with great concern, particularly attorneys representing a defendant but allowing the explicit or implicit inference that they represent or guarantee the Plaintiffs' interests during these closings. Attorneys and brokers complicit in such misconduct, if proven, could be subject to disciplinary proceedings and face threats of loss of license, malpractice, and, perhaps, criminal prosecution.

32

discriminatory mortgage lending using deceptive or misleading conduct, including actual misrepresentations by the Emigrant or its agents.

As set forth above, with respect to the federal claims, Plaintiffs credibly allege that Emigrant's conduct obscured Plaintiffs' claims, and that failure to raise these claims earlier was not attributable to lack of due diligence. Under New York State law, where, as here (see infra), there is a credible allegation that the Emigrant's "conduct was calculated to mislead and [Plaintiffs] relied on it, that is enough and the estoppel is imposed to prevent him from obtaining an unconscionable advantage." Arbutina v. Bahuleyan, 75 A.D.2d 84, 86, 428 N.Y.S.2d 99, 100 (1980). Emigrant is equitably estopped from asserting a statute of limitations defense to Plaintiffs' claims and, as a result, Plaintiffs state and municipal claims are not subject to dismissal as time-barred.

For the foregoing reasons, the recommendation with respect to equitable tolling of the federal claims is accepted and adopted. The recommendation with respect to dismissal of the state and municipal claims is set aside, given the availability of the doctrine of equitable tolling to Plaintiffs' state and municipal claims under the analysis set forth above, and Emigrant is equitably estopped from asserting a statute of limitations defense to Plaintiffs' state and municipal claims.

### iii. Continuing Violations Theory

In the Report, Magistrate Judge Orenstein ruled that the continuing violations theory did not apply to Plaintiffs' federal and state civil rights claims. (Report at 17–20.) The Court has reviewed this recommendation and is

33

unpersuaded by that analysis, in light of Plaintiffs' supplemental briefing on this issue. Plaintiffs objected to the recommendation and set forth detailed arguments in support of the applicability of the continuing violations theory in these circumstances, offering a far more detailed analysis of the issue than was presented in their original briefing. (Pl. Obj. at 7–14.) In addition, having found the statute of limitations equitably tolled and subject to the discovery rule, see supra, Plaintiffs' claims may proceed and the Court sees no reason to reach the issue of whether the theory of continuing violations would toll the statute of limitations in this case. The Court will set aside the recommendation from the Report and decline to rule on the viability or applicability of the continuing violations theory in this context.

### b.    Plaintiffs Successfully State a Disparate Impact Claim

In the Report, the magistrate judge rejected Emigrant's motion to dismiss for failure to state a claim, including Emigrant's interpretation of Second Circuit precedent, and concluded Plaintiffs' successfully stated a disparate impact claim. Citing Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934 (2d Cir. 1988), the Report notes that "a prima facie case is established by showing that the challenged practice of the defendant actually or predictably results in racial discrimination," and rejects the "substantive shortcomings" in the claims argued by Emigrant.    (Report at 30, 34.)    The Magistrate Judge was unpersuaded by Emigrant's claims that these loans were approved or endorsed by federal law, their invitation to construe words used by Plaintiffs, like 'high cost,' as legal terms or terms of art, or Emigrant's claim that the APR disclosure mitigates claims the loans

34

were grossly unfavorable to Plaintiffs. (Report at 31–33.) In addition, the Report references Emigrant's improper substitution of the standards to prevail on a disparate impact claim for the lesser standards to plead such a claim. (Report at 34–35.) Having alleged predatory lending within the NINA programs in minority census tracts in New York City, the magistrate judge concludes Plaintiffs met their pleading burden and recommends denying Defendant's 12(b)(6) motion.

Emigrant objects to the Report's conclusion that Plaintiffs' disparate impact claims are properly pled. (Def. Obj. at 14–17.) Citing Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565 (2d Cir. 2003) and Watson v. New York Pressman's Union No. 2, 444 Fed. App'x. 500 (2d Cir. 2011), Emigrant claims Plaintiffs failed to adequately plead impact to minority borrowers different from similarly-situated white borrowers. (Def. Obj. at 14–15.) In addition, Emigrant claims Plaintiffs proceed on a "racial quota theory" and that the Magistrate Judge focuses on inappropriate legal authority. (Def. Obj. at 16.)

