## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

JEAN ROBERT SAINT-JEAN, EDITH
SAINT-JEAN, FELEX SAINTIL, YANICK
SAINTIL, LINDA COMMODORE,
BEVERLEY SMALL, JEANETTE SMALL,
and FELIPE HOWELL,

                  Plaintiffs,

v.

EMIGRANT MORTGAGE COMPANY,
EMIGRANT SAVINGS BANK-
MANHATTAN, EMIGRANT BANK, and
EMIGRANT BANCORP, INC.,

                  Defendants.

Civil Action No. 11-CV-2122(SJ)(JO)

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.      From 2004 through 2009, Emigrant Mortgage Company (hereinafter "Emigrant")

utilized a highly-abusive home mortgage "No Income" refinance product.  Emigrant aggressively

originated these high-cost loans to minority homeowners with low credit scores who were most

likely to default on their payments.  By selecting borrowers with substantial equity in their

homes, Emigrant ensured that it could reap high profits from these nonperforming loans by

extracting exorbitant "default" interest charges—calculated at a predatory 18% interest rate—

from the borrowers' equity.  After origination, Emigrant regularly assigned its predatory "No

Income" refinance loans to other entities in the Emigrant family of institutions, including

Emigrant Savings Bank-Manhattan and Emigrant Bank.

2.      Since black and Latino individuals are disproportionately represented among

persons with low credit scores, Emigrant's marketing of these abusive loans to this population

ensured that the loans would have their greatest impact on minority homeowners.  In fact,

Emigrant originated 62.5% of its most costly loans in census tracts where blacks and/or Latinos

were in the majority, in violation of the Fair Housing Act, the Equal Credit Opportunity Act, and state and local civil rights laws.

3.    Emigrant intentionally targeted black and Latino borrowers, and neighborhoods where they constituted the majority of the population, for these abusive loans.  It did so by, *inter alia*, selecting advertising outlets because they reached predominantly black and Latino audiences.  Emigrant targeted these groups because it found, through racially explicit analysis of its lending history, that this was where it had its greatest success in making its most profitable "No Income" loans.

4.    Emigrant relied on inaccurate federal Truth in Lending consumer disclosure forms to mask the true cost of these equity-stripping refinance loans to borrowers in violation of the federal Truth in Lending Act.  Concealing the inevitable imposition of 18% "default" rates, Emigrant routinely listed a deceptively low Annual Percentage Rate ("APR") on its Truth in Lending disclosures.

5.    Emigrant induced longtime Brooklyn homeowners Jean Robert and Edith Saint-Jean into an abusive and patently unaffordable refinance, bearing an initial interest rate of 11.75% and a "default" interest rate of 18%.  Emigrant employed inaccurate Truth in Lending disclosures to disguise the true cost of the mortgage loan given to Mr. and Mrs. Saint-Jean. Their loan carried a true APR of at least 17.767%, but was accompanied by a Truth in Lending form disclosing a 10.119% APR.  Emigrant's loan to the Saint-Jeans was certain to fail: the initial payments of the loan exceeded $4,000 and represented nearly 100% of Mr. and Mrs. Saint-Jean's net income.  As a consequence of Emigrant's actions, Mr. and Mrs. Saint-Jean have suffered a foreclosure and the loss of nearly all of the equity in their long-time family home. Emigrant's loan to Mr. and Mrs. Saint-Jean violated the Fair Housing Act, the Equal Credit Opportunity Act, the Truth in Lending Act, and various state and local civil rights laws.

6.     Emigrant induced longtime Brooklyn homeowners Felex and Yanick Saintil into an abusive and patently unaffordable refinance, bearing an initial interest rate of 9.625% and a "default" interest rate of 18%.  Emigrant employed inaccurate Truth in Lending disclosures to disguise the true cost of the mortgage loan given to Mr. and Mrs. Saintil.  Their loan carried a true APR of at least 17.685%, but was accompanied by a Truth in Lending form disclosing a 9.64% APR.  Emigrant's loan to the Saintils was certain to fail: the initial payments of the loan exceeded $3,000 and represented over 100% of Mr. and Mrs. Saintil's net income.  As a consequence of Emigrant's actions, Mr. and Mrs. Saintil have suffered a foreclosure and the loss of nearly all of the equity in their long-time family home.  Emigrant's loan to Mr. and Mrs. Saintil violated the Fair Housing Act, the Equal Credit Opportunity Act, and various state and local civil rights laws.

7.     Emigrant induced longtime Manhattan homeowner Linda Commodore into an abusive and patently unaffordable refinance, bearing an initial interest rate of 6.5% and a "default" interest rate of 18%.  Emigrant's loan to Ms. Commodore was certain to fail: at the outset her loan payments exceeded $900 and represented nearly 100% of Ms. Commodore's net income.  As a consequence of Emigrant's actions, Ms. Commodore suffered a foreclosure, the loss of her home, and the loss of a substantial amount of the equity she had in the home.  Emigrant's loan to Ms. Commodore violated the Fair Housing Act, the Equal Credit Opportunity Act, and various state and local civil rights laws.

8.     Emigrant induced longtime Brooklyn homeowners Beverley and Jeanette Small into an abusive and patently unaffordable refinance, bearing an initial interest rate of 9.375% and a "default" interest rate of 18%.  Emigrant's loan to the Smalls was certain to fail: at the outset their loan payments exceeded $2,800 and represented close to double the Smalls' monthly gross

income.  As a consequence of Emigrant's actions, the Smalls suffered a foreclosure and the loss of nearly all of the equity in their long-time home.  Emigrant's loan to the Smalls violated the Fair Housing Act, the Equal Credit Opportunity Act, and various state and local civil rights laws.

9.      Emigrant induced longtime Queens homeowner Felipe Howell into an abusive and patently unaffordable mortgage bearing an initial interest rate of 10.375% and a "default" interest rate of 18%.  Emigrant's loan to Mr. Howell was certain to fail: at the outset the loan payments exceeded $1,800, but Mr. Howell was not earning any income.  As a consequence of Emigrant's actions, Mr. Howell suffered a foreclosure and the loss of nearly all of the equity in his long-time home.  Emigrant's loan to Mr. Howell violated the Fair Housing Act, the Equal Credit Opportunity Act, and various state and local civil rights laws.

## JURISDICTION

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 for claims under sections 3604 and 3605 of the Fair Housing Act; the Equal Credit Opportunity Act; and the Truth in Lending Act.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiffs' claims under state and local law.

## PARTIES

11.      Plaintiff Jean Robert Saint-Jean, a 48-year-old black Haitian-American man, and plaintiff Edith Saint-Jean, a 48-year-old black Haitian-American woman, husband and wife, live together at 1145 East 80th Street, Brooklyn, New York 11236.  Two of their four daughters, ages 20 and 24, also reside in the property.

12.      Plaintiff Felex Saintil, a 49-year-old black Haitian-American man, and plaintiff Yanick Saintil, a 48-year-old black Haitian-American woman, husband and wife, live together at

1409 Remsen Avenue, Brooklyn, New York 11236. Four of their five children, ages 8, 14, 20, and 24, also reside in the property.

13.     Plaintiff Linda Commodore, a 63-year-old black woman, lives at 434 East 115th Street, Apartment 1A, New York, New York 10029. At the time Ms. Commodore received a loan from Emigrant, she lived at 4 West 101st Street, Apartment 59A, New York, New York 10025.

14.     Plaintiff Beverley Small, a 48-year-old black woman, and her mother, Plaintiff Jeanette Small, a 71-year-old black woman from Guyana, live at 982 East 43rd Street, Brooklyn, New York 11210. At the time the Smalls received their Emigrant loan, they lived at 1038 East 57th Street, Brooklyn, New York. The Smalls lived at their home with Beverley's teenage son.

15.     Plaintiff Felipe Howell, a 66-year-old black Panamanian-American man, lives at 1634 St. Mark's Avenue, #6P, Brooklyn, New York 11233. At the time Mr. Howell received his Emigrant loan, he lived at 115-56 158th Street, Jamaica, New York 11434.

16.     Defendant Emigrant Mortgage Company, Inc. ("Emigrant") is a wholly-owned subsidiary of Emigrant Credit Corporation ("ECC") and a corporation organized under the laws of New York. ECC is a wholly-owned subsidiary of Emigrant Bank. Emigrant Mortgage Company maintains its principal place of business at 7 Westchester Place, Elmsford, NY 10523.

17.     Defendant Emigrant Bancorp, Inc. is a wholly-owned subsidiary of New York Private Bank & Trust Corporation and a corporation organized under the laws of New York. Emigrant Bancorp, Inc. maintains its principal place of business at 5 East 42nd Street, New York, NY 10017.

18.     Defendant Emigrant Bank is a wholly-owned subsidiary of Emigrant Bancorp, Inc. and a corporation organized under the laws of New York.   Emigrant Bank maintains its principal place of business at 5 East 42nd Street, New York, NY 10017.

19.     Defendant Emigrant Savings Bank-Manhattan is a wholly-owned subsidiary of Emigrant Bancorp, Inc.  Emigrant Savings Bank-Manhattan maintains its principal place of business at 1270 Lexington Avenue, New York, NY 10028.

## VENUE

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and omissions giving rise to this Complaint occurred within the Eastern District of New York.

## STATEMENT OF FACTS

### History of Race Discrimination in the Mortgage Industry

21.     The mortgage lending industry has a long and well-documented history of racial discrimination, for decades offering loans to minority borrowers, if at all, on terms that were substantially worse than those given to their similarly-situated white counterparts.  For much of the twentieth century, this racial discrimination in the credit markets took the form of "redlining," with minority borrowers and minority neighborhoods systematically denied home mortgage loans and other financial products.  *See, e.g.*, Douglas S. Massey et al., *American Apartheid: Segregation and the Making of the Underclass*, at 51-52 (1993).

22.     Today, after nearly two decades as the focus of destructive high-cost home mortgage lending, these same minority neighborhoods are the epicenter of the foreclosure crisis. *See, e.g.*, *Foreclosures by Race and Ethnicity: The Demographics of a Crisis*, Center for Responsible Lending (2010).

23.     The concentration of high-cost lending in minority neighborhoods was the result of industry shifts and regulatory changes that took place in the 1990s and interacted to fundamentally alter consumer mortgage lending.  For example, legislative changes, including the repeal of the Glass-Steagle Act through the Depository Institutions Deregulatory and Monetary Control Act of 1980, the Garn-St. Germain Depository Institutions Act of 1982, and the Gramm-Leach-Bliley Act of 1999, as well as regulatory changes, loosened long-standing limits on traditional lending institutions and permitted lenders to offer new and different mortgage products, such as adjustable-rate mortgages.

24.     In addition, both bank and non-bank mortgage lenders began to use brokers to advertise their products, identify potential customers, and communicate with those customers, collecting information and submitting this information to the originating lender for processing.

25.     As the result of these developments, home mortgage lending—especially lending to minority groups traditionally deprived of credit—increased dramatically.  Encouraged by investors eager for high-yielding investment vehicles, lenders expanded their offerings beyond traditional "prime" products into "subprime," "Alt-A" and other non-traditional loan products. These products purported to provide borrowers with blemished credit histories loans priced to account for the additional risk lenders, and/or assignees, would assume.  In practice, even controlling for such factors as income and credit history, minority borrowers were more likely to receive these costly loan products, than their white counterparts. *See, e.g.*, "Unequal Burden: Income and Racial Disparities in Subprime Lending," HUD study available at *http://www.huduser.org/Publications/pdf/unequal_full.pdf* (last visited April 28, 2011).

26.     Mortgage loans strayed far beyond traditional, fully-underwritten, 30-year fixed rates.  Banks offered Stated Income Stated Assets ("SISA") loans, in which the borrower merely

stated their income without offering any supporting proof.  SISAs appeared alongside their close

cousins, No Income No Asset ("NINA") loans.  The NINA loan did not require the borrower to

provide any information whatsoever about income or assets on the loan application.  Instead,

banks relied exclusively on the borrower's credit report and an appraisal of the property's

remaining equity to the price the loan.  Holden Lewis, "The Kind of Mortgage Tony Soprano

Might Like," CBS Marketwatch, Feb. 15, 2002.  NINA loans were more costly than full-

documentation loans because they were more risky for lenders, with NINA borrowers paying

higher fees and interest rates.  Because a NINA borrower provided no proof of ability to repay a

loan, he or she was required to have a moderate to high credit score, usually 680 or above.

