UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JEAN ROBERT SAINT-JEAN, EDITH SAINT-JEAN, FELEX SAINTIL, YANICK SAINTIL, LINDA COMMODORE, BEVERLEY SMALL, JEANETTE SMALL, and FELIPE HOWELL,<br><br>Plaintiffs,<br><br>v.<br><br>EMIGRANT MORTGAGE COMPANY and EMIGRANT BANK,<br><br>Defendants. | Hon. Sterling Johnson, Jr.<br>Civil Action No. 11-cv-2122 (SJ)(RLM) |

**MEMORADUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE FOR A
<u>NEW TRIAL</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................iii

I.     The Jury Instructions Were Legally Correct...................................................................1

       A.     The Jury Was Properly Instructed on Intentional Discrimination .........................1

       B.     The Jury Was Properly Instructed on Disparate Impact ......................................3

       C.     The Jury Was Properly Instructed on Gross Unfavorability................................6

       D.     The Jury Was Properly Instructed
              Regarding Discrimination Against Hispanics.......................................................7

II.    There Was Sufficient Evidence for the Jury to Find Emigrant Liable on All Claims of
       Discrimination ................................................................................................................8

       A.     Plaintiffs Introduced Overwhelming Evidence of the STAR NINA
              Loan Program's Gross Unfavorability...................................................................8

       B.     There is Ample Evidence on the Record the Support the Jury's
              Finding that Emigrant Intentionally Targeted on the Basis of Race...................10

       C.     Plaintiffs' Presented Sufficient Evidence for a Jury to Find That
              STAR NINA Loans Had a Disparate Impact on
              African-Americans or Hispanic Borrowers ........................................................12

III.   Judgment As A Matter of Law Was Proper on Emigrant's
       Statute of Limitations Defense......................................................................................15

IV.    Plaintiff Edith Saint-Jean Should Prevail Under the Truth in Lending Act.....................17

V.     The Court's Evidentiary Rulings Were Correct and Did Not Prejudice Emigrant ..........18

       A.     Plaintiffs Were Appropriately Permitted to Use the
              Terms Predatory and Toxic.................................................................................18

       B.     Dr. Ian Ayres's Expert Testimony Was Appropriately Admitted........................18

       C.     Dr. Charlton McIlwain's Expert Testimony Was
              Appropriately Admitted .....................................................................................19

       D.     The Court Properly Allowed Evidence Regarding the Legal Status
              and Post-Termination Performance of STAR NINA Loans ...............................20

       E.     The Court Properly Excluded Certain Expert Testimony of
              Dr. Marsha Courchane .......................................................................................20

       F.     The Court Properly Excluded the Testimony of FDIC Investigator
              and Certain FDIC Reports .................................................................................21

VI.     The Court Properly Excused Juror No. 3 For Good Cause ................................................ 22

VII.    The Jury's Damages Awards Were Reasonable ................................................................ 23

CONCLUSION ............................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Akermanis v. Sea-Land Serv., Inc.*, 688 F.2d 898 (2d Cir. 1982) ................................ 24

*Bangerter v. Orem City Corp.*, 46 F.3d 1491 (10th Cir. 1995) ....................................... 2

*Barkley v. Olympia Mortg. Co.*, No. 04-CV-875(KAM)(RLM),
2010 WL 3709278 (E.D.N.Y. Sept. 13, 2010) ........................................................ *passim*

*Barlow v. Liberty Mar. Corp.*, No. 08-CV-4436 (VVP), 2012 WL 12857416
(E.D.N.Y. Dec. 26, 2012), *aff'd*, 746 F.3d 518 (2d Cir. 2014) ............................. 3, 6, n.3

*Bean v. CSX Transp., Inc.*, 111 F. App'x 636 (2d Cir. 2004) ........................................ 23

*Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376 (2d Cir. 2006) ................................. 1

*Boyd* v. *Lefrak Org.*, 509 F.2d 1110 (2d Cir. 1975) ................................................. 5, n.5

*Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994) ................................................... 2, 3

*Clement v. United Homes, LLC*, 914 F. Supp. 2d 362 (E.D.N.Y. 2012) ...................... 16

*Davis v. Velez*, 797 F.3d 192 (2d Cir. 2015) ............................................................... 22

*Eastman v. Union Pacific R. R. Co.*, 493 F.3d 1151 (10th Cir. 2007) ................................ 15, n.12

*Ferrill v. Parker Grp., Inc.*, 168 F.3d 468 (11th Cir. 1999) ............................................. 2

*Fuller v. Instinet, Inc.*, No. 99 Civ. 11453 BSJ,
2001 WL 34893685 (S.D.N.Y. Nov. 28, 2001) ..................................................... 7, n.7

*Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276 (2d Cir. 1998) ............ 8

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) .......................................................... 4

*Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000) .................... *passim*

*Harris v. Folk Const. Co.*, 138 F.3d 365 (8th Cir. 1998) ...................................... 23, n.19

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................ 7, 8

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,
844 F.2d 926 (2d Cir. 1988) ............................................................................... *passim*

*Interpool Ltd. v. Patterson*, 874 F. Supp. 616 (S.D.N.Y. 1995) .................................. 22

*Ismail v. Cohen*, 899 F.2d 183 (2d Cir. 1990) ............................................................ 23

*Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988) ............................................................. 12

*Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) ........................................................... 16

*L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391 (S.D.N.Y. 2013) ............................................. 2, n.2

*Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712 (7th Cir. 1998) ............................................ 7

*Lavin-McEleney v. Marist Coll.*, 239 F.3d 476 (2d Cir. 2001) ................................................... 12

*LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995) ................................................... 2, n.2

*Lopez v. Delta Funding Corp.*, No. CV-98-7204 (CPS),
2000 WL 36688915 (EDNY June 6, 2000) ................................................................. 15, n.12

*Luciano v. Olsten Corp.*, 110 F.3d 210 (2d Cir. 1997) ................................................................ 1

*M & T Mortg. Corp. v .White*, 736 F. Supp 538 (E.D.N.Y. 2010) ............................... 10, n.8, n.10

*MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546 (S.D.N.Y. 2012) ..................... 24

*Meacham v. Knolls Atomic Power Laboratory*, 381 F.3d 56 (2d Cir. 2004) ....................... 25, n.22

*Meloff v. N.Y. Life Ins.*, 240 F.3d 138 (2d Cir. 2001) ................................................................ 18

*MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) ................................. *passim*

*New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir. 1988) ........................................ 16

*Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) ............................................................... 25

*Raedle v. Credit Agricole Indosuez*, 670 F.3d 411 (2d Cir. 2012) .............................................. 8

*Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir. 1993) ........................................ 8

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000) ............................................... 3

*Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*,
294 F.3d 35 (2d Cir. 2002) ................................................................................................ 2, n.2

*Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir. 1979) ................................................ 2

*Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300 (E.D.N.Y. 2014) ............................ 16, 17

*Simon v. Safelite Glass Corp.*, 128 F.3d 68 (2nd Cir. 1997) ............................................... 15, n.12

*Steed v. EverHome Mortg. Co.*, 308 F. App'x 364 (11th Cir. 2009) ............................................. 1

*Tesser v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*, 370 F.3d 314 (2d Cir. 2004) ................... 1, 18

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ................................................... 3

iv

*Tirreno v. Mott*, 375 F. App'x 140 (2d Cir. 2010) ........................................................... 6

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972) ................................................. 7

*United States v. Funaro*, 222 F.R.D. 41 (D. Conn. 2004) ................................................ 19

*United States v. Johnpoll*, 739 F.2d 702 (2d Cir. 1984) .................................................. 6

*United States v. Morris*, 928 F.2d 504 (2d Cir. 1991) ..................................................... 6

*United States v. Reese*, 33 F.3d 166 (2d Cir. 1994) ...................................................... 23

*Ventimiglia v. Hustedt Chevrolet*, No. 05-4149,
2009 WL 803477 (E.D.N.Y. Mar. 25, 2009) ......................................................... 7, n.7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ................................. 2

*Wharton v. Cty. of Nassau*, No. 10-CV-0265 (JS)(AYS),
2015 WL 4611974 (E.D.N.Y. July 30, 2015) ...................................................... 25, n.22

*Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012) ............................................ 25

**Rules, Statutes, and Regulations**                                            **Page(s)**

15 U.S.C. § 1638(b)(1) (2008) ............................................................................ 17

24 C.F.R. 100.500(c) ................................................................................... 3, 6

Fed. R. Civ. P. 47 ........................................................................................ 22

Fed. R. Civ. P. 50 ......................................................................................... 8

Fed. R. Civ. P. 51 .................................................................................... 3 (n.3)

Fed. R. Civ. P. 61 ..................................................................................... 1, 18

**Other Authorities**                                                             **Pages**

3C Fed. Jury Prac. & Instr. (6th ed.) ................................................................. 2, 3

## I.      The Jury Instructions Were Legally Correct.

Trial courts have broad discretion in fashioning jury instructions. *See Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 390 (2d Cir. 2006). A new trial is not warranted because of erroneous instructions "unless, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law," *Luciano v. Olsten Corp.*, 110 F.3d 210, 218 (2d Cir. 1997) (citation omitted), and the error affected a party's "substantial rights" or the interests of justice so require, *see* Fed. R. Civ. P. 61. Defendants Emigrant Bank and Emigrant Mortgage Company ("Emigrant") bear the burden of showing that an alleged error in the instructions was not harmless. *See Tesser v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*, 370 F.3d 314, 319 (2d Cir. 2004).

