**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ AUG 30 2018 ★

~~BROOKLYN OFFICE~~

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JEAN ROBERT SAINT-JEAN, et al.,

                Plaintiffs,

                11 CV 2122 (SJ) (RLM)

      -against-            MEMORANDUM AND
                              ORDER

EMIGRANT MORTGAGE
COMPANY, et al.,

                Defendants.
--------------------------------------------------------X
A P P E A R A N C E S

SOUTH BROOKLYN LEGAL SERVICES
Foreclosure Prevention Project
105 Court Street
Brooklyn, NY 11201
By:    Jennifer Sinton
        Meghan Faux
        Rachel Geballe
Attorneys for Plaintiffs

RELMAN DANE & COLFAX, PLLC
1225 19th St., NW, Suite 600
Washington, DC 20036
By:    John P. Relman
        Glenn Schlactus
        Tara Ramchandani
Attorneys for Plaintiffs

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
By:    Bettina B. Plevan
        Evandro Cristiano Gigante
        Keisha-Ann G. Gray

1

Jeffrey B. Wall
Attorneys for Defendants

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
By:    John P. Collins, Jr.
       Richard H. Klapper
Attorneys for Defendants

DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019-6119
By:    David A. Scheffel
       Eric B. Epstein
       Gina Susan Spiegelman
Attorneys for Defendant

JOHNSON, Senior District Judge:

The facts and circumstances surrounding this action have been set forth in two previous orders and in the transcript of the February 26, 2016 oral argument after which the Court denied defendants Emigrant Mortgage Company's, and defendant Emigrant Bank's ("Emigrant" or "Defendants") motion for summary judgment. (See Dkt. Nos. 206, 258; see generally Tr. of 2/26/16.) Familiarity therewith is assumed. However, due to both the voluminous nature of the record since developed in this case and the verdict entered on June 27, 2016 against Defendants in the amount of $950,000 following a jury trial, the following additional summary is in order.

The plaintiffs ("Plaintiffs") are Black property owners or former property owners living in various parts of New York City who, prior to the subprime mortgage meltdown of the late 2000s, applied for and received "STAR NINA" loans from

Emigrant, loans for which Emigrant did not require proof of income or assets. Plaintiffs claim those loans were predatory and targeted certain minority communities (particularly Black and Hispanic), designed specifically to strip the equity from their homes by imposing an onerous 18% interest rate upon the occurrence of one late payment. They argue that the one late payment triggering the 18% interest rate was a calculated plan by Emigrant to so deprive them of that home equity, given Plaintiffs' 600 or below credit scores; their payment histories on prior mortgages; the fact that Emigrant's advertising and mortgage closing practices were designed to obscure the likelihood of default (such as allegedly "burying" the rider disclosing the default interest rate in stacks of closing documents); and Plaintiffs' lack of sophistication. Additionally, it is undisputed that none of the Plaintiffs had salaries equaling or exceeding that which would be otherwise required by Emigrant for loans of the amounts disbursed. According to Plaintiffs, Emigrant attempted to avoid responsibility for the inevitable default by having the homeowners sign "Resource Letters" drafted by Emigrant which stated, inter alia, that Plaintiffs had access to funds from family and friends to repay the loans in the event of default, and that Plaintiffs understood they would have to be willing to sell their homes to foot the bill in the event of default.

Eight Plaintiffs are involved in this suit, all of whom had significant equity in their homes prior to borrowing from Emigrant, and all of whom have either been forced to sell their homes or live in homes that, pursuant to the terms of their

3

respective STAR NINA loans, were secured by mortgages that applied an 18% interest rate once each of the Plaintiffs made a late payment, which each of the Plaintiffs did.

Jean Robert Saint-Jean and his wife Edith Saint-Jean (the "Saint-Jeans") live in a Canarsie home subject to a foreclosure action. At the relevant time, Jean Robert Saint-Jean had a credit score of 540 and Edith Saint-Jean had a credit score of 545. They were approved for a $370,000 loan with an interest rate of 11.75%. Pursuant to their loan, the mortgage payment was $4,174, about $2,000 more per month than their previous mortgage. After they fell behind on their payments and the 18% default interest rate was applied, their monthly payment became $6,130. During the relevant time period, Mr. Saint-Jean worked as a paraprofessional for the New York City Department of Education, and Mrs. Saint-Jean as a home health aide. They never earned the required $102,000 per year otherwise required to obtain this loan.

Felex and Yanick Saintil (the "Saintils") also live in a forecloseable Canarsie home. Mr. Saintil works as a truck driver and Mrs. Saintil, prior to the stroke she suffered during the pendency of this action, worked as a home health aide. The Saintils closed on a $325,000 STAR loan with an initial interest rate of 9.65% and a monthly payment of $3,145.85. They never earned the approximately $94,000 otherwise required for their loan, and their approximately $3,000 per month payment ballooned to over $4,000 per month by 2007. The Saintils made several unsuccessful attempts to modify their loan. By March 2010, Emigrant approved a loan

4

modification for the Saintils, waived both the default interest provision and approximately $14,000 in "unpaid charges" and reduced their monthly payments to $2,804.38 and their interest rate to 6% for five years. As part of the modification, the Saintils signed a document intended to waive and release all claims they may have had up to the date of the modification. The Saintils were unable to keep up with the $2,804.38 monthly payment and remain in several years' worth of arrears.

Jeanette and Beverley Small (the "Smalls"), a mother and daughter, refinanced their home with Emigrant in August of 2006. They borrowed $330,000 with an interest rate of 9.875%, and a monthly payment of $3,261. After one late payment, their monthly payment shot up to $5,480. The Smalls never earned the approximately $82,000 required for their loan. The Smalls eventually sold their home to avoid foreclosure. The parties dispute the extent of the financial loss the Smalls suffered from their STAR NINA loan, but it is undisputed that the Smalls repaid the amounts then-owed Emigrant in full.

Linda Commodore ("Commodore") refinanced the mortgage on her Manhattan co-op in 2004 through Emigrant's STAR NINA program, and received $125,000. Commodore did not earn the annual income of $54,792 required for the loan and her credit score was 553. Her payments ballooned from $983.38 to almost double that amount after a missed payment. Like other Plaintiffs, she too was denied the opportunity to make a late payment and, like the Smalls, also sold her home to avoid foreclosure. Indeed, Commodore sold her home for $40,000 less than its value.

Finally, Felipe Howell owned his Queens property outright and did not work. He took out a STAR NINA loan from Emigrant requiring a $2,100 monthly payment in order to finance the construction of a rental property on the same lot with the residence that secured the mortgage. Howell's construction project failed, he was unable to make a single payment, and his mortgage increased to $3,378 per month. As he was unemployed, he did not earn the $51,527 annually that would have been required for him to obtain a full-documentation loan or the amount necessary to make his monthly mortgage payments. Howell's property was foreclosed upon and purchased at auction by Emigrant for $1,000.

Plaintiffs filed suit pursuant to following anti-discrimination statutes: the Fair Housing Act, 42 U.S.C. §§ 3604, 3605 ("FHA"); the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq.; and of New York City Human Rights Law. Additionally, Edith Saint-Jean asserts a fifth cause of action under the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"). Emigrant argues, inter alia, that the loans were not predatory, were not targeting minority communities but simply those who could not otherwise obtain loans; and that the claims are time-barred.

