**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

 MAY 24 2022 

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JEAN ROBERT SAINT-JEAN, *et al.*,

                                 Plaintiffs,

               v.

EMIGRANT MORTGAGE COMPANY, *et al.*,

                               Defendants.
-------------------------------------------------------x

11-CV-2122 (SJ)
**MEMORANDUM**
**AND ORDER**

APPEARANCES:

BROOKLYN LEGAL SERVICES
105 Court Street, Fourth Floor
Brooklyn, NY 11201
By:    Rachel Geballe
*Attorney for Plaintiffs*

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
By:    Richard H. Klapper
        Matthew A. Schwartz

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
By:    Evandro C. Gigante
*Attorneys for Defendants*

JOHNSON, Senior District Judge:

In 2011, plaintiff Jean Robert Saint-Jean and his wife, plaintiff Edith Saint-Jean (collectively, "the Saint-Jeans"), who own a home in Canarsie, Brooklyn, commenced this action against their mortgagee, defendant Emigrant Mortgage Company ("Emigrant"), alleging violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604, 3605; the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C, § 1691 *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296-a; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code § 8-502; and the Truth in Lending Act, 15 U.S.C. §1601 *et seq.* In 2016, after the complaint was amended to add other Emigrant borrowers as plaintiffs and to add several corporations affiliated with Emigrant as defendants, the case went to trial before a jury. At the charge conference, the parties stipulated to have the Court, rather than the jury, find facts pertaining to the TILA claim.

Edith Saint-Jean ("Plaintiff") now moves pursuant to Federal Rule of Civil Procedure 58 for entry of judgment on her TILA claim. For the reasons stated below, the Court concludes that Plaintiff has not established a violation of TILA. Accordingly, Plaintiff's motion is denied.

P-049

## BACKGROUND

Although the facts of this case are not complicated, they involve technical provisions of the Truth in Lending Act ("TILA") which may be unfamiliar to the reader. Accordingly, the Court will briefly discuss those provisions before setting forth its Findings of Fact.

TILA was enacted in 1968 to, among other things, "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available ... and avoid the uninformed use of credit ...." 15 U.S.C. § 1601(a). To that end, the statute, "[t]ogether with its implementing Regulation Z, ... requires [certain] disclosure[s] by the 'creditor' ...." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 491 (2d Cir. 2014). The statute defines the term "creditor" to mean "a person who both (1) regularly extends ... consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness ...." 15 U.S.C. § 1602(g). It is undisputed that Emigrant meets this definition and is a creditor as defined by TILA.

3

TILA "has separate disclosure requirements for 'open-end' and 'closed-end' credit transactions." *Benion v. Bank One, Dayton, N.A.*, 144 F.3d 1056, 1057 (7th Cir. 1998). "Open-end credit means consumer credit extended by a creditor under a plan in which: (i) [t]he creditor reasonably contemplates repeated transactions; (ii) [t]he creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) [t]he amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid." 12 C.F.R. § 226.2(20). Closed-end credit means consumer credit other than "open-end credit," *see id.* § 226.2(10), so a closed-end credit transaction is sometimes called a "consumer credit transaction other than under an open end credit plan." *See, e.g.,* 15 U.S.C. § 1638(a). A credit card account is the "prototypical example" of open-end credit, *Benion v. Bank One, Dayton, N.A.*, 967 F. Supp. 1031, 1035 (N.D. Ill. 1997), while a "traditional home equity loan is an example of a closed end loan," *Bartlett v. Bank of Am., N.A.*, No. Civ. MJG-13-975, 2014 WL 3773711, at *2, n. 5 (D. Md. July 29, 2014). A residential loan secured by a mortgage is a closed-end credit transaction. *See Gen. Elec. Cap. Corp. v. DirecTV, Inc.*, No. 97-CV-1901 (PCD), 1999 WL 33954791, at *1, n. 1 (D. Conn. Jan. 28, 1999).