In response, Plaintiffs argue that Emigrant misconstrues or misstates the Second Circuit standard for pleading a disparate impact case, reading in requirements that do not exist; that Plaintiffs' allegations contained adequate statistical and factual demonstrations of disparate impact; and that the legal authority relied upon by the magistrate judge was directly related to the allegations in the Complaint. (Pl. Resp. at 15–17.) In addition, Plaintiffs' Second Amended Complaint, which adds new plaintiffs, claims, and allegations, includes intentional targeting claims.

35

P-049

Analyzing claims of fair housing discrimination post-trial in <u>Tsombanidis</u>, the Second Circuit stated that "a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." <u>Tsombanidis</u>, 352 F.3d at 575. The prima facie case of discrimination "must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals." <u>Id.</u> The Circuit noted the customary use of statistical evidence and the importance of developing appropriate comparison groups in demonstrating disparate impact. <u>Id</u>. at 575, 576–77. In <u>Watson</u>, an unpublished opinion, the Circuit rejected Plaintiffs' premise that disparate impact could be demonstrated solely through actions locking in the effects of alleged past discrimination. <u>Watson</u>, 444 Fed. Appx. at 502. In that case, the effects of the defendant's conduct in the employment discrimination context involved rejecting reliance on a 'bottom line racial imbalance," without a clear link to discriminatory practices or policies.

It is clear to this Court that, at the motion to dismiss stage, Plaintiffs do state a viable discrimination claim. <u>Watson</u>, which relies on a line of cases specific to employment discrimination, is inapposite in this context but also inadequately descriptive of Plaintiffs' allegations. Plaintiffs in this case link evidence of racial imbalance to their discrimination claims with detailed allegations about practices under Emigrant's NINA program that led to these imbalances. Plaintiffs also offer statistical evidence for their claims, which is consistent with the support that has been persuasive in other disparate impact cases. <u>See e.g.</u>, <u>Hargraves v. Capital City</u>

36

Mortgage Corp., 140 F. Supp. 2d 7 (D.D.C. 2000) (allegations of predatory lending concentrated in minority census tracts, supported by statistical evidence, adequately plead disparate impact without favorable loans outside protected class); Huntington Branch, NAACP, 844 F.2d at 937–38 (statistical analysis supports disparate impact claim).

While Plaintiffs and Emigrant might define relevant comparison groups and evidence differently, the task for the Court is to determine whether, accepting all allegations in the complaints as true, a viable disparate impact claim exists. It is clear to this Court that Plaintiffs have set forth allegations that adequately support a disparate impact claim. Plaintiffs' intentional targeting allegations also appear viable given the allegations in the complaints. Plaintiffs offered evidence of an equity-stripping scheme targeted to homeowners with low income, low credit scores, and homeowner equity. The program was marketed to Black and Latino borrowers through intentional analysis and exploitation of this data to target certain communities with advertising outlets of particular and race-based appeal. A high default rate of interest facilitated Emigrant's scheme. Statistical evidence and mapping data confirmed disparate, and devastating, impact to non-white homeowners. Plaintiffs allege the costliest loans and disproportionate foreclosures have resulted for people of color and in minority neighborhoods.

Having reviewed the parties' submissions and the Report, and considered the arguments de novo, and offered the supplemental analysis supra, it is clear to the Court that Plaintiffs successfully state discrimination claims under federal and state

law.  This Court will accept and adopt the recommendation of the magistrate judge in the Report and deny Emigrant's motion to dismiss Plaintiffs' federal claims for failure to state a claim. In addition, Plaintiffs' state and municipal claims survive as well.

**2.     Plaintiffs' Truth in Lending Act Claims**

Emigrant also challenges Plaintiffs' claims under the Truth in Lending Act. The Truth in Lending Act ("TILA") was enacted by Congress in 1968 in order to promote the "informed use of credit." 15 U.S.C.A. § 1601 et seq. Recognizing that "economic stabilization would be enhanced and the competition . . . would be strengthened" where consumers were aware of actual costs involved in credit-based transactions, TILA mandates the "meaningful disclosure of credit terms . . . to protect the consumer against inaccurate and unfair credit billing ... practices." 15 U.S.C.A. § 1601(a). See also, Crawford v. Franklin Credit Management Corp., --- F.3d ----, 2014 WL 3377175 (2d Cir. July 11, 2014).