### Emigrant's Evolving "No Income" Lending Program

27.      Founded in the 19th century as a mutual savings society for Irish immigrants,

Emigrant Savings Bank and its successors, Emigrant and its parents and affiliates, historically

concentrated their mortgage lending in conventional loan products.  As a result of their

conservative lending practices, through the early 1990s, Emigrant and Emigrant Savings Bank

experienced few mortgage defaults, even in difficult economic times.

28.      In 1995, as members of the Milstein family that owned the bank began a bitter,

10-year feud for control of the institution, Emigrant began to test out riskier—and more

profitable—mortgage products.  In that year, Emigrant first offered a mortgage product that did

not require borrowers to demonstrate or state their income: Emigrant's first NINA, or "No

Income," mortgage product.

29.      At the time that it developed its first No Income mortgage product, Emigrant

overwhelmingly made its mortgage loans in wealthy, white census tracts.  According to

Emigrant's 1995 Community Reinvestment Act Performance Evaluation,[1] in 1994, Emigrant made 6% of its loans in low/moderate-income census tracts; 34% of its loans in middle-income census tracts; and 61% of its loans in upper-income census tracts.  In that year, Emigrant made 4% of its loans in minority census tracts, 18% in "integrated" census tracts,[2] and 66% in white census tracts.

30.     In 1995, Emigrant's first year offering its No Income mortgage product, its origination of these mortgages appeared to follow this same demographic pattern.  In that year, No Income loans made up 27% of Emigrant's one-to-four family mortgage loans,[3] according to Emigrant's 1997 Community Reinvestment Act Performance Evaluation.  Of these, Emigrant originated the vast majority of its No Income mortgage loans in New York County (72%), with an additional concentration in Westchester County (14%).  As of 1995, in New York and Westchester counties, 86.6% and 88.8% of homeowners, respectively, were white.

31.     By 2004, Emigrant's lending pattern had shifted dramatically.  In that year, No Income refinance mortgages represented 83% of Emigrant's one-to-four family mortgage refinance loans, and 57% of these No Income loans were originated in majority-minority census tracts.  In addition, in that year, Emigrant substantially expanded No Income lending to individuals with credit scores of 600 or below.

32.     On information and belief, Emigrant's No Income Refinance Program fully developed in 2005 and evolved into an abusive and damaging program designed to broker extremely high-cost loans to vulnerable minority borrowers with substantial equity.  Whereas in

---

[1] Emigrant's Community Reinvestment Act Performance Evaluations are available at: *http://www2.fdic.gov/crapes/* (last visited April 28, 2011).
[2] Emigrant's 1995 Community Reinvestment Act Performance Evaluation defines an "integrated" census tract as one in which "minority residents make up 20% to 79.99% of the population."  *See* p. 21.
[3] A one-to-four family mortgage loan is a mortgage loan secured by a building or home with no more than four units; this category includes loans secured by a condominium or cooperative unit.

2004, 7.32% of No Income refinance loans in minority census tracts were "very high cost" (a difference of at least five basis points above the going "prime" interest rate), in 2005, the proportion was 44.50%; and in 2006, 45.89%.

33.     By 2005, Emigrant's No Income program had developed into one that was highly predatory, outdoing its competitors in the mortgage industry with sky-high interest rates, pernicious terms, and deceptive sales tactics.

34.     What distinguished Emigrant's lending even from that of other NINA lenders was its practice of lending to borrowers with extremely low credit scores who would not qualify even for NINA mortgage loans at other banks.  Emigrant did not reject borrowers with credit scores in the low 500s; instead—where there was sufficient equity in the home—Emigrant merely accorded an applicant with a lower credit score a higher interest rate.

35.     By lending at exorbitant interest rates to borrowers with such low credit scores, Emigrant ensured high default rates.

36.     Whereas most of the industry's originators made NINA loans to sell in the secondary market, and therefore had to accommodate investor and rating agency loan and credit quality assessments, Emigrant held the vast majority of the loans it originated—including those it originated through its equity-stripping No Income Refinance Program—retaining the loans in the portfolio of Emigrant Mortgage Company, or the portfolios of its affiliates.

37.      In order to profit from loans that were predestined to fail, Emigrant engaged mortgage brokers to identify individuals with significant equity in their homes.  Emigrant then extracted this equity from its defaulting borrowers through a variety of onerous mortgage terms. For example, Emigrant imposed an 18% "default" interest rate on the vast majority of its borrowers.  By its terms, this 18% interest rate could be imposed after a single payment was late

by only 30 days.  In 2007, 83% of the loans Emigrant originated incorporated an 18% "default" interest rate; in 2008, 91%.

38.     Whereas subprime originating lenders intending to sell their loans in the secondary mortgage market often utilized inflated appraisals, upon information and belief, Emigrant required careful, accurate appraisals to accurately discern a potential borrower's home equity.

39.     Emigrant also encouraged its brokers to increase the interest rates they sold to a borrower beyond the rate for which the borrower would otherwise qualify by offering its brokers an additional incentive payment called a Yield Spread Premium ("YSP").  The YSP would increase as the interest rate sold to the borrower increased.  Emigrant paid a YSP to the broker who assisted Emigrant in originating the Saint-Jeans' mortgage refinance loan.

40.     Meanwhile, across the industry NINA loans were beginning to fail in large numbers, and regulators, news sources, and industry watchdogs sounded warnings about the weakness of the NINA product.  *See, e.g.*, Intragency Guidance on Nontraditional Mortgage Product Risks, September 2006; "'No Money Down' Falls Flat," Steven Pearlstein, The Washington Post, March 14, 2007;  "A Bad Loan By Any Other Name," Floyd Norris, The New York Times, November 23, 2007; "Experts: Economy nearing cusp of recession," Dean Calbreath, San Diego Union-Tribune, Sept. 12, 2007; "Sorting out the mortgage mess," Boston Globe, 1C, Jan. 25, 2008.

41.     As other lenders retreated from NINA lending, Emigrant continued to press its No Income Refinance Program.  In 2008, the year in which Emigrant originated Mr. and Mrs. Saint-Jean's mortgage, No Income loans represented only 3% of non-Emigrant one-to-four family

refinance mortgage loans originated in New York City, but 85% of the one-to-four family refinance mortgage loans that Emigrant originated.

42.     Even Emigrant's own foreclosure patterns indicated that its No Income Refinance Program was failing to produce performing loans.  Even though, upon information and belief, Emigrant typically waited several months, and even years, after default to commence foreclosure proceedings, nearly half of the foreclosures that Emigrant commenced in 2007 were on loans originated in the prior year and 78% were on loans originated in the prior two years.  In 2008, Emigrant's loan performance fell further still; 69% of the foreclosures that Emigrant commenced in 2008 were on loans originated in the prior year and 83% were on loans originated in the prior two years.  Yet, Emigrant persisted in originating equity-stripping No Income Refinance loans through 2009.  On information and belief, Emigrant intentionally delayed the initiation of foreclosure proceedings in order to maximize accrued default interest.

43.     In spite of the high failure and foreclosure rates that are the inevitable result of loans designed to fail, on information and belief, Emigrant, its parent company Emigrant Bank and its ultimate parent company, Emigrant Bancorp, are able to profit from Emigrant's No Income Refinance Program by intentionally targeting home-owners with high equity and poor credit scores.

44.     In 2008, Emigrant originated less than 1.5% of all refinance loans originated in New York City, but made 30% of all City-wide No Income refinance loans.

### Emigrant's False TILA Disclosures Mask High Cost of Loans

45.     The Truth in Lending Act is a remedial statute, requiring the clear and conspicuous disclosure of the expected costs of a consumer credit transaction.  The statute was

designed to ensure that borrowers would be informed about the consequences of certain types of financial transactions.

46.     In its equity-stripping No Income Refinance Program, Emigrant routinely used the Truth in Lending Act disclosures, not to *clarify* the financial consequences of its transactions, but rather to *mask* the true cost of its unsustainable loans.  Although the Truth in Lending Act requires that all expected principal and interest payments be included in the calculation of the APR on the Truth in Lending disclosure, Emigrant routinely disregarded the predicted and contemplated imposition of the 18% "default" interest in calculating the APR and related terms.

47.     The exclusion of these 18% interest payments falsely lowered the APR of Emigrant's high-cost loans, resulting in inaccurate disclosures that violated the federal Truth in Lending Act and robbed Emigrant's borrowers of the opportunity to accurately evaluate the dire financial consequences of an Emigrant No Income refinance.

### *Emigrant's Discriminatory No Income Refinance Program: Facially Neutral Policy with a Foreseeable Disparate Impact*

48.     Emigrant's equity-stripping No Income Refinance Program, incorporating all of the risky and abusive elements described above, although facially neutral, has had a discriminatory impact on minority borrowers because of Emigrant's origination of these abusive loans through No Income Refinancing to homeowners with extremely low credit scores.

49.     Emigrant's equity-stripping No Income Refinance Program deviated significantly from standard industry NINA programs.  Other lenders made NINA loans available only to borrowers with relatively strong credit scores, typically greater than 680 or, at the most risky, greater than 620.  The high credit score was routinely required because a high score indicated that the borrower was likely to repay the loan, a particularly important indicator in the absence of other information typically required for underwriting.   "Pushing the Edge on Alternative-A,"

13

Robert Stowe England, Mortgage Banking, February 1, 2004.  Emigrant's No Income Refinance Program provided loans to borrowers with much lower credit scores—well below the 680 industry standard, even into the low 500s.

50.     In New York City, at the time that Emigrant made its loans to the Saint-Jeans and the Saintils, residents of minority neighborhoods had significantly lower credit scores than residents of white neighborhoods, as shown in the chart below.

| | Census Tract | | | | |
|---|---|---|---|---|---|
| | 80% or Greater African-American | 50% or Greater Latino | 50% to 79.9% Mixed Minority | Less than 10% Minority | New York City |
| Credit Score 700 and Above | 34.2% | 36.2% | 48.6% | 68.9% | 55.8% |
| Credit Score 620-699 | 25.6% | 26.3% | 23.6% | 17.3% | 21.3% |
| Credit Score Below 620 | 40.2% | 37.5% | 27.9% | 13.8% | 22.9% |

Distribution of individuals within credit score ranges by zip code racial composition, June 30, 2007
From Addendum to "Understanding Credit Score Patterns in New York City," Woodstock Institute (2011)

51.     Notably, the Woodstock Institute study cited above also found that in 2007, over 60% of those with credit scores of 580 or below in New York City resided in zip codes that had 50% or greater minority residents.  *Id.*  Hence, a loan program, such as Emigrant's No Income Refinance Program, designed to charge exorbitant rates to refinance customers with very low credit scores regardless of their ability to pay, would have the foreseeable result of concentrating very high-cost—equity-stripping—loans in minority neighborhoods.

52.     Between 2005 and 2008, Emigrant originated 62.5% of these high-cost, highly-profitable, and highly destructive, No Income refinance loans in "minority census tracts," or census tracts with 50% or greater minority residents.   In 2005 and 2007, Emigrant originated over 70% of its very high-cost No Income refinance loans in minority census tracts.

53.     A review of public records indicates that Emigrant regularly transfers its very high-cost No Income Refinance loans to other entities in the Emigrant family of banks, including Emigrant Savings Bank-Manhattan and Emigrant Bank, in exchange for nominal consideration of ten dollars.  The other Emigrant entities, including Emigrant Savings Bank-Manhattan and Emigrant Bank, know or should have known that Emigrant's No Income Refinance loans were discriminatory at the time they took assignment of the loans.  On information and belief, other Emigrant entities, including Emigrant Bank and Emigrant Bancorp, have exercised influence and control over Emigrant's No Income Refinance program.

**Emigrant's Discriminatory No Income Refinance Program: Disparate Impact on Black and Latino Borrowers**

54.     Emigrant's equity-stripping No Income Refinance Program, a facially neutral policy, has had a devastating effect and disparate impact on minority homeowners in New York City.  Although, from 2005 through 2009, Emigrant originated loans in all neighborhoods of New York City, Emigrant's discriminatory No Income Refinance Program concentrated its most expensive loans in minority neighborhoods.  A map of Emigrant's very high-cost No Income Refinance loans, included below and as Exhibit A to this First Amended Complaint, demonstrates that these loans are concentrated in minority census tracts.