Emigrant has not demonstrated that any of the Court's instructions were legally erroneous, nor has it identified any harm occasioned by any allegedly erroneous jury instructions.

### A.      The Jury Was Properly Instructed on Intentional Discrimination.

Emigrant claims that the Court did not instruct the jury that Plaintiffs "needed to prove that they were '*intentionally* discriminated against.'" Mem. of Law in Support of Defs.' Mot. for Judgment as a Matter of Law or in The Alternative For a New Trial ("Defs.' Mem.") at 4. This is, of course, not true. The Court's jury charge identified Plaintiffs' intentional discrimination claim and included an entire instruction on the elements of such a claim. *See,*  Dkt. 522 at 32-35; *see also* Ramchandani Decl. 1[1] at 3095.

The Court's intentional discrimination instruction was substantively correct.  There are two elements of a reverse-redlining discrimination claim: (1) an unfair, predatory, or grossly unfavorable product that is (2) targeted to communities because of race, national origin, or another protected class. *See, e.g.*, *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20-21 (D.D.C. 2000); *Steed v. EverHome Mortg. Co.*, 308 F. App'x 364, 368 (11th Cir. 2009) (adopting *Hargraves*'s two-prong

---

[1] References to "Ex." are to the exhibits as numbered and identified in the Declaration of Tara K. Ramchandani, dated October 14, 2016.  Excerpts of  the Trial Transcript dated May 24, 2016 to June 27, 2016 (Ex. 1 to the Ramchandani Decl.) are referred to going forward as "Tr."

1

approach). The Court's intentional discrimination instruction adhered to this precedent, stating that Plaintiffs must establish that (1) the "STAR NINA loan product was grossly unfavorable to the borrower" and (2) "Defendants' efforts to make STAR NINA loans in certain communities was motivated, at least in part, by race, color, or national origin." *See* Dkt. 522 at 33.

Emigrant's assertions of error in the intentional discrimination instruction have no merit. Emigrant first argues that the Court should have required Plaintiffs to present evidence that race or national origin was a "significant factor" in Emigrant's actions. The Second Circuit has squarely held that the Fair Housing Act ("FHA") is violated "if race is even one of the motivating factors." *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1042 (2d Cir. 1979) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977)); *see also Cabrera v. Jakabovitz*, 24 F.3d 372, 383 (2d Cir. 1994); *MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 616 (2d Cir. 2016). In addition, the Court's jury instruction language exactly tracks Sands' model jury instructions on disparate treatment under the FHA. *Cf.* 3C Fed. Jury Prac. & Instr. § 87-35, § 87-29 (6th ed.) *with* Dkt. 22 at 33.

Emigrant also argues that Plaintiffs needed to prove "animus against a protected group" to establish intent. Animus is not a required element of an intentional discrimination claim. *See, e.g.*, *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472-73 & n.7 (11th Cir. 1999) ("[R]acial animus and intent to discriminate are not synonymous. . . . In other words, ill will, enmity, [and] hostility are not prerequisites of intentional discrimination."); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995). Evidence of animus is one method for proving discrimination, but it certainly is not the only one. *See MHANY*, 819 F.3d at 606 (stating that a "plaintiff *can* establish a prima facie case of disparate treatment" by showing animus) (emphasis added); *see also LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (same).[2]

---

[2] In support of its untenable position, Emigrant cites to dicta from a footnote in *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 402 (S.D.N.Y. 2013). That particular footnote in *L.C.* relies on *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002), a case that clearly misstates the holding of *LeBlanc* 67 F.3d at 425. Even though *LeBlanc* states that a plaintiff "can" establish a prima facie case of disparate treatment through animus, *LeBlanc*, 67 F.3d at 425, *Reg'l Econ. Cmty* cites

Emigrant also suggests that the Court should have instructed the jury on burden-shifting. The Second Circuit has stated that the phrases "prima facie case," "burden of persuasion," and "burden of production" do not need to be included in an FHA intentional discrimination jury instruction.[3] *See Cabrera*, 24 F.3d at 381 (noting that such language "create[s] a distinct risk of confusing the jury."); *see also, e.g.*, 3C Fed. Jury Prac. & Instr. § 87-35, note ("Instructions on the 'prima facie' case provided in earlier versions of the Treatise are no longer recommended."). Emigrant also asserts that the Court's instruction on pretext was incorrect, but the Court's instruction tracks the Supreme Court's statement that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

### B.    The Jury Was Properly Instructed on Disparate Impact.

The Court's disparate impact instruction precisely tracked the Second Circuit's recent articulation of the required proof for such a claim under the FHA. *See MHANY*, 819 F.3d at 617 (adopting framework set forth in the U.S. Department of Housing and Urban Development's ("HUD") disparate impact regulation); 24 C.F.R. 100.500(c).  Nonetheless, Emigrant raises four critiques of the disparate impact instruction.

First, Emigrant suggests that the instruction relieved Plaintiffs of the burden of identifying the practice being challenged. *See* Defs.' Mem. at 6. To the contrary, the instruction explicitly articulated the challenged practice: "Defendants' practice of making STAR NINA loans."  Tr. at 3096. Emigrant appears

---

*LeBlanc* to incorrectly find that a plaintiff "must" establish animus to establish a prima facie case of discrimination under the FHA. 294 F.3d at 49.

[3] Furthermore, Emigrant did not present an intentional discrimination burden-shifting instruction, nor did it raise the issue in any subsequent briefing or oral argument. A party's "failure to propose this instruction or raise an objection . . . prior to the jury being charged makes it untimely and unpreserved for review." *Barlow v. Liberty Mar. Corp.*, No. 08-CV-4436 (VVP), 2012 WL 12857416, at *10 (E.D.N.Y. Dec. 26, 2012), *aff'd*, 746 F.3d 518 (2d Cir. 2014); *see also, e.g.*, Fed. R. Civ. P. 51(d)(2); *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 109 (2d Cir. 2001).

3

to argue that this articulation of the practice was too general to be challenged as having a disparate impact.  While Emigrant's practice of making STAR NINA loans had subparts—such as limiting the program to credit scores under 600, requiring high equity, and not verifying income and assets—it was the combination of those subparts that determined what individuals would receive STAR NINA loans and therefore whether there would be a resulting adverse impact on African Americans and Hispanics.[4]

Second, Emigrant incorrectly asserts that the jury instruction did not require Plaintiffs to prove that the STAR NINA program "caused" the discriminatory effect challenged by Plaintiffs.  The instruction required the jury to find that Emigrant's practice "*had*" an adverse impact on African Americans and Hispanics. Tr. at 3096.  The use of the verb "had" required an even tighter nexus—akin to but-for cause—between the practice and effect than "caused," which could allow for lessened forms of causation, such as a practice that "caused" an effect only in combination with other factors.