On May 23, 2016, a jury trial commenced. The jury determined that Emigrant violated the Federal Fair Housing Act, Equal Credit Opportunity Act and the New York City Human Rights Law. The Saint-Jeans were awarded $180,000 apiece in compensatory damages, the Smalls were awarded $70,000 (to Beverley) and $110 (to Jeanette), Commodore was awarded $185,000 and Howell was awarded

$225,000. On June 27, 2016, the jury found that the Saintils were not entitled to any compensatory damages because they knowingly and voluntarily a 2010 loan modification that purported to release all existing claims against Emigrant. None of the parties were awarded punitive damages.

Following the trial, both Plaintiffs and Emigrant filed post-trial motions pursuant to Federal Rule of Civil Procedure ("Rule") 50. Defendants take issue with several provisions in the instructions read to the jury by the Court and demand a new trial. They also believe they are entitled to a new trial because (A) Plaintiffs failed to present sufficient evidence of discrimination, either through their own testimony or their experts; (B) certain expert testimony by Plaintiffs was impermissible; (C) Defendants' proffered FDIC expert should have been permitted to testify; (D) the jury award is excessive; (E) Plaintiffs' claims are time-barred; and (F) a juror should not have been excused mid-trial. They also argue that are entitled to judgment as a matter of law as to the Truth in Lending Act claim brought by the Saint-Jeans. Plaintiffs' Rule 50 motion seeks a new trial for the Saintil's, arguing that the 2010 loan modification entered into between Emigrant and the Saintil's is unenforceable. Plaintiffs also argue that, in light of the jury finding that Emigrant violated the FHA, ECOA and NYCHRL, the Court should issue an injunction against certain allegedly predatory behavior, including the appointment a monitor to oversee Emigrant's lending practices, and that the Court should retain jurisdiction over the action for a period of three years while such monitoring is conducted.

Based on the submission of the parties, the oral argument held before this Court on June 28, 2017, and for the reasons stated below Defendants' motion is GRANTED IN PART AND DENIED IN PART, and Plaintiffs' motion is GRANTED IN PART AND DENIED IN PART.

## DISCUSSION

I.    Standard of Review under Rules 50 and 59

    A.  Rule 50

Rule 50(b) permits the Court to enter a judgment as a matter of law and/or order a new trial when there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [person] could not arrive at a verdict against [it]." Canjura v. Laschet, No. 12 CIV. 1524 (JCM), 2016 WL 2755920, at *3 (S.D.N.Y. May 10, 2016) (quoting Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 112 (2d Cir. 2015) (citations omitted) (alterations in original).

"A district court must deny a motion for judgment as a matter of law unless, viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Cruz v. Local Union No. 3 of Int'l Bhd. of Elec.

Workers, 34 F.3d 1148, 1154–55 (2d Cir. 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)); accord Vasbinder v. Ambach, 926 F.2d 1333, 1339 (2d Cir. 1991).

"A party is generally entitled to a new trial if the district court committed errors that were a 'clear abuse of discretion' that were 'clearly prejudicial to the outcome of the trial'…Prejudice is measured by assessing the error in light of the record as a whole." Marcic v. Reinauer Transp. Companies, 397 F.3d 120, 124 (2d Cir. 2005) (quoting Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 17 (2d Cir.1996)).

### B. Rule 59

Rule 59 permits the Court to grant a new trial "on some or all of the issues" and to do so for "any reason a new trial has been heretofore granted in an action in federal court." Fed. R. Civ. P. 59(a)(1)(A).

### II. Sufficiency of the Evidence

Sweepingly, Emigrant argues that Plaintiffs failed to present "sufficient evidence of any type of discrimination." This argument fails because the jury verdict indicates that they credited the testimony and/or evidence of the Plaintiffs and/or their witnesses over the testimony and/or evidence presented by Defendants, and the jury was entitled to do so, as Plaintiffs offered over a dozen witnesses. The following

P-049

brief summary of Plaintiffs' key witnesses provides sufficient evidence from which a jury could find against Emigrant on liability.[1]

### A. Plaintiffs' Witnesses

#### 1. Rebecca Walzak

Plaintiffs called Rebecca Walzak ("Walzak") as an expert witness. Walzak is a mortgage consultant who testified that she has worked in "all aspects of mortgage lending," including overseeing loan closings in all 50 states, evaluating, reviewing and training lenders on various loan products, working in risk management and quality assurance, underwriting guidelines, monitoring and managing brokers and lenders, analyzing information from servicing groups. The holder of a Master's in Business Administration from the University of Maryland with a Certification in Quality Management from George Washington University, Walzak testified that she has underwritten or reviewed over 100,000 loans during the course of her career and that the STAR NINA loan "contained numerous predatory loaning aspects that . . . were the worst [she] had ever seen in a mortgage loan."

Specifically, Walzak testified that STAR NINA's focus on credit scores under 600 indicated that Emigrant was "looking for the borrowers that had the least likelihood to be able to repay the debt." Further, Walzak stated that "No Income No

---

[1] As discussed, supra, much of the factual background involving the individual plaintiffs is incorporated by reference herein and/or is not in dispute. Therefore, this summary is intended to supplement the backdrop of the loan process beyond the particulars of each Plaintiff's loans.

10

Asset" ("NINA") loans are typically extended to people with credit scores in the 800 range – not the 500s – and that she was unfamiliar with any residential loan product that provided for an 18% interest rate in the event of default. These reasons, along with Walzak's observation that the STAR NINA product contained excessive fees,[2] involved the use of insufficiently monitored brokers, suffered from risk management deficits and "focused on people in situations where they were desperate" through advertising designed to allay the borrowers' fears, led Walzak to conclude that the loans were predatory. Walzak also found that the loans were not actually risky given the equity in the collateral (i.e., Plaintiffs' homes) and believed that Emigrant expected a large tranche of these loans to fail, resulting in its collection of an inordinate amount of interest and/or its successful foreclosure of the homes. Walzak made these observations after reviewing both the terms of the loan product and minutes from meetings of Emigrant's Board of Directors which evinced the profitability of these high interest loans notwithstanding the incidence of foreclosure. Walzak also found the default rate of the STAR NINA product to reach as high as 50%, whereas with a prime loan, delinquency rates were about 3-4%, with subprime loans averaging 6% delinquency. In sum, Walzak testified that

> These loans were targeted to some of the most vulnerable individuals in the community. [The loans] were identified as a solution to their financial problems, but instead, simply put them further behind into payments that they could not possibly pay, and it was a foregone conclusion that they would end

---

[2] As to broker's fees alone, Walzak testified that "the typical broker fee is probably $2000-3000," but that Emigrant's "started out as $20,000 and they raised it later to $35,000."

up paying the 18 percent default interest and eventually would lose their homes to foreclosure.

(Tr. at 128.)