4

The disclosure requirements for closed-end credit transactions are "more onerous" than those for open-end transactions. *Benion*, 144 F.3d at 1057 (*comparing* 15 U.S.C. § 1637 with *id.* § 1638).  The section relating to closed-end credit transactions such as the transaction at issue here, 15 U.S.C. § 1638, "requires disclosure by the creditor of, *inter alia*, the 'amount financed,' *id.* § 1638(a)(2)(A), the 'finance charge,' *id.* § 1638(a)(3), and the 'number, amount, and due dates or period of payments scheduled to repay the total of payments,' *id.* § 1638(a)(6).  *Crawford*, 758 F.3d at 491.  A creditor must also disclose the "finance charge expressed as an 'annual percentage rate,'" ("APR"), 15 U.S.C. § 1638(a)(4), and the "total of payments," which is defined as the "sum of the amount financed and the finance charge, *id.* § 1638(a)(5).  Regulation Z provides details regarding what a creditor must disclose and how that disclosure must be made.  *See* 12 C.F.R. § 226.18.

TILA defines some of the disclosures that must be made as "material disclosures."  Specifically, it provides:

> The term "material disclosures" means the disclosure, as required by this subchapter, of the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, the due dates or periods of payments scheduled to repay the

indebtedness, and the disclosures required by section 1639(a) of this title.

15 U.S.C. § 1602(v).

"TILA affords a borrower three business days during which to rescind a covered loan transaction, calculated from 'consummation of the transaction,' the delivery of the required rescission forms, or the delivery of the material disclosures required by the statute, whichever is latest." *Smith v. Wells Fargo Bank, N.A.*, 666 F. App'x 84, 85 (2d Cir. 2016) (summary order) (quoting 15 U.S.C. § 1635(a)).  However, "[i]f proper forms are never provided, the borrower's right of rescission survives until three years after the transaction consummation date or until sale of the property, whichever occurs first." *Id.* (citing 15 U.S.C. § 1635(f)); *see* 12 C.F.R. § 226.23(a)(3).

## FINDING OF FACTS

In the mid-1990s, the Saint-Jeans purchased a home in Canarsie, which they financed through Arbor National Mortgage.  In 2001, after falling into credit-card debt, the Saint-Jeans refinanced the home through Washington Mutual.  The Washington Mutual note and mortgage were subsequently assigned to Wells Fargo Bank.

By 2007, the Saint-Jeans were not only in arrears on their payments to Wells Fargo but had past-due water and gas bills.  As a result, they

6

sought to refinance their home again with a new lender. Although the Saint-Jeans had low credit scores and modest income, they were able to refinance with Emigrant, which was willing to lend money without verifying assets or income under its "STAR NINA" program.

Emigrant agreed to loan the Saint-Jeans $370,000—enough money to pay off the Wells Fargo loan and the outstanding water and gas bills and to give them cash they could use for other purposes. The interest on the 30-year loan was fixed at 11.75% for the first five years but fluctuated based on an index rate published by the Federal Reserve Board for the remaining 25 years. The initial payments on this loan exceeded the payments on the Saint-Jeans' Wells Fargo loan—payments which the Saint Jeans had been unable to make.

The Saint-Jeans closed on their Emigrant loan on January 10, 2008. At the closing on January 10, 2008, Emigrant had the Saint-Jeans sign various documents including a "Resource Letter" and a "High Equity Loan Certificate." The Resource Letter, which Emigrant required all recipients of "No Income No Asset" ("NINA") loans to sign, informed the Saint-Jeans of the monthly payments they were obligated to make and advised them that they would need over $102,000 in annual income to make the payments. The Saint-Jeans, who did not make that much money, told those present at

the closing that they were unable to make the monthly payments. But, falsely assured that the interest rate would go down if they made payments for six months, they ultimately signed both the Resource Letter and the High Equity Loan Certificate, in which they represented that they had sufficient income, assets, and resources to make the payments.

At or prior to the closing, Emigrant also provided the Saint-Jeans with a document entitled "Truth-in-Lending Disclosure (Real Estate)." Since this document—hereafter, the "TIL Disclosure"—is central to the instant motion, the Court will describe it in some detail.

### The TIL Disclosure

The TIL Disclosure is a single page, single-sided document, that appears to be divided into three sections. The top section contains the names and addresses of the Lender, Emigrant, and the Borrowers, the Saint-Jeans. Plaintiff does not contend that this information is inaccurate.

In the second section, surrounded by a rectangle, are the "material disclosures" required by TILA and Regulation Z. The top portion of the rectangle is divided into four smaller rectangles, which are spread evenly across the page. At the top of each rectangle is a heading, with a brief description just below that. A number appears below the description and occupies the remainder of the rectangle.