In this case, Plaintiffs claim Emigrant's TILA representations masked, rather than clarified, the true cost of the home loans. Plaintiffs argue a material violation of TILA through Emigrant's failure to meaningfully disclose the credit terms of the loan.  Among other material violations, Plaintiffs claim that the annual percentage rate (APR) disclosed did not account for the fully anticipated 18% penalty rate, which should not have been withheld from disclosure as an "unanticipated late payment." See 12 C.F.R. §226.4(c)(2). In other words, Plaintiffs claim Emigrant's

38

NINA loans were granted with the expectation that these particular borrowers would default and that the 18% penalty interest rate would apply.

As expected, and as discussed supra, Plaintiffs did not receive the promised benefits. The Saint-Jeans never received the lowered interest rate after six timely payments, nor did any other plaintiff see promises made with respect to lowered payments come to fruition after closing. Ultimately, Plaintiffs could not maintain timely payments, triggering the penalty interest rate. The law allows for a three-year rescission period where there are material violations of TILA.[13] On July 12, 2010, approximately ten months before the commencement of this lawsuit, Plaintiffs mailed a notice of rescission to Emigrant. Emigrant argues this notice inadequately rescinds, absent concomitant commencement of a lawsuit within the three-year window.

In the Report, the Magistrate Judge concluded that Plaintiffs' TILA claims are timely and state a cognizable claim. (See Report at 25–29, 35–36.) Noting the unconditional three-day rescission period under TILA (which does not require a lawsuit) and citing 12 C.F.R. § 226.23(a)(2) and United States Supreme Court authority, the Magistrate Judge noted "[t]he method for exercising either kind of rescission is set forth in a single provision. Presumably, then, the requirement to file a lawsuit before rescinding would apply to both kinds of rescission or to neither." (Report at 28.) Citing the plain language of the statute and the mandate of TILA's remedial purpose, i.e., liberal construction of the statutory language in favor of

---

[13] In the absence of a material violation of TILA, borrowers hold only a three-day unconditional right to rescind, see 12 C.F.R. 226(23).

consumers, the Report concludes that the right to rescission under TILA merely requires notice to the creditor by mail or other written communication, not the actual commencement of a lawsuit. (See Report at 27–28.)

Emigrant objects to the Magistrate Judge's conclusion that Plaintiffs' TILA claims are timely or substantively viable, arguing no cognizable TILA violation was pled and that no three-year right to rescind applies. (Def. Obj. at 11–13.) Even if Plaintiffs were entitled to benefit from the three-year rescission period, Emigrant denies that Plaintiffs adequately rescinded the loan. (Def. Obj. at 13–14.) Plaintiffs respond to these objections, using the same case law cited by Emigrant, to claim that the actual, reasonable expectations of the lender, i.e., default and rising interest rates in the context of subprime lending, do give rise to a TILA violation and that Plaintiffs' notice of rescission was timely and proper. (Pl. Responses to Def. Obj. at 17–22.)

### a. Plaintiffs' TILA Claims are Timely

In reviewing the TILA claims, and TILA's rescission provisions,[14] de novo, this Court finds the Report persuasive. As discussed below, see infra at Section

---

[14] TILA's right to rescind is codified at 15 U.S.C. § 1635. Rescission within three years is addressed in Section 1635(f) and provides in relevant part:

> An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor, except that if (1) any agency empowered to enforce the provisions of this subchapter institutes a proceeding to enforce the provisions of this section within three years after the date of consummation of the transaction, (2) such agency finds a violation of this section, and (3) the obligor's right to rescind is based in whole or in part on any matter involved in such proceeding, then the obligor's right of rescission

40

P-049

2(b), and accepting the allegations in the Complaint as true, it does appear that Plaintiffs have stated a viable TILA claim, including material violations of TILA. The credible pleading of material violations of TILA in the Complaint justifies Plaintiffs' invocation of the three-year rescission period under the statute.

Emigrant cites Beach v. Ocwen, 523 U.S. 410, 412 (1998) in support of its argument that "TILA's extended right to rescind functions as a deadline for bringing suit" and references the Court's recognition that "[t]he terms of a typical statute of limitation provide that a cause of action may or must be brought within a certain period of time." Beach, 523 U.S. at 416.[15] This is, however, precisely the point; TILA does not offer the parties a "typical" statute of limitations setting forth explicitly the expiration of a private right of action and, as a result, the Court recognizes the split in Circuit law renders treatment of this issue far less straightforward than the Court suggests in Beach.[16] See id.