55.    A map of Emigrant foreclosures commenced in 2008, 2009 and 2010, included below and attached hereto as Exhibit B, demonstrates that Emigrant's foreclosures are highly concentrated in minority neighborhoods.



56.     Emigrant's very high-cost, variable-rate loans were disproportionately represented

among the foreclosures it commenced.  In 2007, 65% of foreclosures that Emigrant commenced

on variable-rate loans were on mortgage loans with interest rates of 10% or higher.  In 2008,

66% of foreclosures that Emigrant commenced on variable-rate loans were on mortgage loans

with interest rates of 10% or higher.  In both years, foreclosures on variable-rate loans

represented the vast majority of Emigrant's foreclosures: 87% in 2007; 90% in 2008.

### *Emigrant's Discriminatory No Income Refinance Program: Intentional Targeting of Black and Latino Borrowers*

57.     Emigrant also originated a disproportionate share of its abusive No Income

mortgage loans to blacks and Latinos, and residents of neighborhoods that are majority black and

Latino, because it intentionally targeted these loans on the basis of race.

58.     Emigrant targeted these groups by, *inter alia*, selecting advertising outlets that

disproportionately reached minority audiences.  For example, one of Emigrant's marketing

documents details advertising information about 53 New York newspapers and groups them into

four categories:  African-American (20), Caribbean (10), Haitian (3), and Hispanic (20).

59.     Emigrant's advertising placement and purchases overwhelmingly demonstrate

that their target market consisted of blacks and Latinos.  Almost the entirety of its advertising

purchases was in newspapers circulating in neighborhoods with predominant and/or significant

African-American and Hispanic populations.  Moreover, Emigrant's advertising content exhibits

a core message especially targeted and appealing to blacks and Latinos.  Its advertising content

relies substantially on racial identity cues shown to have great appeal to blacks and Latinos.

60.     The disparities described above further demonstrate that Emigrant intentionally

targeted its most abusive loans on the basis of race.

61.     Defendants intentionally targeted blacks and Latinos because they were making

more money from such borrowers.  Defendants knew this because they paid careful attention to

the profitability of their loans by race.  Their own internal analyses showed that they were

charging higher interest rates to minority borrowers than to white borrowers.  As a result,

Emigrant saw minority borrowers as prime targets for their most lucrative and abusive loans—the No Income products for people with low credit scores.

*Plaintiffs Jean Robert and Edith Saint-Jean*

62.     Mr. Saint-Jean and Mrs. Saint-Jean, live with two of their four daughters in their home, a three-family property located at 1145 East 80th Street, Brooklyn, NY 11236, in the Canarsie neighborhood of Brooklyn.  Mr. Saint-Jean works as a public school library paraprofessional; Mrs. Saint-Jean works as a home health aide.  At the time the Saint-Jean loan was originated, the Saint-Jeans' four daughters were all students and did not contribute to the household income.

63.     Mr. and Mrs. Saint-Jean purchased their home in 1995, with a fixed rate, $216,000 mortgage from Arbor National Mortgage and a down payment of approximately $34,000, their life savings.

64.     In 2001, Mr. and Mrs. Saint-Jean refinanced their mortgage loan, obtaining a $263,900 mortgage loan from American International Mortgage Bankers, Inc., with a fixed rate of 7.25%.

65.     In late 2007, Mr. and Mrs. Saint-Jean began to look for a broker to help them obtain a home equity loan.  Although they had always made their mortgage payments, they were behind in payments on their gas and water bills, and wanted to bring those accounts current.

66.     Mr. and Mrs. Saint-Jean contacted an acquaintance, Kennis Mason, a man who held himself out to be a mortgage broker, and told him that they wanted a $50,000 home equity loan that would allow them to pay off their debts.  Upon information and belief, Mr. Mason worked for a company called N.Y. Financial Mortgage Lending.

67.     At all relevant times, Mr. Mason and N.Y. Financial Mortgage Lending acted as brokers and agents of Emigrant.

68.     Originally, Mr. Mason told Mr. and Mrs. Saint-Jean that the $50,000 sum was too low for a home equity loan, but that he could find them a home equity loan for $100,000.  After running their credit reports, however, Mr. Mason told them—incorrectly—that their credit scores were too low to obtain the home equity loan that they were looking for.  At the time, Mr. and Mrs. Saint-Jean both had credit scores in the 500s.

69.     Mr. Mason had an appraisal performed on the house, which showed that the house was worth $742,000.  Mr. Mason told the Saint-Jeans that, because of the equity in their home, he could easily help them refinance their mortgage with Emigrant.

70.     The Saint-Jeans were reluctant to refinance.  They were happy with their fixed rate mortgage and felt their payments of $2,650 were manageable for them.  Mr. Mason explained, however, that a refinance was the only way they could get the funds to pay off their debts.  The Saint-Jeans believed Mr. Mason because he seemed to be looking out for their interests.  Mr. Mason told them: "I'll take care of you.  I'll take care of everything."

71.     Mr. Mason told the Saint-Jeans to provide him with pay stubs and tax returns in order to document their income, which they did.  Based upon his comments and their past experience applying for mortgage loans, Mr. and Mrs. Saint-Jean thought that Mr. Mason would use these documents to qualify them for a mortgage loan.

72.     At the time, the Saint-Jeans had a gross monthly income of approximately $5,500 and owed approximately $255,000 on their existing mortgage.

73.     The Saint-Jeans pressed Mr. Mason to tell them what their interest rate would be.  At first, he would not tell them.  Eventually, Mr. Mason told the Saint-Jeans that their mortgage

would have a fixed interest rate of approximately 9%, and a monthly payment of $3,000. Although this was higher than the $2,650 monthly mortgage payment on their existing mortgage, the Saint-Jeans felt that they could make the higher payments.  Mr. Mason explained that after six on-time payments, the Saint-Jeans' credit would be improved, and he would help them to get a lower, fixed 6% rate of interest with monthly payments of $2,700 from Emigrant.  Mr. Mason said that they should take additional cash out from the refinance to help them to make their payments on time.  Mr. and Mrs. Saint-Jean felt that, with the help of the extra cash out, they could make these increased payments for just six months.  They could pay off their debts and, after six months, have nearly the same low payment they had been paying for many years.

74.     As the closing approached, Mr. Saint-Jean told Mr. Mason that they were looking for an attorney to represent them at closing.  Mr. Mason discouraged him from doing so.  He told Mr. Saint-Jean that the couple did not need an attorney for a refinance, only for a transfer of the property.  Mr. Mason said the attorney at the closing would look out for the Saint-Jeans' interests.  Based upon Mr. Mason's representations, the Saint-Jeans did not hire an attorney to represent them at the closing.

### Mr. and Mrs. Saint-Jean: At the Closing Table

75.     Mr. and Mrs. Saint-Jean's mortgage closing took place on January 10, 2008.  The Saint-Jeans did not receive any closing papers prior to the mortgage closing.

76.      Mr. Mason picked the Saint-Jeans up and brought them to the closing.  Both of the Saint-Jeans were present at the closing, as well as Mr. Mason, a notary, and an attorney for Emigrant.  Mr. Mason seemed to know the others at the closing well.

77.     In the attorney's presence, Mr. Mason said that the attorney would be representing the Saint-Jeans.  The attorney did not dispute this assertion.  On information and belief, this

21

attorney represented Emigrant at the closing and the Saint-Jeans were not represented by counsel.

78.    When Mr. and Mrs. Saint-Jean looked at the closing papers, they saw that their interest rate was not the 9% that they were promised, but 11.75%. This was the first time the Saint-Jeans learned that their interest rate would be so high. The Saint-Jeans were shocked and asked Mr. Mason to explain how things were so different than what he had told them before.

79.    Mr. Saint-Jean told Mr. Mason that they would not go through with the transaction. Mr. Saint-Jean stopped the closing, got up from the closing table, and walked away while Mrs. Saint-Jean sat at the closing table. Mr. Mason went over to speak with Mr. Saint-Jean. He explained that the interest rate was high because of the Saint-Jeans' lower credit scores. He reminded Mr. Saint-Jean that they would have a fixed 6% interest rate after six months of on-time payments. After talking with Mr. Mason, Mr. Saint-Jean rejoined his wife at the closing table.

80.    At the closing table, Mr. Mason said once again that the high initial monthly payments would last for only six months at which time the Saint-Jeans' credit would be repaired and their interest rate would be reduced by Emigrant to 6%, with monthly payments of $2,700. The additional cash that they were taking out in the refinance would provide them with the resources they would need to make the six timely, monthly payments. No one who was present disagreed with Mr. Mason's explanation.

81.    After this discussion, the closing went quickly. The Saint-Jeans were not given a chance to read through the loan documents at the closing. Based on what Mr. Mason and the attorney told them, they signed the loan documents.

82.     At the closing, Mr. and Mrs. Saint-Jean signed documents for a $370,000 refinance loan.  The loan papers disclosed an initial monthly interest rate of 11.75% and a "default" interest rate of 18%.  Mr. and Mrs. Saint-Jean were not told that their loan terms included a prepayment penalty.  Mr. and Mrs. Saint-Jean were not told that their mortgage interest rate was adjustable.  They thought that their interest rate was fixed, only to be reduced to 6% if they made six on-time payments.

83.     The HUD-1 Settlement Statement that Mr. and Mrs. Saint-Jean received at closing discloses that "NY Financial" received a payment of $1,387.50 from Emigrant outside of the closing.  Upon information and belief, this payment was a Yield Spread Premium, provided as compensation to Mr. Mason and N.Y. Financial Mortgage Lending for inducing Mr. and Mrs. Saint-Jean into a loan that had a higher interest rate than that for which they would have otherwise qualified under Emigrant's lending program.

84.     Emigrant's federal Truth in Lending disclosure accompanying this loan represented the following:

| Annual Percentage Rate | Finance Charge | Amount Financed | Total of Payments |
|---|---|---|---|
| 10.119% | $695,585.19 | $355,256.01 | $1,050,841.20 |

85.     The initial monthly payments of $4,174, including taxes and insurance, nearly exceeded the Saint-Jeans' net monthly income and represented almost 80% of their gross monthly income.  According to the HUD-1 Settlement Statement pertaining to the closing, proceeds from the transaction were used to pay $12,357.50 to N.Y. Financial Mortgage Lending. The proceeds were also used to establish a $21,000 escrow account, to be used to pay the Saint-Jeans' outstanding water charges.

86.     According to the HUD-1 Settlement Statement pertaining to the closing, proceeds from the transaction were used to pay $475 to Emigrant, including a $350 "underwriting" fee and a $125 "document preparation" fee.  In addition, funds from the transaction were used to pay $835 to Mattone & Mattone for "attorneys' fees."

87.     From the $21,000 escrow, only $20,532.76 was sent to New York City's Department of Environmental Protection to pay the overdue water charges.  The Saint-Jeans were never reimbursed $467.24 for the remaining amount.

88.     A "High Equity Loan Certificate" included in the Saint-Jeans' closing papers indicated that Mr. and Mrs. Saint-Jean's mortgage loan was originated under Emigrant's High Equity Plus Loan program, a variety of Emigrant's equity-stripping No Income Refinance Program.  Despite Mr. Mason's assurances that those present at the closing would look out for the Saint-Jeans' interests, no one alerted the Saint-Jeans to review the certificate, nor did anyone present explain its contents to them.

89.     A "Resource Letter" included in the Saint-Jeans' closing papers indicated that the Saint-Jeans' loan had been originated without consideration of Mr. and Mrs. Saint-Jeans' financial capacity to make payments on the loan.  This letter indicated that Mr. and Mrs. Saint-Jean would need dependable annual income of over $102,000 in order to make payments on the mortgage—an annual income which Emigrant had notice greatly exceeded Mr. and Mrs. Saint-Jean's income at the time.  Despite Mr. Mason's assurances that those present at the closing would look out for the Saint-Jeans' interests, no one alerted the Saint-Jeans to review the Resource Letter, nor did anyone present explain its contents to them.

90.     An "Ontime Advantage Rate Reduction" addendum to the Mortgage Commitment provided to the Saint-Jeans for signature at closing promised interest rate reductions after nine,

15, and 21 on-time payments.  This disclosure was an addendum to the Mortgage Commitment provided to the Saint-Jeans at the closing.