Emigrant further suggests that Plaintiffs must show that the challenged practice had an effect that was greater than any underlying racial imbalance. To the contrary, the precise purpose of the disparate impact theory is to prohibit neutral policies or practices that have an adverse impact on minorities precisely because of an *existing* imbalance.  *See, e.g.*, *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), (disparate impact violation even where Duke Power did not create the underlying disparity in high school diploma rates among African Americans); *MHANY*, 819 F.3d at 597 (disparate impact finding even though disparity resulted fact of underlying socioeconomic disparities that resulted in fewer minorities being able to live in single family townhomes than multi-family dwellings); *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926,  938 (2d Cir. 1988) (disparate impact where there was

---

[4] Courts have found practices with multiple components to have an impermissible disparate impact. *See e.g.*, *Huntington*, 844 F.2d at 929-30 (finding disparate impact where the challenged practice was the prohibition of multi-family housing outside a small urban renewal zone, but that overall prohibition was caused by the interaction of multiple sections of the zoning ordinance as well as the availability of vacant land).

an adverse impact on minorities because they had lower incomes and therefore were more likely eligible for the housing precluded by the challenged zoning practices).[5]

Third, Emigrant challenges the Court's use of the phrase "substantial adverse impact on African Americans and Hispanics," without using the word "disproportionate," to describe a prima facie case of discriminatory effect. The jury instruction, however, uses the exact language of *Huntington* for the form of discriminatory effect challenged here. In *Huntington*, the Second Circuit stated that a prima facie case of discriminatory effect can be established by a showing either an "adverse impact on a particular minority group" or perpetuation of segregation. *Id.* at 937. Only the first form of discriminatory effect is relevant here, and the jury instruction tracked the language of *Huntington*, stating that the jury must find that Plaintiffs proved "a substantial adverse impact on African Americans or Hispanics borrowers." Tr. at 3096.

Emigrant further argues that more explanation was needed for the phrase "adverse impact" to ensure the jury understood it referred to the comparison of African Americans and Hispanics to others. The meaning of the phrase was clear. One, the overall instruction relates to the question of *discriminatory* effect, which necessarily requires a comparison in the treatment of different groups. Two, the instruction states that the jury must find a substantial adverse impact *on African Americans or Hispanics*, which again directs the jury to consider the impact on those protected groups as compared to others. Three, the instruction directs the jury to consider whether Emigrant's interests could be served by a practice with a *less discriminatory* effect, requiring the jury to consider the differential effect on African Americans and Hispanics as compared to others.

Fourth, Emigrant critiques the instruction that "if you find that the STAR NINA loan program was necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of Defendants, you must decide whether Plaintiffs have established by a preponderance of the evidence that Defendants'

---

[5] Emigrant cites *Boyd* v. *Lefrak Org.*, 509 F.2d 1110, 1113 (2d Cir. 1975), for the proposition that Plaintiffs were required to show some "prejudicial treatment of minorities." *Boyd* is not good law as it rejected disparate impact as a viable claim under the FHA, a holding long ago overturned by *Huntington*, 844 F.2d at 934.

interests could have been served by another practice that had a less discriminatory effect." Tr. at 3096. Again, the instruction precisely tracks the Second Circuit's articulation of the burden. *See MHANY*, 819 F.3d at 617 (quoting 24 C.F.R. § 100.500(c)(3)).

Despite the instruction's precise consistency with HUD and the Second Circuit, Emigrant argues that the instruction only required a showing of a "hypothetical" rather than an "available" alternative. To the contrary, the instruction required Plaintiffs to establish that there is another practice that "*could* have []served" Defendants' interests. An unavailable practice could not serve Emigrant's interests because it could not be implemented. When *MHANY* rearticulates a plaintiff's burden as showing "an available alternative practice that has less disparate impact and serves Defendants' legitimate nondiscriminatory interests" the court is merely using "available alternative practice" as a different way of articulating the "could be served by another practice" wording used by HUD and described earlier in the opinion. The rewording does not suggest a different burden that would require different language in a jury instruction. *MHANY*, 819 F.3d at 617, 619.

### C.    The Jury Was Properly Instructed on Gross Unfavorability.

Emigrant objects to the Court's "grossly unfavorable" instruction, arguing that the Court should have instructed that the term "grossly unfavorable" is a "distinct element of a reverse-redlining claim" and that the Court should have defined the term. *See* Defs.' Mem. at 8. As a preliminary matter, Emigrant did not request such an instruction and its proposed instructions used "grossly unfavorable" without providing any further definition. *See* Dkt. 484 at 3-4. Emigrant therefore waived any objection. *See, e.g.*, *Tirreno v. Mott*, 375 F. App'x 140, 141-42 (2d Cir. 2010); *Barlow*, 2012 WL 12857416, at *10.

It was not necessary to define "grossly unfavorable" because the term is "neither outside common understanding nor so technical or ambiguous as to require specific definition." *United States v. Johnpoll*, 739 F.2d 702, 712 (2d Cir. 1984). The words "grossly" and "unfavorable" are both "of common usage" such that a definition is unnecessary. *See, e.g.*, *United States v. Morris*, 928 F.2d 504, 511 (2d Cir. 1991).

In addition, there is no support for Emigrant's proposed definition of "grossly unfavorable" as "extremely harsh for [Plaintiffs] *relative to other available sources of credit*." Defs.' Mem. at 8 (emphasis

added). There is no basis for the proposition that the term "grossly unfavorable" requires a comparison to other potential sources of credit offered by other financial institutions. *See, e.g.*, *Barkley v. Olympia Mortg. Co.*, No. 04-CV-875(KAM)(RLM), 2010 WL 3709278, at *18 (E.D.N.Y. Sept. 13, 2010) (requiring only that "the loans were made on grossly unfavorable terms"). Emigrant's definition is inherently self-serving. No responsible lender would extend no-income, no-asset verification loans to people with credit scores of 600 or below. As a result, there would be no comparator sources of credit, precluding (under Emigrant's formulation) any victim of Emigrant's unique reverse-redlining from challenging its discrimination. *Cf. Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 714 (7th Cir. 1998) (finding that imposing comparator requirement in credit discrimination context "would display insensitivity to the thinking behind the standard").

### D.   The Jury Was Properly Instructed Regarding Discrimination Against Hispanics.

Emigrant argues that the jury instructions should not have made any reference to Hispanics because, as African Americans, Plaintiffs do not have standing to challenge harms to Hispanics. *See* Defs.' Mem. at 5-6. Emigrant's argument fails.[6] A plaintiff has standing to sue under the FHA when: (1) the defendant has discriminated on the basis of a protected class, and (2) the plaintiff was injured as a result of the defendant's discriminatory acts. *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972). A plaintiff does not have to be the target (or, as Emigrant contends, the only target) of the discriminatory act to establish injury.[7] *See, e.g.*,  (white resident of neighborhood in which discrimination

---

[6] To the extent that Emigrant objects to Plaintiffs' statement of their case that Emigrant targeted African-American and Hispanic communities, *see* Defs.' Mem. at 5, that objection is waived, as Emigrant's proposed charge contains identical phrasing. *See* Dkt. 484 (proposed jury instructions), at 1-2.

[7] Emigrant cites to two unpublished cases that are inapposite in facts and law. In *Ventimiglia v. Hustedt Chevrolet*, the court dismissed a race-based Title VII claim after finding that "assertions . . . [were] insufficient" to support the plaintiff's allegation that the harassment occurred "because of his race." No. 05-4149, 2009 WL 803477, at *12 (E.D.N.Y. Mar. 25, 2009). In *Fuller v. Instinet, Inc.*, an African-American woman sought to serve as a class representative for a class comprising of African-Americans, Hispanics, and other minorities. No. 99 Civ. 11453 BSJ, 2001 WL 34893685, at *2 (S.D.N.Y. Nov. 28, 2001). The court's holding was based on its finding that the plaintiff had not established sufficient similarity in interest and injury to the intended class, an analysis squarely grounded in class action jurisprudence. *Id.*

occurred had standing to sue); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (organization has standing to sue based on discrimination targeted at individuals). Here, as a result of Emigrant's targeting of the STAR NINA product on the basis of race and/or national origin, Plaintiffs lost substantial equity in their homes, an injury that establishes standing regardless of whether the discrimination was directed at African Americans, Hispanics, or both.

## II.  There Was Sufficient Evidence for the Jury to Find Emigrant Liable on All Claims of Discrimination.

A court may grant judgment as a matter of law under Rule 50 only if it finds that, after evaluating the evidence in the light most favorable to the opposing party, "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50; *see also DiSanto v. McGraw–Hill, Inc.*, 220 F.3d 61, 64 (2d Cir. 2000) (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)). A court may grant a new trial under Rule 59 "if and only if the verdict is seriously erroneous or a miscarriage of justice." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-18 (2d Cir. 2012).