### 2. Ian Ayres

Professor Ian Ayres also testified for Plaintiffs. Ayres holds a doctorate in Economics from the Massachusetts Institute of Technology and a degree from Yale Law School, where for 23 years he has taught and studied statistical tests of race and gender discrimination, including mortgage lending. He was offered as and permitted to testify as an expert in statistical tests of predatory lending and discrimination. Ayres defined "predatory [lending] terms" as "terms in a mortgage that artificially increase the chance that the mortgage will fail," such as pre-payment penalties and default interest, both of which were present in the STAR NINA program. In particular, Ayres testified that in Emigrant's STAR NINA program, the default interest provision made the loans more profitable in that the loans were "issued primarily on the basis of the equity that was built up in the house and not on the credit characteristics of the borrow," which he referred to as "perverse" and unlike any of the other mortgage portfolios he reviewed.

Ayres also compared the census track of communities in relation to the number of STAR NINA borrowers in that community. According to Ayres, in communities with 10% or less African-American or Latino residents, Emigrant's STAR NINA loans constituted 23% of their refinance loans. However, Ayres testified that as the percentage of African-American and Latino residents increased

P-049

upwards of 80% of a given community, Emigrant's STAR NINA loans comprised 45% of those offered in the area.

### 3. Holly Perlowitz

Holly Perlowitz ("Perlowitz"), former Senior Vice President at Emigrant Mortgage Company, and former Co-President of Emigrant Mortgage Company, testified as to the structure of Emigrant's broker program. She at one point managed both the broker and sales programs. Perlowitz testified that she supervised salespeople and sales managers, who in turn managed Emigrant's Broker Direct Account Managers ("BDAMs"). According to Perlowitz, BDAMs are loan originators employed by Emigrant who were given a higher rate of compensation for closing on STAR NINA loans than other loans. Perlowitz testified that Emigrant's BDAMs in New York City (minus the borough of Manhattan) were managed by Paul Rizzo, an individual who Emigrant cited as having "recruited and developed several ethnic BDAMs that consistently produce 2-4 mill [sic] a month each."

Perlowitz admitted that after the STAR program was discontinued, Emigrant's salesforce saw a sharp decrease in "enhanced incentives" that Emigrant offered them for closing on STAR NINA loans. Moreover, Perlowitz admitted that Emigrant did not wish to work with brokers who could not find potential "no doc"[3] borrowers with low credit scores. Indeed, Plaintiffs elicited through Perlowitz that

---

[3] A "no doc" loan was defined by Ayres as one in which the lender does not verify the borrower's ability to pay, a "red flag for something that might artificially increase the chance that [the borrower] won't be able to repay."

P-049

Black STAR NINA borrowers increased from 50% of borrowers in 2004 to 70% in 2006.

### 4. Howard Milstein

Howard Milstein ("Milstein"), the Chief Executive Officer ("CEO") of Emigrant since 2004 testified that STAR NINA loans were nonperforming at a rate of up to 20%, but such failure rate did not result in losses to the bank and he was "not especially" concerned about the level of delinquencies. So unconcerned was Milstein, he testified, that the Board of Directors (chaired by Milstein) approved an increase in the amount of STAR NINA lending that Emigrant would undergo.

Milstein testified that he was aware that the bank was developing relationships with brokers of color or with ties to communities of color, comparing those relationships to the bank's need for Korean-speaking brokers if he wished the bank to do business among Korean-Americans. Specifically, Milstein was asked whether he "targeted particular ethnic groups who were not in the mainstream so that they would receive information about [Emigrant's] loan products." Milstein answered "[w]ell, they would be groups considered underserved by our regulators."

### 5. Charlton McIlwain

Dr. Charlton McIlwain ("McIlwain") is the Associate Dean of Faculty Development at New York University. There, he is also a Professor of Media, Culture and Communications. McIlwain holds a doctorate in Communication from

14

the University of Oklahoma and in addition to teaching, has for at least 18 years conducted research on areas of race and media, "particularly studying racial queuing, racial targeting, the ways that racial messages and other forms of racial-ized communication advance certain ends and the way they affect both our attitudes and behavior." McIlwain was permitted by the Court to testify as an expert in marketing advertising. McIwain testified that he reviewed Emigrant's advertising budget between 2005 and 2008 and found that 76% of its advertising went into four publications: *Caribbean Life* newspaper, *Black Star News*, *Hoy* (a Spanish-language newspaper) and *Mizona* (another Spanish-language newspaper). McIlwain also testified that 82% of Emigrant's overall advertising was in newspapers circulated in areas with a combined Black and Latino population of greater than 80%. Finally, McIlwain took into account that that 96% of the human images in the advertisements were of Black or Latino individuals. With these three criteria, McIlwain concluded that Emigrant's advertising was unethical, in that the STAR NINA product was a "high-interest, low-income product that is predatory and has adverse effects" to the market form which it heavily recruited.

Accordingly, this Court finds that Emigrant has not met its burden of demonstrating that the jury verdict on liability was the result of "surmise" or "conjecture," or was otherwise unreasonable.

P-049

III.     Emigrant's Objection to the Court's Jury Instructions

Emigrant argues that the jury instructions on intentional discrimination, disparate impact and gross unfavorability misstated the law and warrant a new trial. They also argue that certain instructions they proffered were incorrectly altered or incorrectly omitted altogether.

On June 20, 2016, the Court held a charge conference at which Emigrant made the same or similar arguments, all of which were rejected. On Emigrant's Rule 50 motion, the Court again rejects Emigrant's arguments following reasons.

A.   Intentional Discrimination

The Court charged the jury that if it believed that that the evidence demonstrated that the STAR NINA loans were grossly unfavorable and intentionally targeted certain groups based in part on race, color or national origin, it could find discrimination under the FHA, ECOA and NYCHRL. The plain words of the instruction are as follows:

> In order to prevail on their claim that Defendants intentionally engaged in lending practices that violated the Fair Housing Act, Equal Credit Opportunity Act, and New York City Human Rights Law, Plaintiffs must establish that:
>
> (1) the STAR NINA loan product was grossly unfavorable to the borrower; and
> (2) Defendants' effort to make STAR NINA loans in certain communities was motivated, at least in part, by race, color, or national origin.

16

> If you find Plaintiffs have established these elements by a preponderance of the evidence, then you must find that Defendants violated the Fair Housing Act, Equal Credit Opportunity Act, and the New York City Human Rights Law.
>
> Plaintiffs are not required to show that Defendants acted with racial animus, which means hatred or dislike for particular racial or ethnic group. Nor do they need to prove that race, color or national origin was the only reason for Defendants' conduct. Rather, they are only required to show that race, color, or national origin was one motivating factor. This means that in order for Defendants to be found liable for violating the Fair Housing Act, Equal Credit Opportunity Act, and the New York City Human Rights Law, race, color, or national origin need only have played some role in Defendants' conduct.

(Dkt. No. 522 at 33.) Emigrant presents three arguments that this instruction requires the Court to grant them a new trial. They argue that "the jury was not instructed in any way on Plaintiffs' intentional-targeting theory;" that evidence of animus is a necessary component of intentional discrimination and that it was improper to reference Hispanic borrowers when none of the Plaintiffs are Hispanic.