8

The first of these rectangles is headed "ANNUAL PERCENTAGE RATE," which is described as "The cost of your credit as a yearly rate," and is stated to be 10.119%. The second rectangle is headed "FINANCE CHARGE," which is described as "The dollar amount the credit will cost you," and is stated to be $695,585.19. The third rectangle is headed "Amount Financed," which is described as "The amount of credit provided to you or on your behalf," and is stated to be $335,256.01. The fourth rectangle is headed "Total of Payment," which is described as "The amount you will have paid after you have made all payments as scheduled," and is stated to be $1,050,841.20.

The remainder of the second section describes the payment schedule. The heading appears in a longitudinal rectangle to the left of the entry and reads: "YOUR PAYMENT SCHEUDLE WILL BE." To the right of that is a chart which reads:

| NO. OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
| --- | --- | --- |
| 60 | 3,734.82 | monthly, beginning 03/01/2008 |
| 300 | 2,755.84 | monthly, beginning 03/01/2013 |

The third section of the form contains additional disclosures, each introduced by a heading which appears in all capital letters. There are nine headings altogether, most of which are followed by preprinted text and a box which can be checked if the text is applicable. No box is checked with

9

respect to three of the headings—PAYABLE ON DEMAND,

FILING/RECORDING FEE, and REQUIRED DEPOSIT—indicating that

these disclosures are inapplicable to the instant loan.

Boxes are checked, or text is added, following five other headings.

First, after a heading entitled "VARIABLE RATE," Emigrant checked a box

preceding text that states: "This transaction is subject to a variable rate

feature. Variable rate disclosures have been provided at an earlier time."

Second, after a heading entitled "SECURITY," and preprinted text which

reads, "You are giving a security interest in property located at," Emigrant

added the address of the Saint-Jeans' Canarsie home. Third, after the

heading "LATE CHARGE," Emigrant added text to preprinted language to

indicate that if a payment were more than 15 days late, a late charge of 2%

would be assessed on the overdue payment. Emigrant also added text

which reads: "If loan is in default, a default interest rate of 18% may be

imposed." Fourth, after the heading "PREPAYMENT," Emigrant checked

boxes to indicate that a penalty may be imposed if the loan is paid off early

and that the borrowers "will not be entitled to a refund of part of the

finance charge." Fifth, after the heading "ASSUMPTION," Emigrant

checked a box to indicate that someone buying the Saint-Jeans' home could

not assume the remainder of the mortgage on the original terms.

P-049

There are three other disclosures in the form. First, under the heading "INSURANCE," the preprinted text advises the borrowers that they "may obtain property insurance from anyone acceptable to the Lender." Second, in a rectangle near the bottom of the third section is a sentence which advises the Borrowers to consult their "contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties and creditor's policy regarding assumption of the obligation." Finally, just above the signature lines, Emigrant checked a box to refer the Borrowers to a "'Good Faith Estimate' or Settlement Statement for an Itemization of Amount Financed."

The Saint-Jeans signed the TIL Disclosure form on January 10, 2008. At that time, Emigrant knew that a high percentage of its STAR NINA loans were delinquent and in default and could have anticipated that the Saint-Jeans were likely to be unable to stay current with the loan payments. However, even if Emigrant knew that the Saint-Jeans were statistically likely to default, there is no evidence to suggest that they knew for certain that they would default or knew precisely when they would do so.

11

The Default and this Action

The Saint-Jeans, who had taken cash out in the loan transaction, did not default immediately.  Rather, they defaulted in September 2008, approximately eight months after their closing.  (2016 Tr. 1449:18–1450:9; 2019 Tr. 939:25–940:12.)  Thereafter, their interest rate increased to the default rate of 18%, where it remained for the next five months.  In February 2009, Emigrant reduced the default interest rate to 16%, and in October 2010 Emigrant further reduced the default rate to 3% above the regular interest rate.

In July 2010, the Saint-Jeans attempted to rescind their Emigrant loan.  That attempt was rebuffed.  In late April 2011, the Saint-Jeans commenced this action.