---

shall expire three years after the date of consummation of the transaction or upon the earlier sale of the property, or upon the expiration of one year following the conclusion of the proceeding, or any judicial review or period for judicial review thereof, whichever is later.

[15] Defendant also cites Murphy v. Empire of Am., FSA, 746 F.2d 931, 934 (2d Cir. 1984) to suggest there is relevant authority in this Circuit suggesting a rescission notice is an unenforceable legal nullity. (Def. Obj. at 14.) However, Defendant fails to recognize, or note, that Murphy involved analysis of effective "consummation" of a consumer credit transaction under state law, rather than the examination of rescission limitations periods under the federal TILA. Thus, Murphy is entirely inapposite as it does not involve examination or enforcement of the three-year rescission window triggered by material violations of TILA, but the instead merely acknowledges the availability of unilateral rescission which expires, by law, three days after the consummation of a TILA-eligible transaction and clearly does not require a lawsuit at invocation. Since no issue relating to this case was at issue there, the snippet of Murphy quoted by Defendant is irrelevant, dicta, or both.

[16] There is a divide in the circuits as to whether consumers must file civil actions or merely provide written notice in order to exercise their rights to rescission at the three-year mark. Although the Second Circuit has not considered the issue, the Third, Fourth, and Eleventh Circuits have found that written notice to the creditor is sufficient, a conclusion grounded in analysis the plain text of the

41

In <u>Beach,</u> the Court considered whether the right to rescind could be asserted as an affirmative defense in a collection action brought after the expiration of the three-year rescission period and concluded it could not. <u>Id</u>. at 411–12. Without ever reaching the issues presented in this case,[17] the Court acknowledged the TILA statute did not, in fact, function as a typical statute of limitations, but that the statute governed the life of the underlying right to rescind. <u>Id</u>. The Court noted that "[t]he subsection says nothing in terms of bringing an action but instead provides that the right of rescission under the Act shall expire at the end of the time period. It talks not of a suit's commencement but of a right's duration. . . ." <u>Beach</u>, 523 U.S. at 417 (referencing 15 U.S.C. § 1635(f)) (citations omitted). The limitation in TILA, explicitly set forth in 15 U.S.C. § 1635(f), *is a limitation to the right that neither expressly nor implicitly further limits the remedies attached to that right.* In the absence of legislative language or intent to the contrary, TILA's right to rescind is entitled to the liberal construction afforded the rest of the statute and may be

---

TILA statute and its implementing regulation. The First, Sixth, Eighth, Ninth, and Tenth Circuits read a requirement into the right to rescind, namely that a consumer must file a civil action within three years in order to exercise rescission rights. Although these circuits rely on an alternative interpretation of <u>Beach</u>, this Court concludes, as set forth herein, that reading a filing requirement into the right to rescind under TILA is neither a necessary nor an appropriate extension of <u>Beach</u>. This is particularly true in light of the question presented in that case, TILA's statutory text and implementing regulations, and the legislative history and intent, all of which are entirely devoid of such a requirement or its suggestion.

[17] In <u>Beach,</u> the plaintiffs argued that the three-year right to rescission applied to the commencement of a lawsuit but not the assertion of an affirmative defense. The Supreme Court adopted that dialectic in discussing plaintiffs' claim without ever examining the merits of what action suffices to express the right to rescind under the three-year statute, basically using a lawsuit under 15 U.S.C.A. 1635(f) as a foil to discuss the assertion of an affirmative defense, <u>i.e.,</u> the actual question presented, and assuming <u>arguendo</u> but not ruling that a lawsuit accurately and adequately expressed TILA rescission provisions, perhaps because it best illustrated the contrast to plaintiffs' claims in that case.

P-049

exercised by consumers variously in writing until its nearly unconditional expiration at the three-year mark.