91.     The Saint-Jeans together received only one copy of the Truth In Lending disclosure.

92.     The Saint-Jeans together received only one copy of the notice of their right to rescind the mortgage loan.

93.     Mr. and Mrs. Saint-Jean received $66,494.30 in cash at closing.  They used approximately $16,000 of these funds to pay Keyspan for overdue gas charges, and approximately $27,500 to make substantial repairs to their home, as planned.  They applied some of the remaining funds to make timely monthly payments on their mortgage.

### Mr. and Mrs. Saint-Jean: Emigrant's Loan to the Saint-Jeans

94.     Although Emigrant presented the Saint-Jeans' loan as a variable-rate loan with an 11.75% initial interest rate, in reality, Emigrant's loan to the Saint-Jeans was far more costly.  As presented to the Saint-Jeans, the loan disclosed an APR of 10.119%, *lower* than the initial interest rate of 11.75% because of lowered payments after a five-year period at the initial rate.  In fact, because Emigrant knew, or should have known, that the loan was unaffordable to the Saint-Jeans from origination, the APR should have taken into account the predicted and contemplated imposition of an 18% interest rate, raising the correctly calculated APR to at least 17.767%.

95.     Emigrant knew, or should have known, that the Saint-Jeans could not afford to make the high initial payments on the mortgage based on the following indicators: (1) pay stubs and tax returns provided to Emigrant's agent, Mr. Mason, at Mr. Mason's request; (2) the Saint-Jeans' low credit scores; (3) employment and other information included in the Saint-Jeans' credit reports; (4) the "payment shock" that Mr. and Mrs. Saint-Jean would suffer from the

increase in their mortgage payments by almost 100%; and (5) the substantial arrears that the Saint-Jeans had accrued on their gas and water charges, with their prior, lower mortgage payment.

96.     In fact, Emigrant's loan to the Saint-Jeans was designed from origination to fail and to trigger the imposition of the 18% "default" interest rate within the first year of the loan. The many onerous provisions of Emigrant's loan to the Saint-Jeans worked in concert to ensure "default" within a year of origination.  The extremely high initial interest rate guaranteed monthly payments that were well beyond the Saint-Jeans' capacity to pay.  The prepayment penalty prevented refinance once the Saint-Jeans learned the true cost of their loan and discovered that they could not obtain lower payments after six months of on-time payments, as promised.

97.     Properly disclosed, the Saint-Jean's loan should have been accompanied by a Truth in Lending disclosure statement showing an APR of at least 17.767%.

98.     Emigrant not only understated the costs associated with the loan, it misstated the payment schedule of the loan.  The Truth in Lending disclosure that Emigrant provided to the Saint-Jeans contained the following payment schedule:

| No. of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 60 | $3,734.82 | monthly, beginning 03/01/2008 |
| 300 | $2,755.84 | monthly, beginning 03/01/2013 |

99.     Emigrant should have provided a payment schedule for this loan as follows, based upon the expected imposition of an 18% interest rate within 12 months of origination:

| No. of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 12 | $3,734.82 | monthly, beginning 03/01/2008 |
| 348 | $5,559.99 | monthly, beginning 03/01/2009 |

100.    Not only did the Truth in Lending disclosure fail to incorporate the expected imposition of the 18% interest rate, Emigrant's disclosures affirmatively misrepresent the loan that Emigrant made.  The scheduled payments disclosed to the Saint-Jeans reflect an expected decrease to the Saint-Jeans' payments to approximately from over $3,700 to approximately $2,700 after five years, due to the adjustable rate provisions of the Saint-Jeans' note.  This had the effect of artificially lowering the annual percentage rate and making the loan appear even less costly than the 11.75% initial monthly interest rate.  However, Emigrant designed the loan so that the reduced payments would never take effect.  The Truth in Lending disclosures provided to the Saint-Jeans therefore misstate both the APR and the expected scheduled payments.

### Mr. and Mrs. Saint-Jean: After the Closing

101.    In accordance with their understanding of the terms of their loan, the Saint-Jeans made six monthly payments.  After six months of payments, Mr. Saint-Jean contacted Mr. Mason in July of 2008.  When Mr. Saint-Jean spoke with Mr. Mason, Mr. Mason told him that he needed only three days to process the lowered interest rate.  After 10 days, the Saint-Jeans still had not heard from Mr. Mason.  Mrs. Saint-Jean tried to call Mr. Mason, but, despite leaving messages, she was not able to reach him.

102.    Mrs. Saint-Jean waited to hear back from Mr. Mason before making the August 1 mortgage payment.  Mrs. Saint-Jean intended to make this payment by the end of August and hoped that by that point the paperwork would have been processed and the payments would have been reduced.

103.     Finally, after hearing no word from Mr. Mason, Mrs. Saint-Jean went to the Emigrant Savings Bank branch located at Kings Highway and Flatbush Avenue to make the mortgage payment in September.  She told an Emigrant employee there that while she could not make both the August and September payments, she could make the August payment.  Mrs. Saint-Jean made the August payment and Emigrant accepted this payment.

104.     At this point, the Saint-Jeans had used most of the funds set aside from the loan closing to make their monthly mortgage payments and they were struggling to come up with the money to make the September mortgage payment.  Mr. Mason finally responded to the Saint-Jeans, only to inform them that he had run their credit reports and that they would not qualify for the lower 6% interest rate they had been promised.  The Saint-Jeans were shocked to hear this. Mr. Saint-Jean told Mr. Mason that they had been cheated.  After this conversation, Mr. Mason refused to take the Saint-Jeans' calls.

105.     In the fall of 2008, instead of reducing the Saint-Jeans' payment to $2,700 as the Saint-Jeans expected, Emigrant imposed the 18% "default" interest rate, increasing the Saint-Jeans' monthly mortgage payment to over $6,000.  The Saint-Jeans were shocked by this development.  Mrs. Saint-Jean attempted to contact Emigrant repeatedly, calling the phone number listed on their mortgage statement.  Mrs. Saint-Jean was never able to reach a representative and, although she left many messages, her messages were never returned.  Very quickly, the Saint-Jeans fell over $10,000 behind on their loan and realized they were unlikely to be able to bring the loan current.

106.     In November of 2008, when the Saint-Jeans were three payments behind, Mrs. Saint-Jean spoke with an Emigrant representative and told them that they had gathered enough money to make two payments at the original $4,174 payment amount.  Emigrant's representative said that Emigrant would not accept this partial payment, stating that the bank would now accept

only payment of all arrears.

107.    After eight months of delay, during which time over $30,000 in "default" interest accrued against the Saint-Jeans' home, Emigrant filed a foreclosure case against them, in May of 2009.

108.    Unbeknownst to Mr. and Mrs. Saint-Jean, on approximately May 1, 2008 Emigrant transferred ownership and servicing rights to the Saint-Jean mortgage and note to Emigrant Savings Bank-Manhattan.  Mr. and Mrs. Saint-Jean had no way of knowing that Emigrant had assigned their loan to Emigrant Savings-Bank Manhattan.  Neither Emigrant nor Emigrant Savings Bank-Manhattan publicly recorded the assignment of mortgage; in addition, Emigrant Mortgage Company initiated foreclosure proceedings in New York State Court claiming to be the owner of the loan and did not disclose any transfers in ownership in its filings. Mr. and Mrs. Saint-Jean were not aware of the transfer until many years later, when Emigrant disclosed the assignment in connection with discovery in the foreclosure proceedings in state court.

109.    The Saint-Jeans did not discover the discrimination underlying their loan before they consulted with an attorney in July of 2009.  They could not have reasonably discovered the discrimination independently because the information about Emigrant's lending practices was not known to them until explained to them by their counsel.

110.    On July 12, 2010 the Saint-Jeans rescinded their loan, via letter mailed to Emigrant, with a copy to their attorneys, Deutsch & Schneider LLP.  On July 26, 2010, Emigrant by and through its counsel Deutsch & Schneider improperly rejected the Saint-Jeans' rescission.

### *Plaintiffs Felex and Yanick Saintil*

111.    Mr. Saintil and Mrs. Saintil, live with four of their five children in their home, a two-family property located at 1409 Remsen Avenue, Brooklyn, NY 11236, in the Canarsie neighborhood of Brooklyn.  Mr. Saintil works as a truck driver; Mrs. Saintil worked as a home

health aide for most of her life and she recently received a nursing degree, although she is

currently convalescing from a recent stroke.  At the time the Saintil Loan was originated, the

Saintils' five children were all students and did not contribute to the household income.

112.    Mr. and Mrs. Saintil purchased their home in 2001, with a fixed rate, $245,224

mortgage from Alliance Mortgage Banking Corporation, and a down payment of approximately

$40,000, their life savings.  Their monthly payment for this mortgage was approximately $2200.

113.    In late 2005, Mr. and Mrs. Saintil were having trouble with a non-paying tenant,

and needed money to pay their mortgage.  In November, with the help of a broker, they took out

a $33,000 second mortgage from HomEx Funding Corp.  The terms of the second mortgage

required Mr. and Mrs. Saintil to make monthly payments of approximately $440, and repay the

debt in one year.  They used these funds to pay a landlord-tenant attorney, begin repairs on their

rental unit, and make mortgage payments while they were not receiving rental income.

114.    Thereafter, Mr. and Mrs. Saintil began to look for the funds to refinance their

short-term second mortgage.  They were referred to a mortgage broker, Isaac Rochlitz, of

Evergreen Funding of the Tri-State.

115.    At all relevant times, Mr. Rochlitz and Evergreen Funding of the Tri-State acted

as brokers and agents of Emigrant.

116.    Mr. and Mrs. Saintil told Mr. Rochlitz that they needed to obtain financing to pay

off the short-term second mortgage.  Mr. Rochlitz told the Saintils that he could help them, and

asked them for pay stubs and tax returns.  Mr. Rochlitz told the Saintils that he would use this

information to qualify them for a mortgage loan.  Because Mrs. Saintil was not working

regularly, they gave Mr. Rochlitz only Mr. Saintil's pay stubs and tax returns.

117.    At the time, the Saintils' gross monthly income fluctuated and included gross

weekly income of between $480 and $570 to Mr. Saintil, food stamps, and intermittent income to

Mrs. Saintil.  At the time, the Saintils owed approximately $230,000 on their first mortgage and $33,000 on their second mortgage.

118.    Mr. Rochlitz had an appraisal performed on the house, for which he charged them a few hundred dollars.  After that, Mr. Rochlitz told the Saintils that he had qualified Mr. Saintil to refinance the Saintils' mortgages.  Mr. Rochlitz told the Saintils that only Mr. Saintil should apply for the mortgage, because only he had regular income.  At the time, Mr. and Mrs. Saintil believed they both had credit scores in the 400-500s.

119.    The Saintils were nervous about refinancing, but Mr. Rochlitz told them that their monthly payments would be $2,700, which was about what they had been paying for their first and second mortgages together.  Because they had only ever had a fixed-rate mortgage, Mr. and Mrs. Saintil thought their new mortgage would have a fixed interest rate, like their prior mortgage.  Mr. Rochlitz did not explain to them that he had qualified them for a variable-rate mortgage.  The Saintils thought that they could manage the payment, since both of them were intending to work full time and receive overtime pay, and because they intended to fill their vacant rental unit.

### Mr. and Mrs. Saintil: At the Closing Table

120.    Mr. and Mrs. Saintil's mortgage closing took place on August 2, 2006.  The Saintils did not receive any closing papers prior to the mortgage closing.

121.    Both of the Saintils were present at the closing, as well as Mr. Rochlitz, a notary, and an attorney, who Mr. Rochlitz said would represent Mr. and Mrs. Saintil.  The man who had originally referred the Saintils to Mr. Rochlitz was also present, but he left quickly.  The Saintils had never met any of the others present, with the exception of Mr. Rochlitz.

122.     The attorney that they were told was representing them did not review any papers with them.  He merely indicated where on each page they should sign.

123.     The closing went quickly.  The Saintils were not given a chance to read through the loan documents at the closing.  Based on what Mr. Rochlitz and the attorney told them, they signed the loan documents.