### A.  Plaintiffs Introduced Overwhelming Evidence of the STAR NINA Loan Program's Gross Unfavorability.

Emigrant asserts that there was not sufficient evidence for a jury to find that STAR NINA loans were grossly unfavorable for African-American and Hispanic borrowers, who were targeted with the product and who disproportionately received that product. *See* Defs.' Mem. at 9. Plaintiffs introduced an overwhelming amount of testimonial and documentary evidence regarding the host of unfavorable and harmful aspects of the STAR NINA program. *See, e.g.*, Tr. at 109-110, 117-118, 123-124, 128 (Plaintiffs' STAR NINA loans were unaffordable to them from origination); 58, 75-76, 83, 328-331, 337-339, 346-347, 350, 352, 435-438, 1958-1961, 1965, 1968 (STAR NINA loans fit industry and academic definitions of predatory lending according to Plaintiffs' and Emigrant's experts); Tr. at 97-98, 334-335; Ex. 2 at EMC2_368794 (key terms of Plaintiffs' STAR NINA loans were deceptive and hidden in voluminous disclosures or never disclosed at all); Tr. at 86-87, 1966; Exs. 2-5 (STAR NINA loans went delinquent at staggering rates far higher than other subprime mortgage loans); Tr. at 84-85; Ex. 2 at EMC2_368793

(Emigrant charged Plaintiffs, like other STAR NINA borrowers, exorbitant 18% interest rates upon a single late payment, a practice unheard of in home mortgage lending); Tr. at 85, 205-206 (STAR NINA loans not of net benefit to borrowers); Tr. at 101, 110, 115, 120, 126, 208, 1096-1097, 1500-1501, 1710-1711; Exs. 6-7 (Plaintiffs entered into STAR NINA loans with significant financial resources in the form of home equity and emerged with no options, equity depleted); Ex. 8 (STAR NINA had highest delinquency and foreclosure rates of Emigrant's products); Tr. at 352 (95.4% of STAR NINA loans had predatory terms); 441 (Dr. Ayres explaining that delaying foreclosure because of a STAR NINA refinance was a hazard of the program as it allowed a borrower's equity to be stripped during this delay).

Emigrant further suggests that even if the terms of STAR NINA loans were grossly unfavorable, Emigrant cannot be held liable for its predatory lending because it provided disclosures, the Plaintiffs could afford their loans, and Plaintiffs purportedly benefited from their loans.  As described above, the evidence showed that any disclosures Emigrant may have made were inadequate, the Plaintiffs could not afford their loans, and any supposed benefits from loans were outweighed by the costs and effects of their predatory terms.  *See also Id.* at 334-35, 435-37 (disclosures are often not effective); Ex. 2 at EMC2_368794 (regulator finds that important disclosures were frequently not provided); Tr. at 885 (Emigrant's Chief Underwriter admits it was apparent from the Plaintiffs' credit reports that they had repeated delinquencies with their existing mortgages and that their monthly payment would increase with the STAR NINA loan); Ex. 9 (Email to CEO includes admission that Saintils were indicative of STAR NINA borrowers because they could not afford their loan at origination).

### B.    There is Ample Evidence on the Record the Support the Jury's Finding that Emigrant Intentionally Targeted on the Basis of Race.

Emigrant's contention that Plaintiffs did not present sufficient evidence of intentional discrimination is meritless. Plaintiffs introduced substantial evidence that Emigrant engaged in numerous practices that targeted African-American and Hispanic communities with the STAR NINA loan program.[8]

---

[8] Emigrant relies on *M & T Mortg. Corp. v .White*, 736 F. Supp 538 (E.D.N.Y. 2010), and *Barkley* for the baseless proposition that there are only three ways to establish intentional targeting. *See* Defs.' Mem. at 9.

First, the evidence showed that Emigrant recruited employees on the basis of their ethnicity, and solicited brokers to create "ethnic-based" relationships. For example, Paul Rizzo, who headed Emigrant's Brooklyn and Bronx sales team, "recruited and developed several ethnic BDAMs," and was praised by Emigrant's upper management for developing this sales force. Ex. 10; Tr. at 925-926; *see also* Tr. at 361-362, 1630-1631, 1667-1668. Howard Milstein, Emigrant's CEO, acknowledged that he was aware that Emigrant encouraged "ethnic-based" residential and commercial broker relationships. *Id.* at 566; Ex. 11 (same). Emigrant's Director of Sales admitted that Emigrant recruited an ethnic sales force to make it easier to obtain business in minority communities. Tr. at 1631-1632. Courts have held that using minority sales staff to appeal to minority communities is a strong indicator of intentional targeting. *See, e.g.*, *Hargraves*, 140 F. Supp. 2d at 21–22; *M & T*, 736 F. Supp. 2d at 576; *Barkley*, No. 04 CV 875(RJD)(KAM), 2007 WL 2437810, at *11.

Second, Plaintiffs presented evidence that Emigrant targeted minorities with its STAR NINA advertising. CEO Milstein testified that he was aware that Emigrant programs targeted specific ethnic groups, and Catherine Cellamare, Emigrant's Vice President for Marketing, acknowledged that Emigrant used  images of African-Americans and Hispanics in its advertising in order to "appeal to the readership" of ethnic publications. *See* Tr. at 567-568, 1059. Plaintiffs' expert, NYU professor Charlton McIlwain testified that during the height of the STAR NINA program 76% of Emigrant's advertising dollars went to four newspapers—*Caribbean Life*, *Black Star*, *Hoy*, and *Mi Zona Hispana*—that were distributed to an almost exclusively African-American or Hispanic readership, and 83% of the money spent specifically on Emigrant's STAR NINA advertising went to those papers. *See* Tr. at 1222-1223, 1243-1244; *see also* Tr. at 1244-1245; *see also* Ex. 12 (reflecting STAR NINA campaign expenditures in *Caribbean Life* and *Mi Zona Hispana*). Professor McIlwain also found that virtually all of Emigrant's advertising images were of African-American or Hispanic families. Tr. at 1223; *see also* Tr. at 1238-1239, 1241. Even more telling, Emigrant spent tens of thousands of dollars per year in the four ethnic papers when it was marketing the

---

Both decisions simply cite to the types evidence that were put forth in those cases and make no judgment on whether other types of evidence could prove intentional targeting.

STAR NINA loan program, but in 2009, the year STAR NINA ended, its advertising in the ethnic papers dropped to $200. Tr. at 1229-1230. [9]

Emigrant's racial and ethnic targeting with its advertisements is more than sufficient to support the jury's finding of discrimination. *See, e.g.*, *Barkley*, No. 04 CV 875(RJD)(KAM), 2007 WL 2437810, at *11 (allegations that defendant "placed ads in the *Caribbean Life* community newspaper that serves the West Indian immigrant community" is sufficient to allege intentional targeting); *Hargraves*, 140 F. Supp. at 21–22 (evidence that defendants distributed flyers and advertisements in black communities). [10]

Third, the jury's finding is supported by Plaintiffs' showing that STAR NINA loans were disproportionately written in African-American and Hispanic communities. [11] Plaintiffs' experts Dr. Lance Freeman and Dr. Ian Ayres testified that as the proportion of minorities in a neighborhood increased, the number of STAR NINA loans increased. Tr. at 353-354, 1834; *see also* Tr. at 1835. These experts' conclusions showed statistical significance even when controlling for credit score and other non-race factors. *See* Tr. at 360-362 1844-1845; *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 482 (2d Cir. 2001) (holding that "scientifically valid statistical technique[s] for identifying discrimination" can provide the basis for an intentional discrimination claim).

---

[9] Emigrant attempts to explain its advertising by referencing its Community Reinvestment Act ("CRA") obligations. The jury heard testimony that CRA obligates banks to promote their products to all low-to-moderate income populations, not to racial minorities. See, e.g., Tr. at 2691. In contrast, Emigrant's marketing strategy focused almost exclusively on African-American and Hispanic communities (and the advertising to these communities stopped when STAR NINA ended even though the bank's CRA obligations continued). *See, e.g., id.*; Ex. 13 (listing, as "CRA community and ethnic papers," only African-American, Caribbean, Haitian, Hispanic), Ex. 14 (Emigrant's plans to reach out to NAACP and United Methodist Church pastor); Ex. 15 (changing image in advertisement to be "a little more urban, new immigrant"); Ex. 16.

[10] Contrary to Emigrant's argument, the fact that Plaintiffs found their brokers through their family and friends rather than Emigrant advertising "does not mean that [Plaintiffs] were not 'targeted' in the broader sense, or that generally speaking, the defendants did not take advantage of unsophisticated . . . minority home buyers." *M & T*, 736 F. Supp. 2d at 576.