Emigrant's argument that the charge fails to take into account Plaintiffs' theory of targeting is plainly specious and semantic: the intentional offering of "grossly unfavorable loans" to members of "certain communities" with "race, color, or national origin" in mind is, in fact, targeting. That the court did not use the precise word "target" in this instruction does not warrant a new trial when the evidence is viewed as a whole. The charge requires the jury to find that Emigrant was "motivated, at least in part" by the impermissible factors of race, color or national original. It strains logic to imagine that the jury based its verdict on intentional discrimination, found that Emigrant was motivated at least in part by race, color or

17

national origin, did in fact obtain grossly unfavorable loans from certain communities, but that these communities were not targeted. See e.g., Barkley v. Olympia Mortg. Co., 2007 WL 2437810, at *11 (E.D.N.Y. Aug. 22, 2007) (finding an example of targeting to be the placement of advertisements in *Caribbean Life*, a "community newspaper that serves the West Indian immigrant community, while not advertising in community papers that are part of the same newspaper chain but serve primarily white neighborhoods.").

Next, Emigrant argues that Plaintiffs were required to show discriminatory animus, and that the instructions failed to inform them of that. This Court disagrees. In Village of Arlington Heights v. Metropolitan Hous., 97 U.S. 555 (1977), the Supreme Court summarizes *"without purporting to be exhaustive*, subjects of proper inquiry in determining whether racially discriminatory intent existed." Id. at 565 (emphasis added). Those subjects include "sensitive inquir[ies] into such circumstantial and direct evidence of intent[,]...[t]he historical background of the decision," and "[t]he specific sequence of events leading up to the challenged action." Id.; see also Mhany Mgmt., Inc. v. County of Nassau, 819 F.3d 581 (2d Cir. 2015) ("[W]hen Congress amended the FHA in 1988, the circuits were largely in agreement that if one of the factors for an act was unlawful, the act violated the FHA.") (collecting cases); Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1042 (2d. Cir. 1979) ("[W]hile [the court] did not doubt that the defendant's primarily goal was to make money. . . [the court] need not and [did] not find that racial prejudice

P-049

dominated defendant's mind during the negotiations. It is enough that race was one significant factor he considered in his dealings with the men.") (quoting Untied States v. Pelzer Realty Co., 484 F.2d 438, 443 (5th Cir. 1973) (internal quotation marks omitted)); Barkley, 2007 WL 2437810, at *11 ("[A] factfinder might determine that defendants had harbored ill will toward racial minorities, *or* that they had used race as a proxy, doing business exclusively with minorities out of the biased perception that those individuals would be especially vulnerable to fraud.") (emphasis in original).) Accordingly, this Court finds the word "animus" need not appear in a charge on intentional discrimination and that the charge read was correct.[4]

B. Pretext

The Court's charge on pretext was as follows:

> The fact that Defendants offer explanations for their actions does not mean that they are not liable for intentional discrimination. If you conclude that the explanations are false or unworthy of credence, you may infer that Defendants' actions were motivated by discrimination on the basis of race, color or national origin.

---

[4] In Defendants' Memorandum of Law, Emigrant argues that this instruction improperly included reference to Hispanic borrowers. (Def. Mem. of Law at 5.) However, the instruction makes no reference to a specific race. Insofar as the instructions as a whole do make reference to Hispanics, this Court finds no error in giving instructions that included Emigrant's alleged targeting of low-income Hispanic communities. See Trafficante v. Metropolitan Life Ins. Co., 93 S.Ct. 364 (1972) ("The person on the landlord's blacklist is not the only victim of discriminatory housing practices; it is, as Senator Javits said in supporting the [Civil Rights Act of 1968], 'the whole community.'"); Ragin v. Harry Macklowe Real Estate, 6 F.3d 898 (2d Cir. 1993) (reversing district court's finding that nonprofit agency lacked standing to bring discrimination claim against real estate advertisers because the agency had redirected significant resources (constituting an injury in fact) in order to identify and counteract alleged discriminatory conduct).

P-049

> If you find by a preponderance of the evidence that Defendants' explanations for their actions are not the true reason for their actions, you may infer that Defendants' actions were motivated by race, color or national origin, and therefore violated the Fair Housing Act, Equal Credit Opportunity Act, and New York City Human Rights Law.

(Dkt. No. 522 at 34.) Emigrant takes issue with this charge because it "it is not enough to *dis* believe [sic] the [defendant]; the factfinder must *believe* plaintiff's explanation of intentional discrimination." (Def. Mem. of Law at 5 (emphasis in original).) However, Defendants rely in that regard on <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S. 133, 147 (2000), which conversely states that "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." (emphasis in original). Therefore, this charge does not support a finding that a new trial is warranted.

### C. <u>Disparate Impact</u>

Emigrant posits four objections to the Court's disparate impact jury instruction. Each are without merit.

The relevant instruction read as follows:

> As I said earlier, there are two ways the Plaintiffs may prove discrimination under the three statutes I mentioned earlier—the Fair Housing Act, the Equal Credit Opportunity Act and the New York City Human Rights Law. They can prove by a preponderance of the evidence that Defendants intentionally discriminated against them, which I just described to you. They can also prove that a particular practice had a discriminatory effect, even if the practice was not motivated by discriminatory intent.

P-049

Plaintiffs are alleging that Defendants' practice of making STAR NINA loans has a discriminatory effect. For you to assess Plaintiffs' claim, you will consider the following.

First, Plaintiffs must establish by a preponderance of the evidence that Defendants' practice of making STAR NINA loans actually or predictably had a substantial adverse impact on African-American or Hispanic borrowers.

Second, if you find that Plaintiffs have proven the first factor, then you must decide whether Defendants have established by a preponderance of the evidence that the practice of making STAR NINA loans was necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of Defendants. If you find that Defendants failed to establish that the practice was actually necessary to achieve their substantial, legitimate, and nondiscriminatory interests, you must find for Plaintiffs on their discriminatory effect claim.

Third, if you find that the STAR NINA loan program was necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of Defendants, then you must decide whether Plaintiffs have established by a preponderance of the evidence that Defendants' interests could have been served by another practice that had a less discriminatory effect. If Plaintiffs make this showing, then you must find for Plaintiffs on their discriminatory effect claim.

I instruct you that Plaintiffs are not required to show that Defendants intended to discriminate in order to establish their claim of discriminatory effect.

(Dkt. No. 522 at 35-36.) Emigrant argues that this charge warrants a new trial because this charge relieved Plaintiffs of their burdens of identifying a specific discriminatory practice or policy and demonstrating that it caused disparity; because the instruction would have permitted the jury to find Emigrant liable if STAR NINA loans had an identical impact on white borrowers, and because the third step in the

P-049

analysis did not require Plaintiffs to prove the existence of an actual available alternative to the STAR NINA loan product but simply a theoretical alternative with "less discriminatory effect."

The first two arguments are simply meritless and need not detain us long: the instruction did not relieve Plaintiffs of either the burdens alleged. First, the plain language of the instruction states that the specific discriminatory practice alleged is Emigrant's practice of offering the STAR NINA loan product. Second, Plaintiffs offered evidence at trial that STAR NINA loans had a substantial adverse impact on African-American or Hispanic borrowers. Emigrant's contentions to the contrary merely attack the level of specificity required to prove these allegations. A jury instruction is not a summation. The Court is not required to summarize all of the evidence presented by Plaintiffs of each element of the STAR NINA loan product -- its advertising, its target audience, its relationship to its broker, or each and every one of its particulars. See Huntington Branch N.A.A.C.P. v. Town of Huntington, 844 F.2d 926, 936-7 (2d. Cir. 1988). Second, the instruction includes the language "had a substantial adverse impact on African-American or Hispanic borrowers." Emigrant argues that this language relieves Plaintiffs of the "robust causality requirement" articulated in Texas Dept. of Hous. and Cmty Affairs v. Inclusive Cmtys. Proj., Inc., 135 S.Ct. 2507, 2523 (2015). However, the full text of that passage ought to be cited here for context:

> [A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity.