The Saint-Jeans were the only plaintiffs named in the original complaint and Emigrant was the only defendant.  As noted above, that pleading alleged causes of action under the FHA, ECOA, NYSHRL, NYCHRL, and TILA.  The complaint was subsequently amended to add other Emigrant borrowers as plaintiffs and to add several corporations affiliated with Emigrant as defendants.  While the causes of action in the amended pleadings remained the same as in the original complaint, the

12

allegations in some causes of action were expanded to suggest other theories of liability.

Although the Second Amended Complaint ("SAC") (Doc. No. 264) expanded the TILA claim to encompass some new theories of liability, the instant motion focuses on the same theory that was set forth in the original pleading. That theory is predicated on a finding that Emigrant failed to "disclose properly and accurately" the "finance charge," the "amount financed," the "annual percentage rate," the payment schedule, and the "total of payments," in violation of 15 U.S.C. § 1638(a) and 12 C.F.R. § 226.18. SAC at ¶ 269. The SAC asserts that because Emigrant failed to make these material disclosures, the rescission period was extended from three days to three years. Noting that the Saint-Jeans requested rescission of the loan in July 2010—less than three years after the closing—the SAC seeks rescission, as well as compensatory and statutory damages.

Plaintiff's Motion

In the instant motion, Plaintiff elaborates on this theory. Plaintiff argues that the material disclosures contained in the TIL Disclosure significantly understated the cost of Emigrant's STAR NINA loan to the Saint-Jeans. (Plaintiff's Memo at 12.) Specifically, Plaintiff asserts that the material disclosures were incorrectly calculated based on the assumption

13

that the "Saint-Jean's loan would remain current, and their interest rate would remain as presented on the face of the note for the duration of the loan." (Plaintiff's Memo at 6). Plaintiff claims that "[w]ith the benefit of extensive information about the delinquencies in its own STAR NINA program, as well as detailed information about the Saint-Jeans' credit history, Emigrant knew that the Saint-Jean loan would quickly go delinquent and the interest rate of the loan would increase to 18%." (*Id.*).

Plaintiff explains in some detail how Emigrant's faulty assumptions about the Saint-Jeans' remaining current on their loan payments affected the calculations of the schedule of payments, total of payments, the finance charge, and the APR. First, noting that the Saint-Jean loan began incurring the 18% default interest rate eight months after the closing, Plaintiff argues that the "schedule of payments" should have been as follows:

- 8 payments of 3,734.82 monthly, beginning 03/01/2008
- 352 payments of 5,565.58 monthly, beginning 11/01/2009

(*Id.* at 8.) Under this payment schedule, "total payments would be $1,979,687" — about $929,000 greater than the total payments disclosed in the TIL Disclosure. (*Id.*) The finance charge and APR would also be greatly increased. Emigrant disclosed a finance charge of $695,585: $14,744 of finance charges at closing and $680,841 of interest payments over the life of

14

the loan.  If the finance charge were recalculated to reflect that the interest rate increased to 18% after eight months, the finance charge would be $1,633,681: $14,744 of finance charges at closing and $1,618,937 of interest payments over the life of the loan.  Similarly, the APR would jump from 10.119% to 18.02%.

Plaintiff contends that, because these material disclosures were grossly inaccurate, the Saint-Jeans right to rescind their loan "was extended for three years and they timely triggered rescission with their letter on July 12, 2010." (*Id.* at 13.)  Plaintiff argues that, in order to effect rescission and unwind the transaction, the Court should order Emigrant to return the Saint-Jeans' payments, including all interest paid throughout the life of the loan and any other finance charges; cancel Emigrant's security interest in the Saint-Jeans' home; and order the Saint-Jeans to return the principal amount that they received from the loan.  (Plaintiff's Memo at 13.)  However, Plaintiff urges the Court to order that the Saint-Jeans return the principal amount in 360 equal monthly installments.

## CONCLUSIONS OF LAW

In order to analyze the instant motion, the Court must first examine the detailed regulations relating to the material disclosures mandated by

15

TILA.[1]  These regulations dictate all aspects of the disclosure, including the timing of the disclosure and the contents of the disclosure form.  The Court trusts that even a cursory description of the requirements will expose the problems with Plaintiff's TILA claim.