This is consistent with the Supreme Court's ruling in <u>Beach</u> and with its precedent with respect to statutory construction as well. Citing its own precedent in <u>Bates v. United States</u>, 522 U.S. 23, 29–30 (1997), the <u>Beach</u> Court recognized that where the legislative process "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." <u>Id.</u> (citations and quotations omitted). The express inclusion of language relating to private civil actions, damages, and enforceability throughout TILA, <u>see e.g.</u>, 15 U.S.C.A. §§ 1635 (b), (g), 1640(a), (e) (contemplating court action <u>after</u> rescission) is noticeably absent from the rescission provisions. <u>Cf.</u> 15 U.S.C.A. § 1635(f). Even more telling, in the *very same provision* discussing rescission, Congress clearly and explicitly tolls the expiration of TILA's rescission right upon the "institution of a proceeding" by an interested agency without ever suggesting that such a high bar, <u>i.e.</u>, institution of a legal proceeding, shall be the sole method by which a consumer may express his intent to exercise his right to rescind at the three-year mark. <u>See</u> 15 U.S.C.A. § 1635(f).

Drawing inferences from the plain language of the statute, and the omission of language in one section of the statute that is used elsewhere in the same statute (a version of <u>expressio unius est exclusio alterius</u>), it is apparent that written notice of rescission at the three-year mark is sufficient. These canons of statutory

43

construction have been relied upon to clarify legislative intent and statutory meaning at every level of the American judiciary, which Congress recognizes in the drafting and adoption of new legislation. See e.g., Congressional Research Service, Report for Congress, Statutory Interpretation: General Principles and Recent Trends (2008) at 1, 14 (available at http://fas.org/sgp/crs/misc/97-589.pdf). This Court sees no reason to depart from time-honored principles of statutory interpretation in evaluating the mechanism by which to exercise the right to rescind under TILA.

In addition, the legislative history and the relevant regulations are relevant to the question of whether valid rescission at the three-year mark requires the commencement of a lawsuit. At its enactment, Congress delegated broad authority to promulgate relevant rules under TILA to the Federal Reserve Board, see, e.g., 15 U.S.C. 1604(a), which promulgated Regulation Z, the implementing regulations of TILA, located at Section 226 of Volume 12 of the Code of Federal Regulations. See generally 12 C.F.R. § 226. Regulation Z deals with the consumer's right to rescission both (1) unilaterally within three days, or (2) subject to material violations of TILA within three years, in the same provision. See 12 C.F.R. §226.23(a)(3).

In Section 226.23, Regulation Z fails to redefine the term rescission or its enforcement based on when or how the right is exercised; the regulation clearly contemplates the right to rescission is one right with multiple routes of access. Regulation Z sets forth generally applicable principles for providing notice of rescission immediately in advance of setting forth parallel timelines to exercise a

44

single, internally congruous right to rescission. <u>Compare</u> 12 C.F.R. §226.23(a)(3) <u>with</u> 12 C.F.R. §226.23(a)(2). According to Regulation Z, in order to exercise the rescission right, consumers "shall notify the creditor of the rescission by mail, telegram or other means of written communication." 12 C.F.R. §226.23(a)(2). Thus, the rules make no mention of the commencement of a lawsuit in order to properly exercise a rescission right at any time, nor do they contemplate a fundamental difference in the substantive right to rescind at the three-day mark versus the three-year mark, beyond availability criteria. This Court has no basis to find that proper rescission in the three-year context requires more than the written notice set forth in the regulations, which clearly applies to both the three-year and the three-day exercise of rescission. <u>See</u> 12 C.F.R. §226.23(a)(2).

Consequently, this Court finds no basis to conclude that exercising the right to rescission at the three-year mark requires bringing a lawsuit, rather than serving written notice, where clearly no such requirement exists with respect to the three-day rescission right under the same statute. The recognition of the Court's proper role, fairness to the parties (including unsophisticated individuals for whom filing fees, added legal requirements and procedures, filing fees, and lawyers' fees pose added and unnecessary barriers to accessing justice or asserting and defending their rights), and judicial economy preclude this Court from mandating the premature filing of a lawsuit when a simple legal notice of rescission will suffice to achieve the same goals.