124.     At the closing, Mr. and Mrs. Saintil signed documents for a $325,000 refinance loan, with an initial monthly interest rate of 9.625% and a "default" interest rate of 18%.  Their monthly payments were not the $2,700 they had been promised, but over $3,000, including escrow amounts.  Mr. and Mrs. Saintil were not told that their loan terms included a default interest rate; in fact they would not learn of this high interest rate until it was imposed months later.  Mr. and Mrs. Saintil were not told that their loan terms included a prepayment penalty. Mr. and Mrs. Saintil were not told that their mortgage interest rate was adjustable.  They thought that their interest rate was fixed.

125.     The Saintil mortgage documents recorded by Emigrant or its agents after the closing did not include the default interest rate rider or the pre-payment penalty rider.

126.     The HUD-1 Settlement Statement that Mr. and Mrs. Saintil received at closing discloses that "Evergreen Funding" received a payment of $3,250 from Emigrant outside of the closing.  Upon information and belief, this payment was a Yield Spread Premium, provided as compensation to Mr. Rochlitz and Evergreen Funding of the Tri-State for inducing Mr. and Mrs. Saintil into a loan that had a higher interest rate than that for which they would have otherwise qualified under Emigrant's lending program.  The HUD-1 Settlement Statement from the transactions reveals that Emigrant Funding of the Tri-State was also paid $5,625 in additional fees from funds at closing.

127.    Despite the fact that the Saintils had already paid out-of-pocket for their appraisal, the HUD-1 Settlement Statement from the transaction reveals that an additional $400 from the transaction was applied to pay an "appraisal fee."

128.    According to the HUD-1 Settlement Statement from the transaction, proceeds from the transaction were used to pay $555 to Emigrant, including a $350 "underwriting" fee, a $80 "tax service fee," and a $125 "document preparation" fee.  In addition, Emigrant received a $200 payment outside of the closing as an "EMC desk appraisal review fee."  Funds from the transaction were also used to pay $800 to Nathan Erlich, PC for "attorneys' fees."

129.    Emigrant's federal Truth in Lending disclosure accompanying the Saintil loan represented the following:

| Annual Percentage Rate | Finance Charge | Amount Financed | Total of Payments |
|---|---|---|---|
| 9.640% | $653,214.06 | $316,837.14 | $970,051.20 |

130.    The initial monthly payments of $3,145.95, including taxes and insurance, represented over 100% of their gross monthly income.

131.    A "High Equity Loan Certificate" included in the Saintils' closing papers indicated that Mr. and Mrs. Saintil's mortgage loan was originated under Emigrant's High Equity Plus Loan program, a variety of Emigrant's equity-stripping No Income Refinance Program.  Despite Mr. Rochlitz's assurances that he and the attorney at the closing would look out for the Saintils' interests, neither alerted the Saintils to review the certificate, nor did anyone present explain its contents to them.

132.    A "Resource Letter" included in the Saintils' closing papers indicated that the Saintils' loan had been originated without consideration of Mr. and Mrs. Saintil's financial

capacity to make payments on the loan. This letter indicated that Mr. and Mrs. Saintil would need dependable annual income of over $94,384 in order to make payments on the mortgage— an annual income of which Emigrant had notice greatly exceeded Mr. and Mrs. Saintil's income at the time. Despite Mr. Rochlitz's assurances that he and the attorney at the closing would look out for the Saintils' interests, neither alerted the Saintils to review the Resource Letter, nor did anyone present explain its contents to them.

133. Although they did not request cash from the transaction, Mr. and Mrs. Saintil received $22,536.09 in cash at closing. Surprised to have these funds available to them, Mr. and Mrs. Saintil soon purchased a used car, so that they could get to and from work more easily.

### Mr. and Mrs. Saintil: Emigrant's Loan to the Saintils

134. Although Emigrant presented the Saintils' loan as a variable-rate loan with an 9.625% initial interest rate, in reality, Emigrant's loan to the Saintils was far more costly. In fact, because Emigrant knew, or should have known, that the loan was unaffordable to the Saintils from origination, the APR should have taken into account the predicted and expected imposition of an 18% interest rate, raising the correctly calculated APR to at least 17.685%.

135. Emigrant knew, or should have known, that the Saintils could not afford to make the high initial payments on the mortgage based on the following indicators: (1) pay stubs and tax returns provided to Emigrant's agent, Mr. Rochlitz, at Mr. Rochlitz's request; (2) the Saintils' low credit scores; (3) employment and other information included in the Saintils' credit reports; and (4) the "payment shock" that Mr. and Mrs. Saintil would suffer from the increase in their mortgage payments.

136. In fact, Emigrant's loan to the Saintils was designed from origination to fail and to trigger the imposition of the 18% "default" interest rate within the first year of the loan. The

many onerous provisions of Emigrant's loan to the Saintils were designed to work in concert to ensure "default" within a year of origination.  The extremely high initial interest rate guaranteed default, as the monthly payments were well beyond the Saintils' capacity to pay.

137.    Properly disclosed, the Saintils' loan should have been accompanied by a Truth in Lending disclosure statement showing an APR of at least 17.685%.

138.    Emigrant not only understated the costs associated with the loan, it misstated the payment schedule of the loan.  The Truth in Lending disclosure that Emigrant provided to the Saintils, which by law should have properly indicated to them the expected payments on the loan Emigrant was extending to them, instead contained the following payment schedule:

| No. of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 60 | $2,762.47 | monthly, beginning 10/01/2006 |
| 300 | $2,681.01 | monthly, beginning 10/01/2011 |

139.    Emigrant should have provided a payment schedule for this loan as follows, based upon Emigrant's expectation that the 18% interest rate would be triggered within 12 months of origination:

| No. of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 12 | $2,762.47 | monthly, beginning 10/01/2006 |
| 348 | $4,843.10 | monthly, beginning 10/01/2007 |

***Mr. and Mrs. Saintil: After the Closing***

140.     With their rental apartment not yet earning money and the depletion of their funds

due to a family emergency, the Saintils found they could not make the October 1 payment on

time.  They were able to make their October 1 payment, along with a late payment of $62.92,

several weeks late, on October 31, 2006.

141.     The Saintils also had difficulty making their November 1 payment.  This time

they were unable to come up with the funds necessary to make the payment before December 1.

In a phone call with Emigrant in December, Mrs. Saintil learned that Emigrant had imposed a

"default" interest rate of 18% on the Saintil loan.  This was the first time that the Saintils had

even heard about an 18% interest rate.  They were shocked to realize that their loan was so much

more costly than they had thought.

142.     By late December, only months after they obtained the Emigrant refinance, the

Saintils began to look for an affordable refinance, to escape Emigrant's default interest rate and

avoid losing their home.  They requested payoffs from Emigrant in December and January.  The

payoff they received from Emigrant showed a pre-payment penalty of 2% of the principal

balance.  After talking to a number of brokers, the Saintils were devastated to learn that they

could not find a lender to refinance their Emigrant loan.

143.     Throughout 2007 and 2008, the Saintils struggled to stabilize their finances.  Even

with Mrs. Saintil working full-time, and a renter in their second apartment, the Saintils found

they could not catch up on their mortgage.  Over this time they were nearly always behind,

despite their persistent attempts to bring themselves current.  The Saintils drew on their earnings,

loans from family members, and another short-term mortgage to make large payments in March,

July, October, and November of 2007, January, February, April of 2008, as well as a number of

smaller payments.  Each time the Saintils thought they had come current, they would find out

from Emigrant that they were still behind, and that the 18% interest rate would continue to be

charged.

144.     Although the Saintils were nearly always behind, Emigrant did not initiate

foreclosure proceedings against the Saintils; instead it continued to charge the couple the 18%

"default" interest rate, for a period of almost two years.

145.     Finally, in October of 2008, Emigrant offered the Saintils a modification of their

loan terms, which fixed the Saintils' interest rate at 7.5%, and added some of the accrued default

interest to the loan balance.  Under the modified terms, their initial payments were $2,916.69, an

unaffordable sum which Emigrant knew represented over half of the couple's monthly income.

In addition, the Saintils were required to make a payment of $1,566.68 upfront to obtain the

modification.  Thinking they were finally escaping the onerous default interest term, the Saintils

signed the modification papers.

146.     The Saintils once again struggled to make such high monthly payments,

particularly after the death in late 2008 of Mrs. Saintil's mother, a supportive family member

who had frequently given funds to the Saintils to help them make payments.  After making a

partial payment in December of 2008, the Saintils learned that—although the "default" interest

rate had not been listed on the modification—the 18% "default" interest rate was still a term of

their modified mortgage.  Emigrant re-imposed the 18% term, and proceeded to collect payments

from the Saintils throughout the spring of 2009.

147.     In the spring of 2010, when, upon information and belief, Emigrant was under

pressure from the New York State Banking Department to offer improved modification terms,

Emigrant offered a second modification to the Saintils.  Although this second modification

finally waived the default interest rate, the payment required, $2,804.38, was still unaffordable to

the Saintils, as Emigrant was aware.  In addition, Emigrant fixed the lower, 6% interest rate, for

only five years after which time it would return to a higher interest rate and a yet higher

payment; required an upfront payment of $5,632.98 from the Saintils; and increased the loan

balance once again, further eating away at the equity in the Saintil home.  The Saintils

predictably fell behind on the second modification, but continued to make payments into the

winter of 2010-2011.

148.    Finally, in the fall of 2011, after years of delay, during which time Emigrant

collected tens of thousands of dollars in payments from the Saintils and increased their principal

balance through the use of the default interest rate and unaffordable modifications, Emigrant

Bank filed a foreclosure case against them, in August of 2011.

149.    Unbeknownst to Mr. and Mrs. Saintil, on information and belief, Emigrant has

transferred ownership and servicing rights to the Saintil mortgage and note to Emigrant Bank.

Mr. and Mrs. Saintil had no way of knowing that Emigrant had assigned their loan to Emigrant

Bank.  Neither Emigrant nor Emigrant Bank publicly recorded the assignment of the mortgage.

Mr. and Mrs. Saintil were not aware of the transfer until many years later, when they were served

with foreclosure papers.

150.    The Saintils did not discover the discrimination underlying their loan before they

consulted with an attorney in June of 2011.  They could not have reasonably discovered the

discrimination independently because the information about Emigrant's lending practices was

not known to them until explained to them by their counsel.

*Plaintiff Linda Commodore*

151.    Ms. Commodore lived at 4 West 101st Street, Apartment 59A, New York, New York 10025 for 16 years.  Ms. Commodore lost her home when Emigrant sold it in foreclosure in 2007.  She now lives in a rental apartment.

152.    Ms. Commodore purchased her home in 1991 with a fixed rate mortgage from IndyMac, and prior to refinancing with Emigrant had a remaining balancing of $100,000 with IndyMac.  Her monthly payment for this mortgage was approximately $840.

153.    In 2004, Ms. Commodore had recently lost her job as an admissions officer for a subsidiary of Chubb Insurance, where she enrolled adults in an IT-related career school.  She had held her job at Chubb for seven years, and had been able to make her mortgage payments without difficulty during this time.  However, the office where she worked was across the street from the World Trade Center.  The branch never fully recovered after 9/11, and this led to the loss of Ms. Commodore's job.

154.    Because she was having trouble making her mortgage payments to IndyMac in the fall of 2004, Ms. Commodore, with the help of a friend, contacted HomeTrust Mortgage Bankers to see if she could refinance her IndyMac mortgage.

155.    At all relevant times, HomeTrust Mortgage Bankers acted as a broker and agent of Emigrant.

156.    Ms. Commodore filled out a form providing HomeTrust Mortgage Bankers with her background information, including information about her current income, her employment history and the loss of her job at Chubb.  Ms. Commodore was working part-time jobs at the time, first as a jewelry sales person working on commission, and then as a part-time bridal consultant at Kleinfeld's.  Neither of these jobs allowed her to cover her expenses.  Despite this

information about her income and job loss, HomeTrust Mortgage Bankers told her that they would be able to get her a loan with Emigrant.

157.    At the time that HomeTrust Mortgage Bankers found Ms. Commodore the Emigrant loan, she had a credit score of 553.

158.    Ms. Commodore was nervous about being able to make her monthly payments of $983 to Emigrant, but badly needed the new loan and felt she had no choice.  Because she had a fixed-rate mortgage with IndyMac, Ms. Commodore assumed her Emigrant mortgage would also have a fixed rate, and did not understand that there was the potential for her monthly payment to go up.  Ms. Commodore believed she would be able to manage the payment since she was intending to find full time work again with a salary roughly equivalent to what she had been making at Chubb.