[11] Emigrant's argument that "more white borrowers received STAR NINA loans than African-American borrowers," Defs.' Mem. at 11, fails at this first basic step. The inquiry is not measured in absolute numbers of loan recipients by race/national origin, but instead by percentages of loan recipients that would be statistically expected by race/national origin. *See MHANY*, 819 F.3d at 617.

C.     **Plaintiffs' Presented Sufficient Evidence for a Jury to Find That STAR NINA Loans Had a Disparate Impact on African-Americans or Hispanic Borrowers.**

Contrary to Emigrant's argument, Plaintiffs made a prima facie showing, based on comprehensive statistical evidence, that the STAR NINA loan program had a substantial adverse impact on African Americans and Hispanics. Plaintiffs' experts Dr. Ian Ayres and Dr. Lance Freeman testified that the proportion of Emigrant's refinance loans that were STAR NINA loans increased as the African American and Hispanics in a census tract increased. Tr. at 353-54, 1834. In census tracts that were 0-10% minority, 23% of the refinance loans were STAR NINA, but in census tracts that were 80-100% minority 45% of the refinance loans were STAR NINA. *Id.; see also Keith v. Volpe*, 858 F.2d 467, 484 (9th Cir. 1988) (racially discriminatory effect established where defendant's action "had twice the adverse impact on minorities as it had on whites").

Emigrant's expert, Dr. Marsha Courchane, agreed that the higher the percentage of African Americans and Latinos in a census tract, the higher the percentage of STAR NINA loans in that tract. Tr. at 2816, 2960-61. A July 2006 email among senior management at Emigrant recognized the disparities observed by these experts, noting that blacks had higher priced loans than whites because a greater percentage of black loan applicants got STAR NINA loans. Ex. 17. The adverse impact was also confirmed by other Emigrant employees. *See*, *e.g.* Tr. at 943, 2210-18, 2227.

In response to Plaintiffs' showing of disparity, Emigrant notes that STAR NINA was not more harmful for African-American borrowers than white borrowers. Emigrant is correct in its factual assertion—Emigrant's predatory STAR NINA product was bad for everybody who received it. The relevant question, however, is whether African-American and Hispanic borrowers were more likely to be written those harmful loans. Tr. at 371-2, 425; *see also Hargraves*, 140 F. Supp. 2d at 20-21 (holding that plaintiffs did not have to show that "defendants make loans on preferable terms to non-African Americans" and that it was sufficient that the plaintiffs had alleged that the terms of the defendants' loans were predatory).

12

Emigrant next argues that it described substantial, legitimate, nondiscriminatory reasons for making STAR NINA loans.  As an initial matter, no business interest can justify a grossly unfavorable and predatory product. *See Barkley*, 2010 WL 3709278, at *18 (same evidence that scheme was predatory and targeted "rebuts any legitimate, nondiscriminatory reason" for the defendants' actions); *Hargraves*, 140 F.Supp.2d at 21 (only non-predatory lenders are able to avoid liability by showing their lending practices are legitimate).

The three different interests Emigrant articulates were not supported by the evidence at trial. First, Emigrant claims that STAR NINA was justified because it served the needs of low- and moderate-income borrowers with poor credit who could not qualify for more traditional loans. The evidence showed that the product did the opposite. The program was defined by high delinquencies and foreclosures because the loans were sold to individuals with poor credit and an inability to repay the loans, particularly when the default interest rate was imposed.  *See, e.g.*, Ex. 8 (STAR NINA had highest delinquency and foreclosure rates of all Emigrant products); Ex. 2 (NYSBD report finding that STAR NINA targeted a particular group of consumers for foreclosure); Ex. 9 (Emigrant management recognizing that STAR NINA borrowers typically could not afford their loans from origination). As a result, STAR NINA did not benefit minority communities, but instead stripped equity from them.

Second, Emigrant claims STAR NINA was justified as a response to Emigrant's obligations under the Community Reinvestment Act ("CRA").  Linda Coluccio, Emigrant's CRA officer, however, made clear that Emigrant met its CRA obligations through many other activities and lending products. Tr. at 2651-65.  The vast majority of these activities had nothing to do with STAR NINA, and there is no evidence that STAR NINA was necessary to Emigrant's CRA obligations.

Third, Emigrant claims that STAR NINA was properly designed in light of the credit-risk profile of its borrowers.  While it may be a legitimate interest for a lender to engage in risk-based pricing and to obtain a reasonable yield, Dr. Ayres and Plaintiffs' industry expert Rebecca Walzak testified that it is not legitimate to do so by imposing an 18% default interest rate. Tr. at 71, 84-85 (Walzak testifying that 18% default interest rate was predatory), 329 (Dr. Ayres testifying that 18% default interest rate considered to

13

be a potentially predatory loan term), 404, 421-423 (18% default interest rate was not "perfectly legal"). *See also* Ex. 2 at EMC2_368793-94 (NYSBD report critiquing the 18% default interest rate); Tr. at 1951 (Emigrant's expert Raphael Bostic testifying that an 18% default interest rate increases the likelihood of default or failure of a loan), 2092 (retired President of Emigrant Mortgage Company testifying that he is not aware of any other bank that charges customers an 18% default interest rate).

Even if the jury concluded that Emigrant proved a substantial, legitimate, nondiscriminatory interests in making STAR NINA loans, Plaintiffs showed that such interests could be served by other, less discriminatory, practices, such as (1) requiring income and asset verification for potential borrowers; (2) maintaining a minimum credit score; or (3) eliminating the default interest rate.

In response to the alternative of requiring income and asset verification, Emigrant makes the highly factual (and disputed) argument that requiring full documentation would have harmed African-American borrowers, but cannot point to any evidence introduced that would support that claim. *Cf.* Tr. at 631 (Howard Milstein could not give an answer as to why Emigrant did not make STAR NINA a full documentation product).  It was undisputed that full income documentation would reduce delinquencies. *See* Ex. 18; *see also* Tr. at 844-49 (full documentation would reduce delinquencies); Ex. 19 (senior management considered making certain no-doc loans full income in order to avoid reputational concerns that Emigrant was "foreclosing on middle America").  Indeed, after Emigrant ceased all no-income, no-asset lending, it reported that "one result of Emigrant's transition away from NINA lending to Full Documentation lending in New York has been virtually no delinquencies . . . ." Ex. 20. The evidence also supported a jury conclusion that income and asset verification was feasible for STAR NINA because Emigrant actually turned STAR NINA into a "stated income" program in September 2008, requiring borrowers to provide information about, and third-party verification of, their income, assets, and employment. Ex. 21.

It is also undisputed that a higher credit score minimum for STAR NINA borrowers would reduce the harm of the product. As Emigrant's own officials and experts testified, borrowers with higher credit scores tend to have lower rates of delinquency.  *See, e.g.*, Tr. at 802 (Emigrant Chief Underwriter Edward

14

Goldberg), 1937 (Emigrant's expert Raphael Bostic), 2849 (Emigrant's expert Marsha Courchane).

Again, it is clear such a practice was possible because STAR NINA originally included a minimum credit

score but it was discontinued (prior to the high delinquency rates in the program).  Ex. 22; Tr. at 801-802.

The evidence also showed that eliminating the default interest rate would allow Emigrant to meet

its profit goals while reducing delinquencies. The default interest rate was not necessary to protect

Emigrant from risk of default or otherwise preserve Emigrant's profit.  For example, in 2008, the

expected annual interest from STAR NINA *without* including default interest was $54.8 million.  Ex. 23.

Emigrant officials acknowledged that eliminating default interest would reduce delinquencies.  *See, e.g.*,

Tr. at 849.

### III.    Judgment As A Matter of Law Was Proper on Emigrant's Statute of Limitations Defense.

Emigrant claims that it is entitled to judgment as a matter of law because Plaintiffs'

discrimination claims were untimely.[12] *See* Defs.' Mem. at 17. At the close of trial, this Court correctly

denied Emigrant's affirmative statute of limitations defense.[13] Tr. at 3156.