P-049

> A robust causality requirement ensures that "[r]acial imbalance…does not, *without more*, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create.

Id. (emphasis added). The Court does not see a reading of this instruction that would permit a jury "without more," to rule against Emigrant for disparities Emigrant did not create. So, too, is Emigrant's reliance on Boyd v. Lefrak Org., 509 F.2d 1110 (2d Cir. 1975) misplaced. In that case, a Black applicant and a Puerto Rican applicant denied an apartment in defendants' complex sued under the FHA, claiming that the defendants' requirements that, in the absence of an acceptable co-signer, their net weekly income be equivalent to 90% of a month's rent had a discriminatory impact on them. The circuit held:

> While blacks and Puerto Ricans do not have the same access to Lefrak apartments as do whites, the reason for this inequality is not racial discrimination but rather the disparity in economic level among these groups. While a showing of a disproportionate effect on non-whites is sufficient to require application of the compelling state interest standard in the context of an equal protection challenge to government action, see, e.g., Hunter v. Erickson, 393 U.S. 385, 391-392, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), such an analysis is inappropriate in the context of a purely private action asserting a claim of racial discrimination. A businessman's differential treatment of different economic groups is not necessarily racial discrimination and is not made so because minorities are statistically overrepresented in the poorer economic groups. The fact that differentiation in eligibility rates for defendants' apartments is correlated with race proves merely that minorities tend to be poorer than is the general population. In order to utilize this correlation to establish a violation of the Fair Housing Act on the part of a private landlord, *plaintiffs would have to show that there existed some demonstrable prejudicial treatment of minorities over and above that which is the inevitable result of disparity in income.*

23

Boyd, 509 F.2d at 1113 (emphasis added). As stated, <u>supra</u>, the challenged charge does instruct that "Plaintiffs are alleging that Defendants' practice of making STAR NINA loans has a discriminatory effect." Therein lies the alleged cause (beyond mere ethnicity -- or even credit scores, as Emigrant argues -- but including the entire loan product and its marketing to Black and Hispanic communities, the absence of income or asset verification, its longevity notwithstanding its rate of failure) of the impact on the communities targeted.

### D. Emigrant's Remaining Challenges to the Instructions

Emigrant's additional objections to the jury instructions have been considered by this Court and are without merit.

### E. Plaintiff's Objection to Jury Instruction on Waiver

Plaintiff argues that the Court erred in instructing the jury as to whether the waiver executed by the Saintils was knowing and voluntary. The Court instruction read as follows:

> During this trial, you heard evidence that in March 2010, Plaintiffs Felex and Yanick Saintil signed an agreement releasing and discharging Emigrant from all claims and demands that they had against Emigrant, including claims related to their August 2, 2006 mortgage loan. This agreement has been referred to as a "release." As I stated earlier, this is the one issue on which Defendants bear the burden of proof.
>
> To be enforceable, a release must be made knowingly and voluntarily. In determining whether, under the totality of the circumstances, the Saintils' release was made knowingly and voluntarily, you must consider:

24

(1) the Saintil's level of education and business experience;
(2) the amount of time they had possession of or access to the agreement before signing it;
(3) the Saintils' role in deciding the terms of the release;
(4) the clarity of the agreement;
(5) whether the Saintils were represented by or consulted with an attorney; and
(6) whether what the Saintils received in exchange for the waiver exceeded any benefits to which the Saintils were already entitled by contract or law.

These factors are not exhaustive. No one factor is necessarily controlling, which means there is no particular factor that must be in Emigrant's favor for the release to be found to be knowing and voluntary. Rather, you must consider all of these factors under the totality of the circumstances.

(Dkt. No. 522 at 38.)

Plaintiffs argue that, by using the language "there is no particular factor that must be in Emigrant's favor," this instruction would have allowed two impermissible outcomes: (1) the jury may have found for Emigrant on only one factor of the six non-exhaustive factors but found the waiver to be knowing and voluntary nevertheless based on an incorrect assumption that one factor is sufficient; and (2) the jury may have believed that all six non-exhaustive factors needed to favor the Saintils to in order for them to invalidate the waiver.

Plaintiffs' arguments are meritless. As to the former, the instruction explicitly states that the jury is to consider the factors "under the totality of the circumstances." Therefore, the instruction both provides the jury with a non-exhaustive list and a mandate to consider the six factors given. As to the latter, the

jury was instructed that the burden of proof was on Emigrant to establish that the waiver was knowing and voluntary. (Dkt. No. 522 at 10.) It would have been impermissible (and not a result of the reading of this instruction) for them to have shifted the burden to the Saintils to prove all six factors.

IV.    Timeliness of Plaintiff's Claims

Emigrant claims they are entitled to judgment as a matter of law because Plaintiffs' claims were untimely, given the two year statute of limitations on FHA. However, this argument was presented to this Court and rejected by this Court at the motion to dismiss stage. (See Dkt. No. 258 at 30-31.) Nothing has changed to alter the Court's decision and no new evidence has been overlooked by the Court. Therefore, for the reasons stated then, and for the reasons stated hereinbelow, this argument is rejected.

A. Equitable Tolling

The requirements for equitable tolling are (1) that the defendant concealed the existence of a cause of action; (2) the action commenced within the applicable limitations period; and (3) plaintiffs' failure to bring the action sooner was not from the absence of due diligence. Of these prongs, Emigrant primary argues there was no concealment involved in the offering of the STAR NINA loan. Where fraudulent concealment can be demonstrated, a defendant may not present a statute of

limitations defense as to any such claim. <u>New York v. Hendrickson Bros. Inc.</u>, 840 F.2d 1065, 1083 (2d Cir. 1988).

While Emigrant cites <u>Hendrickson Bros.</u> on the issue of concealment, the case is more supportive of Plaintiffs' view of the case. In <u>Hendrickson Bros</u>, the Second Circuit found that "the plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." <u>Id.</u> (holding that plaintiff in contract big rigging case had adequately proven concealment on appeal of final judgment). This Court's order of September 24, 2014 already held that discriminatory mortgage lending is inherently self-concealing and cited three authorities with fact patterns comparable to the instant case in support. <u>See</u> <u>M&T Mortg. Corp. v. White</u>, 736 F. Supp. 2d 538, 555–56 (E.D.N.Y. 2010); <u>Council v. Better Homes Depot, Inc.</u>, No. 04-CV-5620, 2006 WL 2376381, at *9 (E.D.N.Y. Aug. 16, 2006); <u>Phillips v. Better Homes Depot, Inc.</u>, No. 02-CV-1168, 2003 WL 25867736, at *25 (E.D.N.Y. Nov. 12, 2003). Emigrant cites to <u>Clement v. United Homes, LLC</u>, 914 F.3d 362, 374 (E.D.N.Y. 2012), in which the court actually found the requisite concealment prong to be met. Therefore, Emigrant has not presented any evidence to persuade the Court that its reasoning on concealment should change.