First, the regulations prescribe that the disclosures be made "before consummation of the transaction."  12 C.F.R. § 226.17(b).[2]  As used in this regulation, "[c]onsummation means the time that a consumer becomes contractually obligated on a credit transaction."  *Id.* § 226.2(a)(13).  In this context, "'consummation' occurs 'when a borrower signs the loan documents and becomes obligated to pay'"—*i.e.*, at the closing.  *Nadler v. Bank of Am., N.A.*, No. 10 Civ. 4237 (TPG), 2010 WL 4922307, at *2 (S.D.N.Y. Nov. 30, 2010) (quoting *Ngwa v. Castle Point Mortg., Inc.*, No. 08 Civ. 859, 2008 WL 3891263 at *9 (S.D.N.Y. Aug. 20, 2008).

---

[1] Both TILA and Regulation Z have been amended since January 2008, when the TIL Disclosure was provided to the Saint-Jeans.  The following discussion refers to the statute and regulations as they existed in January 2008.

[2] For present purposes, the Court need not determine how long prior to the consummation the disclosures had to be made.  However, the Court notes that the disclosures may have to be made well in advance of consummation.  In the case of a "mortgage transaction subject to the Real Estate Settlement Procedures Act (12 U.S.C. 2601 *et seq.*) that is secured by the consumer's dwelling, other than a home equity line of credit or mortgage transaction [relating to a timeshare]," the creditor must "make good faith estimates of the disclosures … and … deliver or place them in the mail not later than the third business day after the creditor receives the consumer' written application."  12 C.F.R. § 226.19(a).

P-049

At the closing, it is not yet known whether or how well the borrower will perform the obligations set forth in the loan agreement. Accordingly, the regulations dictate that the disclosures "reflect the terms of the legal obligation between the parties." 12 C.F.R. § 226.17(c)(1). The regulations further provide that "[i]f a disclosure becomes inaccurate because of an event that occurs after the creditor delivers the required disclosures, the inaccuracy is not a violation of this regulation ...." *Id.* § 226.17(e).

The list of the required disclosures for closed-end credit transactions is set forth in 12 C.F.R. § 226.18. The version of this section which was applicable in January 2008 listed over a dozen disclosures that had to be made by the creditor making a mortgage loan. These included the name of the creditor, the amount financed, an itemization of the amount financed, the finance charge, the APR, whether the transaction involved a variable rate, a payment schedule, and the total of payments to be made pursuant to that schedule. The regulation also required the creditor to disclose if the loan 1) included a demand feature or penalties for prepayments or late payments, 2) was secured by a security interest in real property, or 3) could be assumed by subsequent purchasers of that property.

Although there is no need to describe all of these disclosure requirements in detail, a few merit further discussion. First, in disclosing

17

the "payment schedule," a creditor is required to list the "number, amounts, and timing of payments scheduled to repay the obligation." 12 C.F.R. § 226.18(g).  In summing those payments, the creditor is required to use the term, "total of payments," with "a descriptive explanation such as 'the amount you will have paid when you have made all scheduled payments.'"  *Id.* § 226.18(h).

Second, as used in TILA and Regulation Z, the "finance charge" means "the cost of consumer credit as a dollar amount" and "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit."  15 U.S.C. §1605(a); 12 C.F.R. § 226.4(a).  It does not include "[c]harges for actual unanticipated late payment … or for delinquency, default, or a similar occurrence."  12 C.F.R. § 226.4(c)(2).

Third, the APR "is a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made."  *Id.* § 226.22(a)(1). Regulation Z requires that the APR "be determined in accordance with either the actuarial method or the United States Rule method," which are discussed in Appendix J to the regulation.  *Id.*

18

The difference between these two methods is explained in that appendix, which also provides a detailed "explanation of the actuarial method as well as equations, instructions and examples of how this method applies to single advance and multiple advance transactions." 12 C.F.R. § Pt. 226, App. J, ¶ (a)(1). "Under the actuarial method, at the end of each unit-period (or fractional unit-period) the unpaid balance of the amount financed is increased by the finance charge earned during that period and is decreased by the total payment (if any) made at the end of that period." *Id.*, ¶ (a)(2). "In contrast, under the United States Rule method, at the end of each payment period, the unpaid balance of the amount financed is increased by the finance charge earned during that payment period and is decreased by the payment made at the end of that payment period." *Id.*, ¶ (a)(3). Under either method, calculation of the APR requires knowledge of the unpaid balance and interest rate for each payment period.