P-049

The courts are meant to be a resource of last resort, within the generally accepted principle that the courts (and, for that matter, the government) should avoid overreaching or inserting itself prematurely into private disputes potentially capable of resolving without court intervention. It is patently unnecessary for the courts to referee a dispute between lender and borrower where the possibility of an adequate negotiated solution without governmental interference may exist. Certainly service of a notice of rescission in writing – which requires neither the presence of counsel nor the vast machinery of the federal government – adequately puts defendants on notice. To require, rather than permit, the filing of a lawsuit in order to trigger rescission at the three-year mark is to ask the federal judiciary to babysit every questionable long-term credit transaction nationwide. This is both impractical and undesirable. Even at the three-year mark, written notice of rescission facilitates a pre-filing period of dialogue, negotiation, and potential mutually satisfactory resolution of a claim by the parties outside of court or in advance of litigation. To paraphrase well-known words on negotiation and resolution, albeit out of context, this is an outcome "devoutly to be wished." [18]

Finally, this Court is aware the United States Supreme Court recently granted a writ of certiorari relating to the three-year rescission period and how it may be exercised under TILA. See Jesinoski v. Countrywide Home Loans, Inc., 729 F.3d 1092, 1093 (8th Cir. 2013), cert. granted, No. 13-684, 2014 WL 1659857 (U.S. Apr. 28, 2014). Presumably the Supreme Court will hear arguments to

---

[18] The Court refers, of course, to the famous "To Be or Not To Be..." soliloquy by Hamlet in Shakespeare's play of the same name. See Shakespeare, William. Hamlet. Act III, Scene 1 (1604).

determine whether a notice of rescission or the filing of a lawsuit that must occur before the expiration of the TILA three-year rescission period in its next session. If necessary, this Court will revisit this decision in light of new authority from the Supreme Court. With respect to Plaintiffs' TILA claims, the Court adopts the recommendation of the Magistrate Judge and offers additional <u>de novo</u> analysis above, and finds these claims are timely.

### b. Plaintiffs State a Claim Under TILA

In addition, taking the Plaintiffs' allegations as true, it is clear that the Complaint succeeds in stating a TILA claim. Plaintiffs' status as consumers, Emigrant's status as creditors, and the loan in question clearly fall within the scope of TILA. <u>See generally</u>, 15 U.S.C.A. §§ 1601 <u>et seq.</u>, <u>and</u> 15 U.S.C.A. §§ 1602(f), 1602(h), 1602(i). Moreover, the transgressions alleged fit the type of conduct TILA was enacted to capture. <u>See</u> 15 U.S.C.A. § 1601(a).

In this case, Plaintiffs' allegations, if proven, demonstrate specific and material violations of TILA. TILA sets forth specific disclosure requirements for creditors, including the expected APR. According to the statute and its implementing Regulation Z, 12 C.F.R. § 226, TILA requires disclosure of the amount financed, the finance charge, the schedule and total of payments, and rescission rights under specific circumstances in order to avoid liability. <u>See</u> 15 U.S.C. §§ 1635, 1638(a)(2)(A), 1638(a)(3), 1638(a)(6), 1639; 12 C.F.R. §§ 226.18; and 226.23(b)(1). <u>See also</u> <u>Crawford v. Franklin Credit Management Corp.</u>, --- F.3d ----, 2014 WL 3377175, at *15 (2d Cir. July 11, 2014). TILA is a remedial statute,

P-049

requiring courts to liberally construe its provisions in favor of consumer claims. See e.g., Kurz v. Chase Manhattan Bank, 273 F.Supp.2d 474 (S.D.N.Y. 2003) ("TILA, being a remedial statute, must be strictly construed"). As discussed below, Plaintiffs' argument that the appropriate APR ought to factor in the fully anticipated penalty rate – given the Plaintiffs' ability to pay, representations made to alleviate Plaintiffs' concerns in this regard prior to the consummation of the loan, and the frailty of the arguments denying the inevitable penalty rate constituted "unanticipated late payment" within the meaning of 12 C.F.R. § 226.4(c)(2) in the context of widespread subprime lending in this period – is not an unreasonable interpretation of TILA's language or intent. At the motion to dismiss stage, plaintiffs need not do more than credibly allege plausible TILA violations in order to maintain their claims.

Here, Plaintiffs claim that Emigrant failed to accurately and properly disclose the finance charge, the amount financed, the annual percentage rate (APR), the payment schedule, and the total of payments. Plaintiffs claim Emigrant inaccurately disclosed the terms of the the APR as set forth supra, failed to provide each Plaintiff with two copies of the notice of right to cancel, and failed to provide each Plaintiff with a copy of the required TILA disclosure statement. (Comp. at 122; SAC ¶¶ 273, 274.) If proven, these allegations demonstrate material violations of TILA, even under a narrow construction of relevant authority. Insofar as TILA must be liberally construed, Plaintiffs have alleged adequately material violations of TILA sufficient to state a claim.