### Ms. Commodore: At the Closing Table

159.    Ms. Commodore's mortgage closing took place on August 27, 2004.

160.    Ms. Commodore was present at the closing, as well as the friend who had helped her find HomeTrust Mortgage Bankers.  There were several representatives from Emigrant, none of whom she had met before, including an attorney representing Emigrant.  Ms. Commodore did not have a lawyer representing her.

161.    The closing went very quickly, and was very short compared to other closings Ms. Commodore had attended.  Ms. Commodore signed the loan documents she was presented, but did not understand all of the terms of the mortgage and no one present at the closing explained the terms to her.

162.    At the closing, Ms. Commodore signed documents for a $125,000 refinance loan, with an initial monthly interest rate of 6.5% and a "default" interest rate of 18%.  Ms.

Commodore was not told that her loan terms included a default interest rate; she did not learn of this high interest rate until it was imposed a few months later. Ms. Commodore was not told that her mortgage interest rate was adjustable. She believed that her interest rate was fixed.

163.    According to the HUD-1 Settlement Statement from the transaction, proceeds from the transaction were used to pay $482.75 to Emigrant, including a $350 "underwriting" fee, a $125 "document preparation" fee, and a $7.75 "Fed Ex fee." Funds from the transaction were also used to pay $425 to David Frankel, Esq. for "attorneys' fees."

164.    The monthly payments of $983.38, which did not include Ms. Commodore's coop maintenance fees, were far more than she was able to pay given her limited part-time work.

165.    A "Resource Letter" included in Ms. Commodore's closing papers indicated that her loan had been originated without consideration of her financial capacity to make payments on the loan. This letter indicated that Ms. Commodore would need dependable annual income of over $54,792 in order to make payments on the mortgage—an annual income of which Emigrant had notice greatly exceeded her income at the time. Ms. Commodore received $10,410.07 in cash at closing. She used these funds to live on and to help her pay other debts she had acquired during her period of unemployment.

### Ms. Commodore: Emigrant's Loan to Ms. Commodore

166.    Although Emigrant presented Ms. Commodore's loan as a variable-rate loan with a 6.5% initial interest rate, in reality, Emigrant's loan to Ms. Commodore was far more costly. In fact, because Emigrant knew, or should have known, that the loan was unaffordable to Ms. Commodore from origination, the APR should have taken into account the predicted and expected imposition of an 18% interest rate.

167.     Emigrant knew, or should have known, that Ms. Commodore could not afford to make the payments on the mortgage from the outset based on the following indicators:  (1) employment information provided to Emigrant's agent, HomeTrust Mortgage Bankers, at the broker's request; (2) Ms. Commodore's low credit scores; (3) other information included in Ms. Commodore's credit reports, including that she was already behind in her existing IndyMac mortgage; and (4) the "payment shock" that Ms. Commodore would suffer from the increase in her mortgage payments.

168.     In fact, Emigrant's loan to Ms. Commodore was designed from origination to fail and to trigger the imposition of the 18% "default" interest rate within the first year of the loan. The many onerous provisions of Emigrant's loan to Ms. Commodore were designed to work in concert to ensure "default" within a year of origination.  The monthly payments well beyond Ms. Commodore's capacity to pay guaranteed her default.

### *Ms. Commodore: After the Closing*

169.     With only part-time, commission-based work, Ms. Commodore found she could not make her payments on time.  Between September 2004 and February 2005, she was only able to make one complete payment.

170.     Ms. Commodore's monthly payments quickly doubled because of the imposition of the 18% default rate.  She was shocked to realize that her loan was so much more costly than she had understood.

171.     Realizing that she was already behind in her mortgage payments shortly after closing, Ms. Commodore sought a modification from Emigrant or a payment plan that she could afford.  Emigrant refused to work with her to lower her payments.

172.     At one point, Ms. Commodore scraped together $3,000 on an outstanding $4,000 debt to Emigrant, but Emigrant refused to accept anything less than the entire amount due, allowing the outstanding debt to continue accruing at 18%.

173.     Throughout 2004 and 2005 Ms. Commodore struggled to stabilize her finances and make her payments.

174.     Despite taking loans from her family and working part-time jobs, Ms. Commodore was unable to make her mortgage payments, and in August 2006 her loan was sent to the Emigrant foreclosure committee for processing.

175.     Emigrant sold Ms. Commodore's house to a third party in or around October 2007.  On information and belief, the home she had lived in for 16 years was sold for $314,340.  The majority of the proceeds were used to pay Emigrant her outstanding balance, including thousands of dollars in default fees that had accrued since the fall of 2004 when Ms. Commodore first got the loan from Emigrant that she was never able to afford.

176.     Ms. Commodore did not discover the discrimination underlying her loan before she consulted with attorneys at the end August 2013.  She could not have reasonably discovered the discrimination independently because the information about Emigrant's lending practices was not known to Ms. Commodore until explained to her by the attorneys she consulted with in August 2013.

### *Plaintiffs Beverley & Jeanette Small*

177.     Beverley and Jeanette Small, daughter and mother, along with Beverley's teenage son, lived at 1038 East 57th Street, Brooklyn, New York 11234 for nearly a decade.  The Smalls lost their home when they were forced to sell it in 2008 after Emigrant instituted foreclosure proceedings.  They now live in a rental apartment.  At the time the Smalls' Emigrant loan was originated, Beverley had graduated from massage therapy school and was unemployed, and

Jeanette was working as an administrative assistant for Corizon Correctional Healthcare on Rikers Island.

178.    The Smalls purchased their home in 1996, and at the time they refinanced with Emigrant they had a loan with CitiMortgage.  Their monthly payment for this mortgage was approximately $2,508.

179.    In 2006, the Smalls were having trouble making ends meet.  Beverley had lost her job as an IT consultant, which she had maintained while she was in massage therapy school. Beverley finished school in or around April 2006 and got her license later that year, but had trouble finding work.  Jeanette was supporting Beverley and her grandson with her income which was approximately $17,000.  The Smalls spoke with Shazeem Ali, a broker at 1st Republic Mortgage Bankers, Inc., who told them that refinancing would be an option.

180.    At all relevant times, 1st Republic and Mr. Ali acted as brokers and agents of Emigrant.

181.    The Smalls told Mr. Ali that they wanted to know what their options were as they were having trouble paying their CitiMortgage loan.  They provided Mr. Ali with their employment information, and Mr. Ali was aware that Beverley was out of work at the time.  Mr. Ali told her that it did not matter that she was not working, and that he would be able to get her a loan with Emigrant.

182.    Mr. Ali had an appraisal performed on the house, for which he charged the Smalls.  He then told them he had qualified them to refinance their home with Emigrant.

183.    At the time that Mr. Ali found the Smalls the Emigrant loan, they owed $286,825 on their CitiMortgage loan and all three household members were living off of Jeanette's income.  Jeanette had a credit score of 573, and Beverley had a credit score of 495.

184.   The Smalls were nervous about being able to make their monthly payments of more than $2,800 to Emigrant and expressed this fear to Mr. Ali.  Mr. Ali assured them that the payments would only be that high for the first two months and would then go down to $1,100. The Smalls did not understand that there was the potential for their monthly payments to go up, and believed they would be able to make their monthly payments of $1,100 once Beverley found a job.

### Beverley & Jeanette Small: At the Closing Table

185.   The Smalls' closing took place on August 11, 2006.

186.   Mr. Ali attended the closing with the Smalls. Mr. Ali told them that they did not need to bring a lawyer because there would be a lawyer at the closing who would represent their interests and answer any questions that they had.  At the closing there were several representatives from Emigrant, none of whom the Smalls had met before, including the attorney that Mr. Ali told the Smalls would represent their interests.

187.   The closing went very quickly, and the Smalls signed the loan documents that were presented to them, but did not understand all of the terms of the mortgage, no one present at the closing explained the terms to them other than to tell them that the payments would quickly drop from $2,800 to $1,100.

188.   At the closing, the Smalls signed documents for a $330,000 refinance loan, with an initial monthly interest rate of 9.375% and a "default" interest rate of 18%.  The Smalls were not told that their loan terms included a default interest rate; they did not learn of this high interest rate until it was imposed a few months later.

189.    The mortgage documents recorded by Emigrant or its agents after the closing did not include the default interest rate rider or the pre-payment penalty rider that were included in the Smalls' loan.

190.    The HUD-1 Settlement Statement that the Smalls signed at closing discloses that 1st Republic received a payment of $3,300.00 from Emigrant outside of the closing.  Upon information and belief, this payment was a Yield Spread Premium, provided as compensation to 1st Republic for inducing the Smalls into a loan that had a higher interest rate than what they would have otherwise qualified for under Emigrant's lending program.

191.    Despite the fact that the Smalls had already paid out-of-pocket for their appraisal, the HUD-1 Settlement Statement from the transaction reveals that an additional $175 from the transaction was applied to pay an "appraisal fee."

192.    According to the HUD-1 Settlement Statement from the transaction, proceeds from the transaction were used to pay $475 to Emigrant, including a $350 "underwriting" fee and a $125 "document preparation" fee.  Funds from the transaction were also used to pay $800 to Cullen and Dykman for "attorneys' fees."

193.    The monthly payments of more than $2,800, not including property taxes and homeowner's insurance, were far more than the Smalls were able to pay.

194.    A "Resource Letter" included in the Smalls' closing papers indicated that their loan had been originated without consideration of their financial capacity to make payments on the loan.  This letter indicated that the Smalls would need dependable annual income of over $82,728 in order to make payments on the mortgage—an annual income of which Emigrant had notice greatly exceeded their income at the time.  Despite Mr. Ali's assurances that he and the

attorney at the closing would look out for the Smalls' interests, neither alerted the Smalls to review the Resource Letter, nor did anyone present explain its contents to them.

### Beverley & Jeanette Small: Emigrant's Loan to the Smalls

195.    Although Emigrant presented the Smalls' loan as a variable-rate loan with a 9.375% initial interest rate, in reality, Emigrant's loan to the Smalls was far more costly.  In fact, because Emigrant knew, or should have known, that the loan was unaffordable to the Smalls from origination, the APR should have taken into account the predicted and expected imposition of an 18% interest rate.

196.    Emigrant knew, or should have known, that the Smalls could not afford to make the payments on the mortgage from the outset based on the following indicators:  (1) employment information provided to Emigrant's agent, 1st Republic, at Mr. Ali's request; (2) Beverley and Jeanette's low credit scores; (3) other information included in the Smalls' credit reports; and (4) the "payment shock" that the Smalls would suffer from the increase in their mortgage payments and the fact that those payments would not be cut by more than half within two months of closing.

197.    In fact, Emigrant's loan to the Smalls was designed from origination to fail and to trigger the imposition of the 18% "default" interest rate within the first year of the loan.  The many onerous provisions of Emigrant's loan to the Smalls were designed to work in concert to ensure "default" within a year of origination.  The monthly payments well beyond the Smalls' capacity to pay guaranteed their default.

47

### *Beverley & Jeanette Small: After the Closing*

198.    The Smalls quickly found that they were unable to afford their payments.  The Smalls had relied on Mr. Ali's assurances that their payments would fall to $1,100, but the payments only began to climb higher.

199.    Because they were unable to make the full $2,800 payments, the Smalls' mortgage payments quickly went up because of the imposition of the 18% default rate.  The Smalls were shocked that their loan was so much more costly than they had been led to believe by Emigrant and its representatives.

200.    By December 2007, Emigrant had instituted foreclosure proceedings, and the Smalls were struggling to keep their home.  Knowing that they would be unable to pay their $2,800 mortgage payments, the Smalls contacted Emigrant to see if they could get a modification.  Emigrant refused to work with them.

201.    Beverley had found work in the massage therapy field in 2007, but the Smalls' annual income was less than $70,000, and they were unable to afford their Emigrant mortgage, especially in light of the 18% default interest rate that had been imposed.

202.    The Smalls realized that they were fighting a losing battle to stay in the home that had been theirs for nearly a decade.  Because they were not going to be able to keep the home, the Smalls sold their home through a realtor in May 2008, before the foreclosure was completed.

203.    On information and belief, the Smalls' home sold for $620,000.  The majority of the proceeds of the sale were used to pay Emigrant their outstanding balance, including thousands of dollars in default fees that had accrued since the fall of 2006 when the Smalls first got the loan from Emigrant that they were never able to afford.