Emigrant contends that equitable tolling should not apply because Plaintiffs did not "prove that

Emigrant affirmatively concealed anything about their loans." Defs.' Mem. at 17.  Equitable tolling

applies, however, where a defendant "took affirmative steps to prevent the plaintiff's discovery of his

claim or injury *or* [] the wrong itself was of such a nature as to be *self-concealing*." *New York v.*

---

[12] Emigrant further asserts that it is entitled to judgment on Howell's claims because of the *Rooker-Feldman* doctrine and on Commodore's claims because of judicial estoppel.  At the close of the trial, the Court denied both of these affirmative defenses. Tr. at 3156; *see also* Tr. at 1979, 1980-1982, 1991-1992, 2972, 3156.  The Court's ruling should stand as Emigrant presented no evidence on either affirmative defense. In addition, the *Rooker-Feldman* defense fails because Howell did not complain of injuries caused by the state court foreclosure judgment (his claim existed prior to the state-court proceedings) and he did not invite district court review of his foreclosure judgment. *See Lopez v. Delta Funding Corp.*, No. CV-98-7204 (CPS), 2000 WL 36688915 at *7 (EDNY June 6, 2000); Dkt. 364 at 36-37. The judicial estoppel defense fails because it is undisputed that Commodore did not have knowledge of her discrimination claim at the time of her bankruptcy. *See* Tr. at 1709-1710; *see also Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72-73 (2nd Cir. 1997); *Eastman v. Union Pacific R. R. Co.*, 493 F.3d 1151, 57 (10th Cir. 2007); Dkt. 364 at 39-40.

[13] A more extensive discussion of the legal standards for applying equitable tolling and the discovery rule can be found at Dkt. 364 at 29-34 and Dkt. 229 at 6-14.

*Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (emphasis added); *Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 375 (E.D.N.Y. 2012).  Throughout this case, Emigrant has repeatedly ignored "a significant body of case law, including in this district, finding that . . . claims similar to those advanced by Plaintiffs in the context of discriminatory mortgage lending, are inherently self-concealing." *Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300, 316 (E.D.N.Y. 2014); *see also* Tr. at 878, 1191, 1313, 1710 (Plaintiffs' testimony regarding impossibility of discovering discrimination in their loans). Equitable tolling applies as a matter of law.[14]

      The Court's finding on the statute of limitations defense is also supported by the discovery rule, which tolls the statute of limitations for plaintiffs who "would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted."  *Saint-Jean*, 50 F. Supp. 3d at 314 (citation and quotation marks omitted). At trial, the evidence was undisputed that none of the Plaintiffs knew of the discrimination underlying their loans (and therefore their injury and its cause) until they met with counsel, or for the Saint-Jeans, from observations at the courthouse in May 2009. *See* Tr. at 253, 669, 1824-1827, 1098-1099, 1313, 1382, 1497-1498, 1709-1710.  As the Second Circuit held, "a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice."  *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998). As the Court has previously articulated, Plaintiffs would only know of their potential causes of action once they were aware of and understood "Emigrant's broader conduct in enacting a predatory, equity-stripping scheme that targeted minority homeowners and neighborhoods." *Saint-Jean*, 50 F. Supp. 3d at 315.  While Plaintiffs may have been aware after closing that they could not afford their loans, "[t]here is a difference between being aware that you got a bad deal and being aware that you were discriminated against in a systematic fashion." *Id.* at 317.

---

[14] Emigrant's reliance on *Karakus* and *Marine* for the proposition that the written agreements preclude tolling is misleading as those holdings concern fraudulent inducement and do not even address equitable tolling or fraudulent concealment.

IV.     **Plaintiff Edith Saint-Jean Should Prevail Under the Truth in Lending Act.**

In urging the Court to reject Plaintiff Edith Saint-Jean's Truth in Lending Act claim, Emigrant raises the same litany of arguments that this Court has reviewed and rejected countless times. *See* Dkt. 258, at 47-49 (Mem. and Order of Sept. 25, 2014); order of Feb. 26, 2016 denying Dkt. 363, (Defs.' Mot. for Summary Judgment); *see also* Dkt. 489, (Bench Mem. Regarding Pls.' Proposed Truth in Lending Jury Instructions (thorough review of statute, regulations, commentary, and case law)). Emigrant was required to provide the accurate cost of the loan on the Saint-Jeans' Truth in Lending Disclosure. See 15 U.S.C. § 1638(b)(1) (2008); *Saint-Jean*, 50 F. Supp 3d at 325-26. Therefore, it is a violation of the Truth in Lending Act, if, at the time Emigrant originated its loan to the Saint-Jeans, Emigrant reasonably expected to impose its 18% interest rate during the life of the loan and, once imposed, Emigrant reasonably expected to continue to impose that rate upon the Saint-Jeans. *See* Dkt. 489 at 6-8.

It is evident that Emigrant *did* reasonably expect to impose its 18% interest rate: Emigrant knew the Saint-Jeans' poor credit history, and in particular their poor record in making timely mortgage payments (Tr. at 116-118); before consummation of the loan Mr. Saint-Jean expressed concern to Emigrant representatives about his ability to maintain the high monthly payments on the loan, (Tr. at 1483-1486, 1488); and at the time that Emigrant originated the Saint-Jean loan in 2008, Emigrant executives, including the Chief Underwriter, knew that STAR NINA loans were going into default at staggering rates and that borrowers, such as the Saint-Jeans, with very poor credit scores, were particularly susceptible to delinquency (Tr. at 524-525, 532). Emigrant also knew that, once it imposed its 18% interest rate on borrowers such as the Saint-Jeans, it became nearly impossible for those borrowers to revert to the original interest rate. *See, e.g.*, Tr. at 869, 2468-2470, 2490-2491; Ex. 2 at EMC2_368794 ("Borrowers who cannot maintain current status on the original loans are generally unable to catch up once the interest rates escalates by 50 to 100 percent . . ."). Therefore, the material disclosures on the Saint-Jean TIL disclosure were inaccurate and the Court should find Emigrant liable for violating the Truth in Lending Act.

V.     **The Court's Evidentiary Rulings Were Correct and Did Not Prejudice Emigrant.**

It is well-settled that trial courts have "wide latitude in determining whether evidence is admissible at trial." *Meloff v. N.Y. Life Ins.*, 240 F.3d 138, 148 (2d Cir. 2001) (internal citation omitted). A jury verdict may be set aside based on an evidentiary error only if a party shows that "in some material respect the factfinder's judgment was swayed by the error." *Tesser*, 370 F.3d at 319; *see also* Fed. R. Civ. P. 61. Emigrant has failed to make any such a showing.

### A.     Plaintiffs Were Appropriately Permitted to Use the Terms Predatory and Toxic.

The Court was correct to allow the use of the terms "predatory"[15] and "toxic" during the trial. *See* Johnson Order of May 18, 2016 at 1:31 pm. These terms are not, as Emigrant contends, "pejorative terms" that "lack any legal relevance to Plaintiffs' discrimination claims"; nor are they "inflammatory." Defs.' Mem. at 19. They are, instead, well-established terms commonly used in the lending industry, as demonstrated by the testimony of both Plaintiffs' and Emigrant's experts. *See, e.g.*, Tr. at 74-76 (Rebecca Walzak); 1973 (Dr. Raphael Bostic). These experts' testimony, as well as industry literature on abusive lending, *see* Dkt. 472 (Pls.' Opp. Mot. to Exclude Terms), demonstrate that the term "predatory" and "toxic" are used to describe the types of practices that defined Emigrant's STAR NINA loans.

### B.     Dr. Ian Ayres's Expert Testimony Was Appropriately Admitted.

Dr. Ayres's testimony was highly relevant to and probative of Plaintiffs' theories of liability and his testimony was appropriately admitted by the Court. Dr. Ayres explained how his findings were relevant to determining the discriminatory nature of STAR NINA. As he recounted, in examining Emigrant's dataset of refinance loans, he first identified aspects of Emigrant's lending that the literature and his scholarship indicated might be predatory, or as he defined it, terms that might "artificially increase the chance that the mortgage will fail." Tr. at 324. He then tested those terms, and determined that they were in fact predatory, i.e., these predatory terms caused Emigrant's loans to fail at statistically significant

---

[15] Notably, Emigrant's counsel elicited testimony about predatory lending throughout the trial. *See, e.g.*, Tr. at 308-310 (cross examination of Felipe Howell); 1802-1804 (cross examination of Yanick Saintil). Given Emigrant's regular use of the term, they cannot now be heard to suggest they were prejudiced by the jury hearing the term.

and disproportionate rates, even when controlling for other underwriting factors.  Tr. at 328-329, 346-347, 350; Ex. 24.  Examining Emigrant's loan portfolio, Dr. Ayres then determined that nearly all of Emigrant's STAR NINA loans contained the predatory terms.  Ex. 25.  Dr. Ayres also observed that, the greater the minority composition of the New York City census tract, the greater the proportion of Emigrant refinance loans that were STAR NINA loans.  Tr. at 353-354.  Finally, Dr. Ayres determined that Emigrant targeted loans with these predatory features to African-American and Latino neighborhoods in New York City, even when controlling for dozens of other possible non-race/ethnicity underwriting factors.  Ex. 26.