V.    <u>Enforceability of the Saintils' Waiver</u>

While, as explained, supra, the jury found that the waiver signed by the Saintils was knowing and voluntary, the question of its enforceability is, at this stage, purely legal, and as such, raises a question distinct from Plaintiffs' objection to this Court's jury instruction. Emigrant has argued that the Saintils' execution of the waiver constitutes an affirmative defense to violations of all three statutes presented to the jury. Plaintiffs in turn argue that the release is unenforceable as a matter of law.

"There is no magic formula for determining when a contract . . . is void as against public policy." Anders v. Verizon Comms., Inc., (VSB) 15 CV 5654, 2018 WL 2727883, at *9 (S.D.N.Y. Jun. 5, 2018) (quoting SI Venture Holdings, LLC v. Catlin Specialty Ins., 118 F. Supp. 3d 548, 551 (S.D.N.Y. 2015)); see also Estate of Walker, 64 N.Y.2d 354, 359 (N.Y. 1985) ("A legacy is contrary to public policy, not only if it directly violates a statutory prohibition . . . but also if it is contrary to the social judgment on the subject implemented by the statute."); cf. Waters v. Fulwood, 675 F. Supp. 155, 161 (S.D.N.Y. 1987) (foreclosing a party from "collect[ing] the rewards of corruption" by holding that the underlying agreements violate public policy); but see AXA Inv. Managers UK Ltd. V. Endeavor Capital Management LLC, 890 F. Supp. 2d 373, 389 (S.D.N.Y. 2012) (upholding the imposition of a 25% default interest rate where, inter alia, "no disparity [in sophistication] between the parties impugns the valid and binding agreement they reached.")

"It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Additionally, it is "unlawful for any creditor to discriminate against any applicant, with respect to any credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status or age (provided the applicant has the capacity to contract)." 15 U.S.C. § 1691(a)(1). These are among the terms found in the FHA and ECOA, both of which the jury found Emigrant to have violated. Moreover, in issuing the STAR NINA loan program in the matter they did, Defendants were also found to have violated them more broadly interpreted NYCHRL, the provisions of which must "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws . . . have been so construed." Dillon v. Ned Mgmt., Inc., 85 F. Supp. 3d 639, 653-4 (E.D.N.Y. 2015) (quoting the Restoration Act sec. 7 (amending N.Y.C. Admin. Code § 8-130).).

Of course, the existence alone of statutes meant to prevent certain harms is not sufficient to render unenforceable waivers of claims that could have been brought pursuant to those statutes. More is needed.

Policies ought not be considered in a vacuum. Indeed, in denying Emigrant's motion to dismiss, this Court put the instant action in context by providing a historical overview of mortgage lending in the United States, (Dkt. No. 258 at 5-8), fraught as it has been with the systematic demarcation of zones largely population by Black and

Latino residents and parsing of them as exempt from investment locations, while cultivating "effective lending territories" in other neighborhoods. (See e.g., id. at 6 n.2 ("Most major lenders do not wait passively for customers to walk into their offices and request loan application forms. Instead they actively initiate specific marketing strategies that target certain types of consumers.").) While the feature of last generation's housing discrimination was the act of giving no investment quarter to Black and Latino communities, the iteration of the late 2000s was to offer to those communities the loans most likely to result in equity-stripping and/or foreclosure of their properties altogether. In short, these communities went from no loans to the worst loans.

Although Emigrant modified the Saintil's loan in 2010 to terms not subject to FHA, ECOA or NYCHRL scrutiny by the jury, the Saintils were back in default within five months of the modification and owing Emigrant over $700,000 at the time of trial, with monthly payments of $3,750 expected of them, notwithstanding their reduced incomes, Mrs. Saintil having suffered a stroke in the interim, and Emigrant's policy of refusing to accept partial payments from STAR NINA customers.

The modification thus did little to bring the Saintils within reach of making regular payments for any considerable length of time, which "raise[s] concerns about [Emigrant's] motivations." Anders, 2018 WL 2727883, at *9 (finding an agreement void as against public policy where plaintiff paid $16,000 in consideration for an

P-049

anticipated high-profile publicity stunt in order to gain employment opportunities). Therefore, this Court finds the release to be void as against public policy and orders a new trial to the Saintil's on the issue of damages.

VI.     Dismissal of Juror Number 3

Emigrant argues that it is entitled to a new trial because, prior to deliberation, the Court dismissed Juror Number 3, who repeatedly expressed concerns about missing a personal planned event if the jurors did not reach a verdict in the first and only day of deliberation that occurred before her event.

As Emigrant correctly articulates, pursuant to Federal Rule of Civil Procedure 47(c), "the court may excuse a juror for good cause." FED. R. CIV. P. 47(c). According to the Advisory Committee Notes, "[s]ickness, family emergency or juror misconduct that might occasion a mistrial" are potential grounds for dismissing a juror, while a juror's refusal "to join with fellow jurors in reaching a unanimous verdict" is not. The Advisory Committee Notes on what may constitute "good cause" are not exhaustive. See Interpool Ltd. v. Patterson, 874 F. Supp. 616, 618 (S.D.N.Y. 1995). The single case Emigrant cites to support its argument that Juror No. 3 deserved a hearing, Harris v. Folk Constr. Co., involved a juror who was inappropriately dismissed on the only grounds specifically singled out as improper by the Advisory Committee Notes. See Harris v. Folk Constr. Co., 138 F.3d 365,

P-049

367–68 (8th Cir. 1998) (finding court should have held a hearing before dismissing lone juror holding out from unanimous verdict).

The trial in this matter commenced on May 23, 2016. On Wednesday June 22, 2016, Juror No. 3 privately expressed to the courtroom deputy her displeasure with the length of the trial because on Friday June 24, the juror was expected to attend a bachelorette party in the Hamptons and did not wish to deliberate that day (or possibly did not wish to deliberate any day beyond June 23). The jury had yet to begin deliberating.

The Court called Juror No. 3 into the courtroom and, outside the presence of the other jurors, informed her that she would not be getting Friday off. (See id. at 2675.) She questioned whether or not the deliberations might be "expedited" by having everyone "come in a little earlier or stay a little later" on Thursday May 23 in order to finish deliberations that day. (See id.) The Court explained that the case would only be done Thursday if she and her fellow jurors reached a decision by that time. (See id.) The Court declined to excuse Juror No. 3 at this stage, a decision the juror characterized as "unfortunate." (See Tr. at 2677.) Plaintiffs' counsel expressed concern that Juror No. 3 might "rush to judgment" on a complicated case "so she can get to a bachelorette party." (See id.) The Court nevertheless decided to allow Juror No. 3 to stay. (See id. at 2678.)