Fourth, Regulation Z contains specific accuracy requirements with respect to the finance charge and the APR. The finance charge, which has to be expressed in dollars and accompanied by a "brief description such as 'the dollar amount the credit will cost you,'" is considered accurate only if it is "understated by no more than $100 ... or ... greater than the amount required to be disclosed." *Id.* § 226.18(d). The APR—which has to be

19

accompanied by a "brief description such as 'the cost of your credit as a yearly rate,'" *id.* § 226.18(e) — is considered accurate if it is not more than ⅛ of 1 percentage point above or below the APR determined in accordance with those methods, *id.* § 226.22(2).

The TIL Disclosure in this case appears to have met the regulatory requirements that existed in January 2008 and to have accurately provide the material disclosures. The payment schedule set forth in that document reflected the payments required by the loan agreement, as prescribed by 12 C.F.R. § 226.17(c)(1). The total payments accurately summed those scheduled payments. The dollar amount financed was also accurately calculated; it was total payments minus the amount financed. And while the Court is incapable of calculating the APR, no one has suggested that the APR was incorrectly calculated based on the other figures stated in the TIL Disclosure.

Rather, Plaintiff takes the position that the APR and other material disclosures were inaccurate because they did not reflect the Saint-Jeans' actual performance of the loan obligations. Plaintiff asserts that the payment schedule should have reflected that the initial 11.75% interest rate applied only to the first eight payments, and that the 18% default interest rate applied to all subsequent payments. However, Plaintiff's assertion

20

ignores the fact that the TIL Disclosure had to be provided before the closing, *see* 12 C.F.R. §§ 226.17(b), 226.2(a)(13), at a time when the Saint-Jeans' actual performance under the loan agreement was unknowable.

To be sure, the payment schedule changed after the Saint-Jeans' missed a payment, resulting in increases in the total payments, the finance charge, and the APR over the life of the loan. However, the Saint-Jeans defaulted eight months after the TIL Disclosure was provided. Accordingly, even though the Saint-Jeans' default resulted in a drastic increase in the interest rate and rendered the disclosures in the TIL Disclosure inaccurate, the inaccuracies did not violate TILA's material disclosure requirements. *See* 12 C.F.R. § 226.17(e).

The Court acknowledges that the Saint-Jeans' default could have been anticipated at the time of closing. After all, the couple had been unable to remain current on their Wells Fargo loan, which charged a lower interest rate and had significantly lower monthly payment. However, their default was by no means certain; not every recipient of a STAR NINA loan defaulted, and the Saint-Jeans had represented in writing that they had the resources to make the payment.

Even assuming that Emigrant knew the Saint-Jeans would eventually default, they could not know exactly when that default would

21

occur.  Absent this knowledge, Emigrant could not know what the payment schedule would be, could not calculate the total payments, and could not calculate the finance charge or the APR with the precision required by the regulations.

Plaintiff tacitly acknowledges this, implying that Emigrant could have simply estimated when the Saint-Jeans would default and calculated the material disclosures based on that assumption.  Although this might have resulted in an overstatement of the finance charge, Plaintiff notes that TILA does not regard such overstatements as inaccuracies. *See* 12 C.F.R. § 226.18(d).  However, Plaintiff ignores the fact that, under this strategy, other material disclosures, such as the payment schedule, the total of payments, and the APR, would almost certainly be inaccurate.  Moreover, employment of this strategy would completely frustrate the purpose of the disclosure requirements, depriving customers of an accurate disclosure of the costs of credit under the terms of the loan agreement.

For the reasons stated above, the Court concludes that Plaintiff has not established the material disclosures in the TIL Disclosure were inaccurate.  Accordingly, she has not established liability under TILA.  Her right to rescind the loan agreement ended on January 13, 2008, and

22

Emigrant properly rejected Plaintiff's July 2010 request for rescission.  Her

motion for entry of judgment is, therefore, denied.

    **SO ORDERED.**

Dated: May 16 , 2022                signed Sterling Johnson, Jr., U.S.D.J.
    Brooklyn, New York              Sterling Johnson, Jr., U.S.D.J.

P-049