48

Plaintiffs also allege misconduct by Emigrant which, if proven, situates Emigrant's NINA program squarely within widespread conduct (1) underlying the subprime lending crisis, (2) instrumental in the near-collapse of the capital markets by 2008-2009 and the subsequent recession, and (3) underlying millions of foreclosures, considerable and/or total loss of equity for nearly a quarter of American homeowners, and a significant loss of wealth to middle-income Americans, particularly in black and Latino communities.

The "economic stabilization" TILA was enacted to promote was arguably a casualty of both irresponsible lending and irresponsible borrowing throughout this period. And, in fact, some of the earliest cases on point reveal the legislative intent of TILA contemplated precisely situations such as those pled by Plaintiffs in the Complaint. See e.g., N.C. Freed Co., Inc. v. Board of Governors of Federal Reserve System, 473 F.2d 1210, 1214 (2d Cir.1973) cert. denied, 414 U.S. 827, 94 S. Ct. 48, 38 L.Ed.2d 61 (1973) (TILA "is remedial in nature, designed to remedy what Congressional hearings revealed to be unscrupulous and predatory creditor practices throughout the nation.... [and] its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated."). The Court finds that the allegations in the Complaint, if proven, are consistent with the plain language and the legislative intent in the enactment of TILA and its amendments.

## II. Motion to Amend the Complaint

Judge Orenstein determined that Plaintiffs should be allowed to amend the Complaint to add claims, additional defendants, and additional plaintiffs. In doing

so, the magistrate judge rejected Emigrant's untimeliness arguments, arguments that some plaintiffs knowingly and voluntarily released claims against the Emigrant, and arguments that Emigrant would face undue prejudice arising from added discovery obligations or strategic and defensive obligations attendant to new claims involving intentional targeting. See Report at 36–39.

The Report notes that Emigrant is largely responsible for the delay of which they complain, given unusual and extraordinary delays in producing discovery and complying with timely requests to produce discovery. Id. at 37. Judge Orenstein found Emigrant's claims of prejudice with respect to (1) the addition of new plaintiffs and (2) intentional targeting claims, unavailing. The additional plaintiffs only slightly increased the scope of discovery which remained incomplete. Id. at 37–38. The additional intentional targeting issues were raised repeatedly by Emigrant in the course of arguing issues in the case and thus Emigrant is well-aware of their potential relevance defensively, even prior to Plaintiffs' prosecution of the case in this manner. Id. at 38-39. Emigrant objects to these conclusions, claiming amendment would be futile and untimely, that the addition of new plaintiffs repeats defects in timeliness of the claims, fails to state substantive claims, and, interestingly at this stage of the proceedings, Emigrant questions the credibility of the Plaintiffs. (See Def's. Obj. to Report at 17–18.)

In addition, Plaintiffs' first motion to amend seeks joinder of additional defendants, Emigrant Savings Bank-Manhattan, Emigrant Bank, and Emigrant Bancorp, Inc. (See Pls. 1st Mot. Amend at 8–12.) These parties are subsidiaries of

50

Defendant Emigrant, transferees in some transactions, current owners of some of Plaintiffs' loans, or otherwise involved in the misconduct alleged by Plaintiffs. (See id.) As parties jointly and severally liable if Plaintiffs' allegations prove true, and as parties alleged to be intimately involved with a discriminatory predatory lending scheme, joinder of the additional defendants does appear to be warranted pursuant to Rule 19 and Rule 20 of the Federal Rules of Civil Procedure. Defendants' principal argument against joinder (see Opp. 1st Mot. Amend, Dkt. No 43, at 14), that joinder is futile as it merely seeks to impose derivative liability for unfounded and non-meritorious claims, is unavailing in this context.

Thus, despite review of the substantive briefing on the motion to amend and the Objections to the Report, the Court is not persuaded by Emigrant's arguments. The addition of parties and legal theories in Plaintiffs' Second Amended Complaint was both foreseeable and fails to unduly prejudice Emigrant in this case. Judge Orenstein's ruling with respect to the motion to amend the complaint is sound and Plaintiffs will be allowed to proceed with their Second Amended Complaint.

SO ORDERED.

Dated: September 25, 2014
       Brooklyn, NY

Sterling Johnson, Jr., Senior U.S.D.J.

P-049