204.    The Smalls did not discover the discrimination underlying their loan before Beverley consulted with attorneys at the end August 2013.  They could not have reasonably

discovered the discrimination independently because the information about Emigrant's lending practices was not known to the Smalls until explained to them by the attorneys they consulted with in August 2013.

### *Plaintiff Felipe Howell*

205.     Felipe Howell lived at 115-56 158th Street, Jamaica, New York, his home of almost thirty years, and had paid off his first mortgage in full.  Mr. Howell lost his home in a foreclosure sale instituted by Emigrant in 2009.  At the time Emigrant originated Mr. Howell's loan, Mr. Howell was retired and earning no income.  Before his retirement, Mr. Howell had run a restaurant and music club, Cheyenne Roadhouse, on Jamaica Avenue in Queens.

206.     Mr. Howell and his now ex-wife purchased their home in 1979.  In 2006, Mr. Howell had paid off his mortgage and owned his property free and clear.

207.     In or around 2007, Mr. Howell was approached by a contractor who was doing other work around his neighborhood.  The contractor proposed to Mr. Howell that he build a separate, two-family residence on Mr. Howell's land to generate rental income for Mr. Howell so he could support himself during his retirement.

208.     The contractor introduced him to a man named Purelight Allah.  On information and belief, Mr. Allah worked for Stur-Dee Funding, Ltd., a mortgage broker.  At all relevant times, Stur-Dee Funding acted as broker and agent of Emigrant.

209.     Stur-Dee Funding told Mr. Howell that he could get him a cash-out refinance with Emigrant.  Stur-Dee Funding was aware that Mr. Howell was not working and that he was going to be using the proceeds to build another residence on his property.  Stur-Dee Funding was also aware that Mr. Howell planned to pay his mortgage payments with the rental income from the new units and would not have other sources of income to pay the mortgage.

210.    Mr. Howell was concerned about the timing of the construction and whether he would be able to make mortgage payments, but the broker and contractor repeatedly insisted that it would all work out, that he would have a couple months before he would have to start paying the Emigrant loan, and he felt pressured by them to complete the transaction.

211.    At the time that Mr. Howell got his Emigrant loan he had a credit score of 582.

### Felipe Howell: At the Closing Table

212.    Mr. Howell's closing took place on February 6, 2008.

213.    The broker and the contractor introduced Mr. Howell to an attorney who purported to represent him in the transaction.  The attendees at closing included Mr. Howell, the contractor, the attorney, Mr. Howell's ex-wife, who also wanted to be paid out of the proceeds of the closing, and several representatives from Emigrant whom Mr. Howell had not met before.

214.    Mr. Howell signed the loan documents he was presented, but he did not understand all of the terms of the mortgage.  At the closing, Mr. Howell signed documents for a $200,750 refinance loan, with an initial monthly interest rate of 10.375% and a "default" interest rate of 18%.  Mr. Howell was not told that his loan terms included a default interest rate, and he did not learn of this high interest rate until it was imposed. The HUD-1 Settlement Statement that Mr. Howell signed at closing discloses that Stur-Dee Funding received a payment of $2,007.00 from Emigrant outside of the closing.  Upon information and belief, this payment was a Yield Spread Premium, provided as compensation to Stur-Dee Funding for inducing Mr. Howell into a loan that had a higher interest rate than that for which he would have otherwise qualified under Emigrant's lending program.

215.    According to the HUD-1 Settlement Statement, proceeds from the transaction were used to pay $675 to Emigrant, including a $350 "underwriting" fee, a $125 "document

preparation" fee, and a $200 "Desk Appraisal" fee. Funds from the transaction were also used to pay $835 to Mattone for "attorneys' fees."

216. The monthly payments of more than $1,800, not including property taxes and homeowner's insurance, were far more than Mr. Howell was able to afford given that he had no income.

217. A "Resource Letter" included in Mr. Howell's closing papers indicated that his loan had been originated without consideration of his financial capacity to make payments on the loan. This letter indicated that Mr. Howell would need dependable annual income of over $51,527 in order to make payments on the mortgage—an annual income that Emigrant knew he did not have. Despite Stur-Dee Funding's assurances that he and the attorney at the closing would look out for Mr. Howell's interests, neither alerted him to review the Resource Letter, nor did anyone present explain its contents to him.

### Felipe Howell: Emigrant's Loan to Mr. Howell

218. Although Emigrant presented Mr. Howell's loan as a variable-rate loan with a 10.375% initial interest rate, in reality, Emigrant's loan to Mr. Howell was far more costly. In fact, because Emigrant knew, or should have known, that the loan was unaffordable to Mr. Howell from origination, the APR should have taken into account the predicted and expected imposition of an 18% interest rate.

219. Emigrant knew, or should have known, that Mr. Howell could not afford to make the payments on the mortgage from the outset based on the following indicators: (1) income information provided to Emigrant's agent, Stur-Dee Funding, at the broker's request; (2) Mr. Howell's low credit score; (3) other information included in Mr. Howell's credit reports; and (4) the "payment shock" that Mr. Howell would suffer from the mortgage payments, particularly as

Stur-Dee Funding knew he planned to make the payments with income from residential units on his property that had not yet been constructed.

220.     In fact, Emigrant's loan to Mr. Howell was designed from origination to fail and to trigger the imposition of the 18% "default" interest rate within the first year of the loan.  The many onerous provisions of Emigrant's loan to Mr. Howell were designed to work in concert to ensure "default" within a year of origination.

### Felipe Howell: After the Closing

221.     Mr. Howell was unable to make even one loan payment.

222.     Mr. Howell sought help from The Legal Aid Society in Queens.  On information and belief, attorneys there attempted to negotiate with Emigrant on his behalf, but Mr. Howell never received any response from Emigrant.

223.     Emigrant obtained a judgment of foreclosure in March 2009, thirteen months after providing him an unaffordable mortgage that was designed to fail.

224.     Although the house had been appraised at $430,000 in 2008, in or around August 2009, Emigrant purchased Mr. Howell's home for $1,000 at a foreclosure auction.  Mr. Howell did not receive any proceeds from the foreclosure sale.  Over the course of two years, Mr. Howell went from owning free and clear the home he had lived in since 1978, to losing his home and the substantial portion of the equity he had built over three decades.

225.     Mr. Howell did not discover the discrimination underlying his loan before he consulted with an attorney in late August of 2013.  He could not have reasonably discovered the discrimination independently because the information about Emigrant's lending practices was not known to Mr. Howell until explained to him by the attorney he consulted with in August 2013.

226.     When Mr. Howell previously consulted with The Legal Aid Society, he was not given any information indicating that he may have been the victim of discrimination in connection with his loan.

## FIRST CAUSE OF ACTION

### FAIR HOUSING ACT, 42 U.S.C. §§ 3604, 3605

**(Mr. and Mrs. Saint-Jean, Mr. and Mrs. Saintil, Linda Commodore, Beverley and Jeanette Small, and Felipe Howell ("Plaintiffs") against Emigrant)**

227.     Plaintiffs repeat and reallege paragraphs 1 through 226 as though fully set forth herein.

228.     Plaintiffs are members of a protected class on the basis of race, color, and national origin because they are black or Latino.

229.     The Fair Housing Act makes it unlawful to "make unavailable . . . a dwelling to any person because of race, color, . . . or national origin."  42 U.S.C. § 3604(a).

230.     The Fair Housing Act makes it unlawful to discriminate on the basis of race, color, or national origin against any person in a residential real estate-related transaction such as the making or purchasing of loans or providing other financial assistance.  42 U.S.C. § 3605(a).

231.     Emigrant engaged in residential real estate-related transactions with respect to Plaintiffs by making loans to them secured by residential real estate.

232.     Emigrant actions violated the Fair Housing Act and constitute actionable discrimination on the basis of race, color, and national origin.

233.     Plaintiffs are aggrieved persons as defined by Section 3602(i) of the Fair Housing Act by virtue of having been subject to Emigrant's discriminatory equity-stripping No Income Refinance Program.  42 U.S.C. § 3602(i).

234.     As described above, through its equity-stripping No Income Refinance Program, Emigrant engaged in a facially neutral mortgage pricing policy of "no income" "underwriting," lending solely on the basis of the equity remaining in a borrowers home and credit score, targeting individuals with low and extremely low credit scores for loans with very high interest rates that were designed to fail and stripping the equity in a borrower's home through 18% "default" interest rates and other onerous terms.

235.     Emigrant engaged in a pattern and practice of originating equity-stripping No Income Refinance loans, which had a disparate and harmful impact to the detriment of black and Latino borrowers throughout New York City.

236.     As described above, Emigrant engaged in a pattern and practice of intentionally targeting blacks and Latinos, and residents of predominantly black and Latino neighborhoods, for abusive and predatory mortgage loans through its No Income Refinance Program.

237.     As a proximate result of such discriminatory housing practices, Plaintiffs have suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of their home.

238.     Emigrant's actions were intentional, wanton, malicious and done in reckless disregard of the Plaintiffs' civil rights.

239.     As a result of the aforesaid violations of the Fair Housing Act, Emigrant is liable to Plaintiffs for:

      a.     Compensatory and punitive damages to be determined at trial;

      b.     Injunctive relief;

      c.     Costs and disbursements; and,

      d.     Attorney's fees.  42 U.S.C. § 3613(c).

## SECOND CAUSE OF ACTION

**EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691 et seq.**

**(Mr. and Mrs. Saint-Jean, Mr. and Mrs. Saintil, Linda Commodore, Beverley and Jeanette Small, and Felipe Howell ("Plaintiffs") against Emigrant, Emigrant Savings Bank-Manhattan, Emigrant Bank, Emigrant Bancorp, Inc.)**

240.     Plaintiffs repeat and reallege paragraphs 1 through 239 as though fully set forth herein.

241.     Plaintiffs are members of a protected class on the basis of race, color, and national origin because they are black or Latino.

242.     Emigrant is a creditor as set forth in the Equal Credit Opportunity Act because in the ordinary course of its business Emigrant extended credit to Plaintiffs.  Moreover, Emigrant is a creditor as set forth in the Equal Credit Opportunity Act because it set the terms of the credit that was extended to the Plaintiffs through the equity-stripping No Income Refinance Program.

243.     Emigrant designed, disseminated, controlled, implemented and profited from the discriminatory equity-stripping No Income Refinance Program, which has had a disparate economic impact on minority homeowners.

244.     As the result of Emigrant's discriminatory equity-stripping No Income Refinance Program, Emigrant has charged black and Latino borrowers disproportionately high interest rates, stripped the equity from their homes, and subjected them to the risk of foreclosure.

245.     As described above, Emigrant engaged in a pattern and practice of intentionally targeting blacks and Latinos, and residents of predominantly black and Latino neighborhoods, for abusive and predatory mortgage loans through its No Income Refinance Program.

246.     Emigrant Savings Bank-Manhattan, Emigrant Bank and Emigrant Bancorp, Inc. are creditors as set forth in the Equal Credit Opportunity Act because they participated in the

credit transaction as Emigrant's assignees and because—as members of the Emigrant family of companies with common ownership, leadership and operation—they knew or had reasonable notice of the acts, policies, and practices that constituted the violation before becoming involved in the credit transaction.

247.     Emigrant, Emigrant Savings Bank-Manhattan, Emigrant Bank, and Emigrant Bancorp, Inc.'s actions violated the Equal Credit Opportunity Act and constitute actionable discrimination on the basis of race, color, and national origin.

248.     Plaintiffs are aggrieved persons as defined in the Equal Credit Opportunity Act by virtue of having been subject to Emigrant's equity-stripping No Income Refinance Program.

249.     As a result of the aforesaid violations of the Equal Credit Opportunity Act, Emigrant, Emigrant Savings Bank-Manhattan, Emigrant Bank, and Emigrant Bancorp, Inc. are liable to Plaintiffs for:

       a.     Compensatory and punitive damages to be determined at trial;

       b.     Injunctive relief;

       c.     Costs and disbursements; and,

       d.     Attorney's fees.  15 U.S.C. § 1691e(d).