Contrary to Emigrant's assertions, Dr. Ayres did in fact study Emigrant's STAR NINA loans (Tr. at 350-354; Ex. 25) and he did analyze whether STAR NINA loans had a disparate impact on minority borrowers (Exs. 26-28).  Dr. Ayres included Plaintiffs' loans in his analysis (Tr. at 391-392). Dr. Ayres' analyses were not "arbitrary" and his labels were not "inflammatory;" rather they were based on the relevant scholarly literature and his own expert analyses (Tr. at 328-329, 339).

**C.      Dr. Charlton McIlwain's Expert Testimony Was Appropriately Admitted.**

Emigrant's challenge to Dr. McIlwain's testimony should be denied because Emigrant offered no objection at all to Dr. McIlwain's qualification as an expert at trial and therefore waived any objection to his testimony.  *See* Tr. at 1222; s*ee, e.g.*, *United States v. Funaro*, 222 F.R.D. 41, 45 (D. Conn. 2004).[16]

In addition, Dr. McIlwain's testimony was properly admitted.  *See* Dkt. 477.  Dr. McIlwain had more than sufficient education and experience to provide expert testimony on the target audience of Emigrant's advertising.  *See* Tr. at 1218-1222.   Dr. McIlwain reviewed the relevant material and Emigrant's loan products, and he found the location of Emigrant's branches unnecessary to his analysis of advertising targets.  Tr. at 1244, 1248.  Dr. McIlwain properly considered the target audience of

---

[16] Emigrant also claims the testimony of experts Rebecca Walzak and Dr. Lance Freeman should not have been admitted, for reasons presented by way of *motions in limine*.  For the reasons stated in Plaintiffs' oppositions to those motions, Dkt. 421 (Walzak) and 424 (Freeman), their testimony was properly admitted.  Moreover, as to Dr. Freeman, Emigrant may not move for a new trial on this ground because they did not renew their objections to his testimony when he was qualified as an expert and did not offer any objection to his testimony at that time.  Tr. at 1831-1832.

Emigrant's advertising without regard to product, as Emigrant's own marketing executive testified that no product names were used in Emigrant advertisements.  Tr. at 974-975, 1241-1242.  The inclusion of drafts and duplicates did not undermine Dr. McIlwain's analysis because all documents pointed to the same conclusion:  that the vast majority (96%) of Emigrant's images of people were of African-American or Latino models.  Tr. at 1223.

> **D.**   **The Court Properly Allowed Evidence Regarding the Legal Status and Post-Termination Performance of STAR NINA Loans.**

Emigrant asserts that the Court erred in denying its motion *in limine* to exclude evidence that no-income, no-asset lending was prohibited in 2010 under the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") and its motion *in limine* to exclude evidence regarding the performance of STAR NINA refinance loans after the program was terminated in late 2008.  The Court properly decided both motions and neither warrant reconsideration.  As outlined in greater detail in Dkt. 466, admission of evidence regarding Dodd-Frank was proper because Emigrant relied significantly on the purported review of its program by government authorities, *see, e.g.*, Tr. at 2671-2673.  In addition, the evidence was relevant to the question of whether Plaintiffs' STAR NINA refinance loans were grossly unfavorable.  Similarly, evidence regarding the continued performance of STAR NINA refinance loans is highly relevant to whether those loans were grossly unfavorable when originated.  *See* Dkt. 459 (Pls.' Opp. to Defs.' Mot. *in Limine* to Exclude Evidence of STAR Performance).

> **E.**   **The Court Properly Excluded Certain Expert Testimony of Dr. Marsha Courchane.**

Emigrant contends that the Court should have permitted Dr. Courchane to testify about portions of a report she produced over 15 months after the close of discovery. The Court properly excluded this testimony.  As discussed in more detail in Dkt. 437, the excluded portions of Dr. Courchane's report impermissibly presented new opinions.  Emigrant incorrectly asserts that the Second Amended Complaint "clarified" Plaintiffs' theory of the case, focusing it on the STAR NINA product.  Emigrant had long been aware of the focus of the case. Indeed, in early 2012, Emigrant reported to the Court that the case was solely about STAR NINA.  *See* Ex. 29 at 18 ("our position has been that the product at issue is a Starflex

20

product.[] There's no reason to go to any other product."); *see also* Dkt. 43 at 8-9, 61 at 13.  Dr. Courchane's late-produced analyses were simply an attempt to remedy inadequacies in her earlier statistical tests.  Without the benefit of Dr. Courchane's late-developed theories, Plaintiffs concluded fact discovery in 2013, including document requests and depositions, without the opportunity to probe her assumptions.

>    **F.    The Court Properly Excluded the Testimony of FDIC Investigator and Certain FDIC Reports.**

The Court properly excluded the testimony of FDIC employee Sandra DiChiara, as well as Exhibits B-24 and Y-3. Ms. DiChiara's testimony was properly excluded because, as described more fully in Dkt. 433, Emigrant had not identified her as a possible witness during discovery or at any time before the eve of trial. Emigrant offered no sufficient explanation for this omission, stating simply that the failure to disclose was "an oversight." Ms. DiChiara's testimony was also properly excluded because Emigrant resisted discovery on its FDIC regulatory examination materials and processes by invoking the examination privilege. Dkt. 438. Finally, Emigrant failed to identify any prejudice from the exclusion of Ms. DiChiara.

The Court properly excluded Defendants' Exhibit B-24, an email authored by a non-witness and discussing a third-party's statements and offered for the truth of the matter, as inadmissible hearsay. Tr. at 2081-2082. The Court properly excluded Defendants' Exhibit Y-3 because, as a 2002 report, it was outside of the time period of discovery, outside the time period relevant to Plaintiffs' claims, and the report did not concern any of Plaintiffs' loans. Tr. at 2669-2670.  In addition, Emigrant has not and cannot demonstrated any prejudice from the exclusion of either Exhibit B-24 or Exhibit Y-3.[17]

---

[17] Emigrant also challenges the exclusion of certain financial and tax documents. In so doing, Emigrant falsely claims that such documents would have demonstrated additional income and a dishonest presentation.  Emigrant's assertions are wrong. The documents permitted set forth a complete picture of Plaintiffs' financial capacity. As set out more completely in Dkt. 443 and 453 exclusion of the irrelevant financial and tax documents was proper and Emigrant was not prejudiced.

**VI.      The Court Properly Excused Juror No. 3 For Good Cause.**

Emigrant asserts that it is entitled to a new trial based on the Court's excusal of Juror No. 3 prior

to the close of evidence. *See* Defs.' Mem. at 24. There is no basis for Emigrant's assertion.  Under Fed. R.

Civ. P. 47(c) a "[d]uring trial or deliberation, [a] court may excuse a juror for good cause." *Id.; see also*,

*Davis v. Velez*, 797 F.3d 192, 208 (2d Cir. 2015); *Interpool Ltd. v. Patterson*, 874 F. Supp. 616, 617-18

(S.D.N.Y. 1995) (noting that "[t]he Advisory Committee note to the 1991 amendment to Rule 47. . . gives

sickness, family emergency and juror misconduct as examples of appropriate reasons, but does not

purport to be exhaustive.").

The Court had good cause to excuse Juror No. 3. The juror initially asked to have the trial delayed

for a day to allow her to attend a bachelorette party. When the Court declined, the juror asked that the

case be "expedited" and suggested that the jury could hurry its deliberations and reach a verdict before

she had to travel to the bachelorette party. Tr. at 2775. While engaged with the Court about the

deliberations process the juror stated "I would hope that we can end it as soon as possible." Tr. at 2777.

The juror further indicated to the Courtroom Deputy that "[s]he was not happy about not being able to go

[to the bachelorette party] on Friday and said that she can't believe she's been here this long, she has a

life, and that she can't believe she's being made to stay." Tr. at 2844[18]  The Court concluded, based on

Juror No. 3's comments, that having an unhappy and resentful juror seeking to rush the verdict would

adversely affect the jury's deliberations. Tr. at 2845.  This is sufficient good cause for excusing Juror No.