The Court only revisited the question of keeping Juror No. 3 after she again approached the courtroom deputy outside of the courtroom, increasing her level of

disbelief and vexation, adding that "she can't believe she's been here this long, she has a life, and that she can't believe she's being made to stay." (See id. at 2744.) Only then did the Court decide, outside the presence of all of the jurors, that she was a "divisive factor" whose attitude had the potential to negatively impact deliberations. (See id.) Even Emigrant's counsel noted that she could potentially affect the other jurors and was "probably talking" about her complaints with them. (See id. at 2745.) The Court called Juror No. 3 in and informed her that she could leave. (See Tr. at 2745.) She questioned, "What do you mean, we're all done for the day?" to which the Court replied, "Not 'we,' you." (See id.) She did not object; nor did Emigrant. (See id.)

Based on the facts of Juror No. 3's excusal, Emigrant claims that it is entitled to a new trial. (See Defs.' Mem. at 24.) It is not. Juror No. 3's expressed sense of urgency and resentfulness naturally led the Court to deem her presence "cancerous," as she evinced the desire to hasten deliberation in order to avoid returning on Friday for even a second day of deliberation. (See Tr. at 2745.) These concerns about her commitment to serve constitute sufficient good cause for her excusal. See Interpool Ltd. v. Patterson, 874 F. Supp. 616, 618 (S.D.N.Y. 1995) (finding dismissal of juror upset over missing planned trip appropriate as he would have adversely affected deliberations).

Emigrant also claims that there should have been a hearing before Juror No. 3 was excused. (See Defs.' Mem. at 24.) No hearing was necessary in this case, as

P-049

she twice put her objections on record and both parties agreed that her continued presence could taint other jurors. See United States v. Reese, 33 F.3d 166, 173 (2d Cir. 1994) (finding the question of whether or not to hold a hearing prior to a juror's excusal to be "within the trial judge's sound discretion" and finding that no hearing was required); see also Interpool, 874 F. Supp. at 618–19 (dismissing juror without hearing).

### VII. Adequacy of Damage Award

"It is well settled that calculation of damages is the province of the jury." Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990). However, "[t]he Court may grant a new trial, pursuant to [Rule 59] if the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice, i.e., that the verdict is against the weight of the evidence, that the damages awarded were excessive, or that for the stated reasons the trial was not fair to the moving party." Hicks v. Vane Line Bunkering, Inc., 2013 WL 1747806, at *4 (S.D.N.Y. Apr. 16, 2013) (collecting cases); see also Lang v. Birch Shipping Co., 523 F. Supp. 1113, 1114 (S.D.N.Y. 1981) ("Where . . . the Court's conscience is shocked by the jury's grossly inadequate award . . . it becomes the bounded duty of the Court to intervene, lest a grave justice result.") (quoting Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir. 1978)).

Moreover:

> unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. . . .trial judge is free to

weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. . . . However, a motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.

See Morris v. Flaig, 511 F. Supp. 2d 282, 304 (E.D.N.Y. 2007); Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004); DLC Mgmt. Corp. v. Town of Hyde Park, 163, 124, 133-134 (2d. Cir. 1998).

In the instant case, the jury found that Emigrant violated the FHA, ECOA and NYCHRL. In doing so, they implicitly credited at least some of Plaintiffs' witnesses over those brought by the Defendants, as they were permitted to do. However, the source of the damages assessed is not clear, and a new trial is therefore warranted.

### A. The Saint-Jean Damage Award

The jury found that Edith Saint-Jean was entitled to $180,000 in damages, and that Jean Robert Saint-Jean was also entitled to $180,000, for a total of $360,000 to the mortgagors of the Saint Jean property. As of the date of the verdict, Emigrant posited that the Saint-Jeans owe $789,081.39, which amount constitutes $369,311.93 in principal, $259,085.88 in "base rate" interest, $95,785.02 in default interest, $505,02 in late charges, $43,665.33 in taxes paid Emigrant, $13,366 in insurance paid by Emigrant, $5,756.21 in water bills paid by Emigrant and $1,606.00 in "other" fees paid by Emigrant. Plaintiffs, on the other hand, ask the court to carve out "charges that would never have accrued had the Saint-Jeans never met Emigrant or been subjected to Emigrant's discriminatory loans" (such as interest, penalties and

35

fees) from the amounts due and hold the Saint-Jeans responsible for $384,035.95.

Though this amount is a little more than half of what Emigrant deems owed, it is still

nearly $25,000 more than the $360,000 awarded to the Saint-Jeans by the jury.

Viewing the jury award as the sole method available to the jury to compensate the

Saint-Jeans for three laws they found to have been broken by Emigrant, an award of

$360,000 falls short of the amount the Saint-Jeans owe (even under Plaintiffs'

conservative estimate of the sum due), to say nothing of the issue of losses due to

emotional or mental anguish, if any.[5]


## B. The Smalls Damage Award

Jeanette Small was awarded $110,000 by the jury and Beverley Small was

awarded $70,000, for a total of $180,000 to the former mortgagors of the Small's

property. In May 2008, the Smalls satisfied their 2006 STAR NINA loan from

Emigrant by selling their property after they defaulted on their $330,000 loan.[6] Their

home was sold for $620,000 and the Smalls now rent an apartment. Of the amount

gained by the sale, the Smalls paid $328,281.27 to Emigrant pursuant to their STAR

NINA loans including the "charges that would never have accrued had the [Smalls]

never met Emigrant or been subjected to Emigrant's discriminatory loans" (such as

---

[5] Both Edith and Jean Robert Saint-Jean testified to the stress and sadness they felt after the 18% default interest rate was imposed and they were unable to rehabilitate the loan once they learned that Emigrant would not accept a partial payment. They remain under threat of foreclosure.

[6] The Smalls defaulted after Beverley Small was diagnosed with a brain hemorrhage in October 2006 and was unable to work.

P-049

interest, penalties and fees that the Saint-Jeans seek to avoid allotting their damage award to paying). Jeanette Small testified to feeling "crushed," "lost," "terrible," unable to provide for her grandchildren, and generally alone, as her extended family lives abroad. Beverley Small testified to experiencing fear after fielding calls made on behalf of Emigrant by individuals threatening that she would come home one day and find the door to her home chained and "be out in the streets living in a cardboard box" with her son.

### C. Linda Commodore's Award

After falling behind in payments on her August 2004 $125,000 STAR NINA loan and borrowing $26,512.63 to catch up on her arrears (most of which consisted of past-due interest), Linda Commodore fell behind again in 2006. Her efforts to catch up were thus far thwarted by Emigrant's policy of refusing partial payments. Commodore's loan was secured by her property, which in 2007 was valued at $350,000. In August 2006, Emigrant initiated foreclosure of her loan for a mere $6,844 in arrears. In October of 2007, Commodore's property sold at auction for $310,000. Of that amount, she remitted approximately $161,000 to Emigrant, an amount *exceeding* the principal borrowed from Emigrant, notwithstanding her 18 months of payments and $25,000 personal loan she took to catch up on arrears once the 18% default interest rate was triggered. Commodore testified as to the stress and sadness that accompanied the process of attempting to catch up, failing to do so, and

P-049

ultimately losing her home to avoid foreclosure: "I was just devastated. I couldn't open mail. I couldn't sleep. I couldn't do anything. I had a friend come to my . . . apartment and open my mail for me and read it for me which is how I found out about the foreclosure." (Tr. at 1706.) Commodore, who described herself as "in a very, very dark place," moved in with her children in North Carolina and put her lifelong belongings in storage, of which she eventually lost possession.