## THIRD CAUSE OF ACTION

### NEW YORK STATE HUMAN RIGHTS LAW
### EXECUTIVE LAW §§ 296-a

**(Mr. and Mrs. Saint-Jean, Mr. and Mrs. Saintil, Linda Commodore, Beverley and Jeanette Small, and Felipe Howell ("Plaintiffs") against Emigrant)**

250.     Plaintiffs repeat and reallege paragraphs 1 through 249 as though fully set forth herein.

251.     Emigrant engaged in a housing-related policy that resulted in a disparate impact to the detriment of non-white homeowners in, and residents and would-be residents of, communities of color throughout New York City; this housing-related policy constituted discrimination on the basis of race, color, and national origin.

252.     As described above, Emigrant engaged in a pattern and practice of intentionally targeting black and Latinos, and residents of predominantly black and Latino neighborhoods, for mortgage loans through its No Income Refinance Program.

253.     As a proximate result of such discriminatory actions, Plaintiffs have suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of their home.

254.     Defendants' actions were intentional, wanton, malicious and done in reckless disregard of the Plaintiffs' civil rights.

255.     As a result of the aforesaid violations of the New York State Human Rights Law, Emigrant is liable to Plaintiffs for:

a.     Compensatory damages to be determined at trial;

b.     Injunctive relief;

c.     Costs and disbursements; and,

d.     Attorney's fees.  N.Y. Executive Law § 297(10).

## FOURTH CAUSE OF ACTION

### UNLAWFUL DISCRIMINATORY PRACTICES IN VIOLATION OF TITLE 8 OF THE NEW YORK CITY ADMINISTRATIVE CODE

**(Mr. and Mrs. Saint-Jean, Mr. and Mrs. Saintil, Linda Commodore, Beverley & Jeanette Small, and Felipe Howell ("Plaintiffs") against Emigrant)**

256.     Plaintiffs repeat and reallege paragraphs 1 through 255 as though fully set forth herein.

257.     Emigrant engaged in a housing-related policy that resulted in a disparate impact to the detriment of non-white homeowners in, and residents and would-be residents of, communities of color throughout New York City; this housing-related policy constituted discrimination on the basis of race, color, and national origin.

258.     As described above, Emigrant intentionally engaged in a discriminatory housing-related policy through a pattern and practice of intentionally targeting blacks and Latinos, and residents of predominantly black and Latino neighborhoods, for abusive and predatory mortgage loans through its No Income Refinance Program.

259.     As a proximate result of such discriminatory actions, Plaintiffs have suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of their home.

260.     Defendants' actions were intentional, wanton, malicious and done in reckless disregard of the Plaintiffs' civil rights.

261.     As a result of the aforesaid violations of Title 8 of the New York City Administrative Code, Emigrant is liable to Plaintiffs for:

a.     Compensatory and punitive damages to be determined at trial;

b.     Costs and disbursements; and,

c.     Attorney's fees.

## FIFTH CAUSE OF ACTION

### TRUTH IN LENDING ACT, 15 U.S.C. § 1601 et seq.

**(Saint-Jeans against Emigrant, Emigrant Savings Bank-Manhattan, and Emigrant Bancorp, Inc.)**

262.     Plaintiffs repeat and reallege paragraphs 1 through 261 as though fully set forth herein.

263.     The subject loan comes within the statutory language of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and its implementing regulations, Federal Reserve Board Regulation Z, 12 C.F.R. § 226, and is not one of the specified transactions exempted by 15 U.S.C. § 1603. Consequently, Mr. and Mrs. Saint-Jean's loan is subject to TILA.

264.     Mr. and Mrs. Saint-Jean are consumers within the meaning of TILA, 15 U.S.C. § 1602(h) and Regulation Z § 226.2(a)(11).  The subject loan is a consumer credit transaction and secured by their principal dwelling and not a residential mortgage transaction.

265.     At all times relevant hereto, Emigrant was a creditor within the meaning of TILA 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).  Emigrant in the ordinary course of business regularly extended or offered to extend home-secured consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments.

266.     The subject loan is a high cost mortgage within the meaning of TILA, 15 U.S.C. § 1602(aa) because the annual percentage rate at closing "exceed[ed] by more than [8] percentage points the yield on Treasury securities having comparable period of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor."  15 U.S.C. § 1602(aa)(1)(A) (2006); 12 C.F.R. § 226..32(a)(1)(i).[4]  When Emigrant originated the subject loan, the applicable index was 4.66%. The annual percentage rate on Mr. and Mrs. Saint-Jeans' loan was at least 17.767.  This exceeds by more than 8% the applicable yield on treasury securities for the relevant period making the Saint-Jean mortgage subject to the enhanced protections of 15 U.S.C. § 1639.

---

[4] The relevant sections of TILA have been amended to provide even greater protections for consumers.  The allegations in the complaint refer to the version of the statute in effect at the time of the Saint-Jean loan.

267.     Emigrant routinely made loans similar in all material respects to the one it made to the Saint-Jeans as part of its equity-stripping No Income refinance programs, which are subject to the enhanced federal protections for high cost mortgages.  These No Income loans are made based on the equity in the consumers' collateral and without regard to the borrower's ability to repay the loan.

268.     TILA and Regulation Z prohibit certain conduct with respect to high cost mortgages as defined in 15 U.S.C. §§ 1602(aa) & 1639 and 12 C.F.R. §226.32 & 226.34. Emigrant violated the provisions of TILA and Regulation Z regarding high cost mortgages by:

a.     Originating the subject loan to include a prepayment penalty in violation of 15 U.S.C. § 1639(c) and 12 C.F.R. § 226.32(d)(6);

b.     Originating the subject loan without regard to Mr. and Mrs. Saint-Jean's ability to repay the debt, and/or without verifying and documenting the Saint-Jean's ability to repay the debt, in violation of 15 U.S.C. § 1639(h) and 12 C.F.R. § 226.34(a)(4);

c.     Engaging in a pattern or practice of extending credit based on the consumers' collateral without regard to the consumers' ability to repay the debt and without verifying and documenting consumers' repayment ability, in violation of 15 U.S.C. § 1639(h) and 12 C.R.F. § 226.34(a)(4); and,

d.      Failing to provide Mr. and Mrs. Saint-Jean with the disclosures required under Section 129 of TILA (15 U.S.C. § 1639(a)) and failing to provide the required disclosures at least three business days prior to the consummation of the transaction, in violation of 15 U.S.C. § 1639(a) and (b) and 12 C.F.R. § 226.32(c).

269.    TILA and Regulation Z mandate that all closed end consumer loans be accompanied by a Truth in Lending disclosure of material terms.  15 U.S.C. §§ 1638, 1639; 12 C.F.R. § 226.18.  In the course of this consumer credit transaction, Emigrant failed to make TILA's required disclosures accurately or clearly and conspicuously in writing in violation of 15 U.S.C. § 1632(a) and Regulation Z § 226.17(a) and failed to deliver all "material" disclosures as required by TILA and Regulation Z, including the following:

a.    Failing to disclose properly and accurately the "finance charge," in violation of 15 U.S.C. § 1638(a)(3) and 12 C.F.R. § 226.18(d);

b.    Failing to disclose properly and accurately the "amount financed," in violation of 15 U.S.C. § 1638(a)(2) and 12 C.F.R. §§ 226.18(b); 226.18(c);

c.    Failing to disclose properly and accurately the "annual percentage rate," in violation of 15 U.S.C. § 1638(a)(4) and 12 C.F.R. § 226.18(e);

d.    Failing to disclose properly and accurately the payment schedule, in violation of 15 U.S.C. § 1638(6) and 12 C.F.R. § 226.18(g); and,

e.    Failing to disclose properly and accurately the "total of payments," in violation of 15 U.S.C. § 1638(a)(5) and 12 C.F.R. § 226.18(h).

270.    Emigrant's loan to the Saint-Jeans was disclosed as an adjustable rate mortgage with an APR of 10.119 %.  However, it is in fact a mortgage with a minimum APR of 17.767% because the 18% default rate was the scheduled rate that Emigrant expected to charge on the loan.  The monthly payments on this loan exceeded the family's income and the true interest rate of the loan was its 18% "default" rate.

271.    The errors on the Saint-Jean Truth in Lending disclosure greatly exceed the tolerances for inaccurate disclosures permissible under 15 U.S.C. §§ 1605(f) (with regard to the

"finance charge," tolerance of .5% of the total amount of credit extended), 1606(c) (with regard to the APR, one eighth of one percent); and 1635(i)(2) (for purposes of rescission, with regard to the "amount financed," $35).

272.    Notice that the borrower has 3-business days to cancel the mortgage is one of the material disclosures required by TILA.  12 C.F.R. §226.23.  TILA and Regulation Z require that each consumer with a right to rescind the loan receive two copies of the notice of their right to rescind. 15 U.S.C. § 1635; 12 C.F.R. § 226.23(b)(1).  Neither Mr. nor Mrs. Saint-Jean received two copies each of the notice of their right to rescind their mortgage.

273.    TILA and Regulation Z require that each borrower receive a copy of the Truth in Lending disclosure statement.  Mr. and Mrs. Saint-Jean together received only one copy of the Truth in Lending disclosure statement, rather than the two to which they were entitled.  Failure to provide the requisite disclosures gives rise to an extended right to rescind.  15 U.S.C. § 1635(a); 12 C.F.R. § 223(a)(3).

274.    Each of the TILA violations described above in paragraphs 176 through 181 is a material violation as defined by Regulation Z, 226.23 and each gives Mr. and Mrs. Saint-Jean an extended three year right to rescind the loan held by defendants pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 226.23.

275.    On July 12, 2010, Mr. and Mrs. Saint-Jean rescinded the subject loan by mailing a notice of rescission to Emigrant and Emigrant's attorney.

276.    On July 26, 2010, Emigrant by and through its counsel Deutsch & Schneider improperly rejected the Saint-Jeans' rescission.

277.    As assignees, Emigrant Savings Bank-Manhattan and Emigrant Bancorp, Inc. are fully liable for Emigrant's violations of TILA under 15 U.S.C. § 1641(c) & (d).

278.     As a result of the aforesaid violations of TILA and Regulation Z, Emigrant, Emigrant Savings Bank-Manhattan and Emigrant Bancorp., Inc. are liable to Mr. and Mrs. Saint-Jean for:

a.     Rescission of the subject loan and termination of any security interest in the Saint-Jeans' property created under the transaction;

b.     Compensatory damages to be determined at trial;

c.     Statutory damages;

d.     Costs and disbursements; and,

e.     Attorney's fees.  15 U.S.C. § 1640(a)(1)-(4).

WHEREFORE, plaintiffs Jean Robert and Edith Saint-Jean, Felex and Yanick Saintil, Linda Commodore, Beverley Small and Jeanette Small, and Felipe Howell respectfully request that this Court:

a.     Grant the relief requested in Counts I - V herein;

b.     Order the rescission of the mortgage loan transaction and termination of any security interest in the Plaintiffs' property created in connection with the Plaintiffs' transactions;

c.     Order the return of any money or property given by Emigrant to anyone in connection with the Plaintiffs' transactions;

d.     Enjoin Emigrant from underwriting loans under its equity-stripping No Income Refinance Program or any other No Income loan program;

e.     Award compensatory damages and interest thereon in the amount to be determined at trial;

f.     Award punitive damages in an amount to be determined at trial;

g.     Award statutory damages, as set forth above;

h.     Award reasonable costs of this action as set forth above;

i.   Award reasonable attorney's fees;

j.   Award such other further relief as the Court deems just and proper.

DATED:  October 2, 2014
        Brooklyn, New York

By:   /s/ Rachel Geballe
      Jennifer Sinton
      Sara Manaugh
      Meghan Faux
      Rachel Geballe
      SOUTH BROOKLYN LEGAL SERVICES
      105 Court Street, Fourth Floor
      Brooklyn, NY 11201
      (718) 237-5500 (tel)
      (718) 875-8546 (fax)

      Michael D. Calhoun
      CENTER FOR RESPONSIBLE LENDING
      910 7th Street, NW, Suite 500
      Washington, DC  20006-1886
      (202) 349-1850 (tel)

      John P. Relman (*pro hac vice*)
      Glenn Schlactus (*pro hac vice*)
      Tara Kolar Ramchandani (*pro hac vice*)
      Tim Smyth (*pro hac vice*)
      RELMAN, DANE & COLFAX PLLC
      1225 19th Street NW, Suite 600
      Washington, D.C. 20036-2456
      Telephone: (202) 728-1888
      Facsimile: (202) 728-0848

      *Attorneys for Plaintiff*