3. *See Interpool*, 874 F. Supp. at 618 (excusing a juror because the unexpectedly extended length of the

trial threatened to interfere with a juror's planned trip and when the court refused to excuse the juror the

court found that the juror's reaction and demeanor suggested he would adversely affect deliberations).

---

[18] Notably, the Court had already once adjourned trial for a day to accommodate Juror No. 3's request to attend a graduation ceremony. Tr. at 891-92, 894.

Emigrant further suggests that the Court erred by not holding a hearing prior to the excusal.[19] A hearing is not always necessary in the context of a trial judge excusing a juror. *United States v. Reese*, 33 F.3d 166, 173 (2d Cir. 1994) ("[a]ll that is needed to satisfy a prudent exercise of discretion is to be certain the trial court had sufficient information to make an informed decision. In this case, nothing would have been gained by a hearing. . . .)" Here, a hearing was not necessary to probe the juror's demeanor, which she clearly expressed to the Court in front of the parties and counsel or to further examine her desire to rush deliberations to a conclusion so that she could attend a bachelorette party.[20]

**VII.    The Jury's Damages Awards Were Reasonable.**

Finally, Emigrant challenges the jury's damages award as "against the weight of the evidence." Defs.' Mem. at 25. "It is well settled that calculation of damages is the province of the jury." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990). Therefore, a court may reduce a damage award or order a new trial on damages only in extremely limited circumstances: when the award is "grossly excessive," *Akermanis v. Sea-Land Serv., Inc.*, 688 F.2d 898, 902 (2d Cir. 1982), or "so high as to shock the judicial conscience," *Bean v. CSX Transp., Inc.*, 111 F. App'x 636, 637 (2d Cir. 2004) (internal quotations omitted). Here, the jury awarded six Plaintiffs a total of $950,000 in compensatory damages. That award is fully supported by the trial record and is consistent with law in this circuit.

The jury heard evidence regarding two types of compensatory damages: economic damages and emotional distress. Plaintiffs' economic damages consisted of: (1) their loss of equity as a result of Emigrant's discriminatory loans and (2) the interest they paid to Emigrant throughout the life of the loan. *See* Exs. 6, 30-31; Tr. at 1377, 1380, 1385, 1499-1501 (Saint-Jeans' loss of equity of $426,653; interest

---

[19] Notably, when another juror, earlier in the case, called the court to state that she could not attend trial because of an medical emergency, Emigrant sought to excuse her without a hearing or further factual development and were prepared to try the rest of the case to the remaining seven jurors. Tr. at 891.

[20] This case presents different circumstances than *Harris v. Folk Const. Co.*, 138 F.3d 365, 372 (8th Cir. 1998), where the Eight Circuit concluded that an impermissible reason (the refusal of a juror to join other jurors in a unanimous verdict) was likely the basis for the excusal of the juror, and the trial judge's articulated reason for dismissing the juror (emotional instability) was based in large part on an *ex parte* examination by the magistrate judge that was not recorded. *Id.*

paid of $23,736); Exs. 32-33; Tr. at 1205-1207 (Smalls' loss of equity of $22,868; interest paid of $88,142); Exs. 34-36; Tr. at 1704-1705, 1707-1708 (Commodore's loss of equity of $46,602.36; interest paid $54,661); Ex. 37-38; Tr. at 252 (Howell's loss of $257,457.15).

Economic damages account for the bulk of the jury award here,[21] but, in addition, each Plaintiff testified about the emotional toll caused by his or her STAR NINA loan. Beverley and Jeanette Small, who had saved for 12 years for their down payment, both spoke of the devastating effect of the Emigrant loan on their sense of security and familial stability. They described the feelings of stress and anger arising from Emigrant's actions, and the harm on their relationships, including their relationship with each other and Beverley's relationship with her son. Tr. at 1095-1096, 1099, 1304-1305, 1312-1313.

Linda Commodore also testified about the devastation she felt after Emigrant forced her out of her home. Ms. Commodore had to ask for loans from her close friends and even asked her sister to cash in her 401(k). She described being in a "very, very dark place," not being able to sleep or even open mail. As a result of the eviction, Ms. Commodore had to leave New York City, where she had lived her entire adult life. Tr. at 1683, 1702-1703, 1705-1706, 1709-1710, 1753.

Mrs. Saint-Jean testified how, as a result of the Emigrant loan, she feels constant stress and sadness, has trouble sleeping, and that Emigrant "took [her] life" and Mr. Saint-Jean described how it felt to realize that Emigrant took advantage of him because of his race and how his entire family suffers pain, mentally and physically. Tr. at 1362-1363, 1385, 1472, 1498-1499. And Felipe Howell testified that he was so embarrassed after his foreclosure that he could not face his partner and friends, especially those who had loaned him money. *See* Tr. at 230, 251-252.

Plaintiffs' testimony demonstrates that they suffered significant emotional distress. *See MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012). But even a finding

---

[21] The jury's awards to Mr. Howell and Mr. and Mrs. Saint-Jean were less than their calculated economic losses; thus, those three plaintiffs' damages awards can be justified by their economic loss alone. The jury awarded Ms. Commodore $84,000 more than her calculated economic loss, and the Smalls were collectively awarded $74,000 more than their calculated economic loss.

of garden-variety distress could sustain jury verdicts well above those awarded here.[22] *See, e.g.*, *Meacham*, 381 F.3d at 62, 68 (2d Cir. 2004) (upholding award of $125,000 for "subjective distress" without evidence of "physical sequelae"); *Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006) (upholding award of $100,000 in compensatory damages for emotional distress where plaintiff testified regarding humiliation, embarrassment, sleeplessness, and loss of self-confidence).

Emigrant's challenges to the jury's verdict are unfounded. First, Emigrant asserts that the jury "failed to take into account the offsetting financial benefits that Plaintiffs received." Defs.' Mem. at 25. The sole basis for Emigrant's assumption is the expert testimony of Marsha Courchane, and Emigrant fails to explain why the jury could not have instead believed Plaintiffs' presentation of economic damages, which accounted for any benefits Plaintiffs may have received from the loans. Second, Emigrant repeatedly references the fact that Plaintiffs did not present evidence of medical or psychological treatment for their emotional distress. A plaintiff, however, need not seek medical treatment nor present medical evidence to sustain an award for emotional distress. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 672 (2d Cir. 2012).

## CONCLUSION

For the reasons set forth above, Emigrant's motion for judgment as a matter of law or a new trial should be denied in full.

---

[22] Although Emigrant claims that the cases it cites in Footnote 17 support the proposition that Plaintiffs' emotional distress "cannot support anything beyond the most minimal awards," they in fact demonstrate that Second Circuit law has frequently sanctioned awards of upwards of $100,000, even for "garden-variety" emotional distress. *See, e.g.*, *Wharton v. Cty. of Nassau*, No. 10-CV-0265 (JS)(AYS), 2015 WL 4611974, at *12 (E.D.N.Y. July 30, 2015). District courts' frequent citation to a range of $30,000 to $125,000 for garden variety emotional distress can be traced to the Second Circuit's decision in *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56 (2d Cir. 2004). But the court in *Meacham* arrived at the $30,000-to-$125,000 range based on a collection of cases which had been decided between 1992 and 2000. *Id.* at 78. Even at the time *Meacham* was decided in 2004, the court recognized that "the passage of time since the cited cases were decided could reasonably support higher verdicts;" that logic surely sounds even more strongly at present. *Id.*

Respectfully submitted,

/s/     Reed N. Colfax
REED N. COLFAX (*pro hac vice*)
JOHN P. RELMAN (*pro hac vice*)
GLENN SCHLACTUS (*pro hac vice*)
TARA K. RAMCHANDANI (*pro hac vice*)
YIYANG WU (*pro hac vice*)
Relman, Dane & Colfax PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888

RACHEL GEBALLE
JENNIFER SINTON
South Brooklyn Legal Services
105 Court Street, Fourth Floor
Brooklyn, NY 11201
(718) 237-5500

MICHAEL CALHOUN (*pro hac vice*)
Center for Responsible Lending
910 7th Street NW, Suite 500
Washington, DC 20006
(202) 349-1850

*Counsel for Plaintiffs*

CC: All counsel via ECF