The jury awarded Commodore, who has since rented her own studio, $185,000. As with the Smalls, it is not possible to determine how this amount was selected; and, as with the Smalls, Commodore's satisfaction of her STAR NINA loan means that she did repay in full a loan (with its concomitant fees, penalties and default interest rate ) found by the jury to violate the law. There was substantial testimony about the emotional effect this process had on Commodore, which could have played a factor in her award. Yet, the Court cannot determine how much credence this testimony was given compared to either the complaints of emotional damages made by the other Plaintiffs or to Commodore's financial loss.

### D. Felipe Howell's Damage Award

The largest individual jury award went to Felipe Howell. As stated, supra, Howell was the only homeowner whose property was unencumbered when he entered into his $200,750 STAR NINA loan with Emigrant in February 2008. The interest rate attached to Howell's loan was 10.375%. Howell was unemployed and

Howell's property was valued at $430,000. Howell's monthly payment pursuant to the loan was to be $2,104. Howell used the $200,750 loan to pay his ex-wife her share in the property and to pay off other bills, including $28,709.03 in closing costs. Outside of these responsibilities, Howell did not receive any liquid proceeds of the loan, which closed on February 6, 2008. By February 2009, a judgment of foreclosure and sale was entered in the Supreme Court of Queens County, and ultimately Howell's property was purchased at auction by Emigrant for $1,000. Howell now lives in an apartment. Howell was awarded $225,000 in damages, an amount close to the $430,000 value of his former home minus the principal sum of $200,750 he received from Emigrant. Again, this award may or may not include damages for the alleged emotional distress Howell testified that he endured, including embarrassment and shame over not just the foreclosure of his home but on account of the amounts he borrowed from friends throughout this process that he could not repay.

E. Analysis

In any event, it is not within the province of this Court to speculate as to how the jury arrived at the amount of damages awarded to Plaintiffs. Indeed, as demonstrated, supra, any such effort would in any event be fruitless, for the Court can neither bifurcate economic from emotional damages at this stage nor determine the weight, if any, afforded to the very critical differences between the Plaintiffs.

Some homeowners still occupy the subject property (and have not paid Emigrant in accordance with the loan). Others sold (or lost) their homes and fully satisfied the terms of loans deemed illegal by the jury, remitting various fees and large sums of interest and penalties that the still-occupying homeowners are being asked to remit. Some are currently renting apartments and have lost their status as homeowners and possibly the creditworthiness to become homeowners in the near or distant future. And in what may be the most extreme case, Howell went from owning a home outright to having his home sold back to Emigrant for $1,000. In short, the STAR NINA program had very different emotional and economic effects on each of the Plaintiffs and this Court cannot determine the extent that the jury weighed that testimony or arrived at each Plaintiff's actual damages. See 15 U.S.C. § 1691e(a); see also Anderson Group, LLC v. City of Saratoga Springs, 805 F.3d 34, 52 (2d Cir. 2015) ("[G]eneral tort principles govern the award and calculation of damages in FHA cases. . . .[C]ompensatory damages are designed to place the plaintiff in a position substantially equivalent to the one he would have enjoyed had no tort been committed.") (citations omitted).

Because the relationship between the damages awards and the various losses alleged (loss of equity, loss of home ownership or home ownership potential, and/or emotional distress damages) cannot be sufficiently ascertained, it cannot be said that the damages awards succeed at restoring Plaintiffs to their pre-STAR NINA loan

positions.[7] The awards are thus against the weight of the evidence and a new trial on

damages is warranted.

VIII.   Injunctive Relief

Because this Court has determined that a new trial on damages is warranted,

it is at this stage premature to address Plaintiffs' requests for (1) a disposition of

Edith Saint-Jean's Truth in Lending Claim[8] and (2) Plaintiffs' motion for injunctive

relief pursuant to 42 U.S.C. § 3613. Both results turn on the damages awarded to

---

[7] For example, the award to the Saint-Jeans of $360,000 neither satisfies the principal due nor the interest accumulated on their loan (and they are currently in foreclosure), whereas the $225,000 awarded to Howell is unencumbered by any claim brought by Emigrant. (See Dkt. No. 602 at 1 n.1 (stating that Howell "has no balance due to Emigrant at the time of verdict."); see also Schaafsma v. Morin Vermont Corp., 802 F.2d 629, 635 (2d Cir 1986) ("Only when jury verdicts are logically incompatible is it error for the district court not to grant a new trial.") (collecting cases); Portee v. Hastava, 853 F. Supp. 597, 612 (E.D.N.Y. 1994) (granting a new trial on issue of damages for emotional distress where jury "was presented with a great deal of evidence" and court sought to "parse out the damages for emotional distress due to the constitutional violation.").

[8] At the motion to dismiss phase, this Court found Edith Saint-Jean's TILA claim to be timely, plausible and satisfied by the borrower's provision to the lender of written notice of an intent to rescind. (Dkt No. 258 at 37-49.) The Court rejected the argument that the 18% default interest rate was "unanticipated" (as defined by 12 C.F.R. 226.4(c)(2)) in light of Plaintiffs' allegations about the method in which the closings were conducted. This argument has only been strengthened by the evidence at trial, which included, inter alia, testimony from Howard Milstein indicating that, as early as 2004, Emigrant's Board of Directors discussed the high rate of delinquencies of the STAR NINA program, the continued growth of the number of STAR NINA loans that were not performing, did not anticipate losses from these delinquencies, were not concerned by those delinquencies and even approved in increase in the amount of lending authority under those loans. (Tr. 524-534.) The evidence presented at trial that Emigrant refused to accept partial payments when STAR NINA borrowers fell behind on their mortgages further supports the claim that the 18% default interest rate was far from "unexpected."

P-049

(and level of solvency of) the Plaintiffs on re-trial.[9] These motions are therefore denied with leave to renew upon a jury finding as to damages.

### IX.  Remaining Claims

All remaining arguments (most of which were raised and rejected in limine) have been considered and are without merit.

### CONCLUSION

For the foregoing reason, Defendants' motion is granted in part and denied in part. Plaintiff's motion is granted in part and denied in part. The parties are hereby directed to appear on September 27, 2018 at 9:30am for a status conference.

SO ORDERED.

Dated: August 20, 2018                    s/Sterling Johnson, Jr. USDJ
      Brooklyn, New York                   Sterling Johnson, Jr., U.S.D.J.

---

[9] It is important to note that while certain aspects of Plaintiffs' motion for injunctive relief will turn on the extent of the damages award after re-trial, the evidence presented on the issue of liability strongly suggests that, at a minimum, education and training of major decision-makers at Emigrant as to reverse redlining and predatory lending would benefit Emigrant, its principals, and the communities they serve. For example, CEO Howard Milstein testified that while he has held that position since 2004 and chaired every meeting of the Board, he had not read the complaint in this action but "knew" that "it includes outrageous claims of racial discrimination." Milstein was unfamiliar with the term "reverse redlining;" unconcerned with the rate of defaults among the STAR NINA loans to the point of expanding the product; and could not define "subprime loan." (See, e.g., Tr. at 519-559.)

P-049